**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 18-07762-JJG-11 |
| FAYETTE MEMORIAL HOSPITAL ) | |
| ASSOCIATION, INC. d/b/a FAYETTE ) | |
| REGIONAL HEALTH SYSTEMS, ) | |
|     Debtor. ) | |
| ) | |

---

**DEBTOR'S FIRST DAY MOTION PURSUANT TO 11 U.S.C. §§ 363, 361, AND 105 FOR AUTHORIZATION TO USE CASH COLLATERAL AND PROVIDE ADEQUATE PROTECTION**

---

Fayette Memorial Hospital Association, Inc. d/b/a Fayette Regional Health Systems ("**Fayette Regional**" or the "**Debtor**"), by the undersigned proposed counsel, hereby files its *First Day Motion Pursuant to 11 U.S.C. §§ 363, 361, and 105, for Authorization to Use Cash Collateral and Provide Adequate Protection* (the "**Motion**") and in support of the Motion states the following:

**JURISDICTION AND VENUE**

1.    On October 10, 2018 (the "**Petition Date**"), the Debtor filed a voluntary petition in this Court for reorganization relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtor seeks to operate its businesses and manage its property as debtor-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code.

2.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this case and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

3.    The Debtor will shortly be filing its application to hire Fultz Maddox Dickens, PLC, as counsel for the Debtor.

## BACKGROUND

### DEBTOR'S BUSINESS OPERATIONS

4. The Debtor is an Indiana not-for-profit corporation that does business as Fayette Regional Health Systems.

5. The Debtor operates a 112-bed acute care hospital, and provides both inpatient, outpatient, emergency, and other ancillary services from its locations in Connersville, Fayette County, Indiana. The hospital and the primary business operations of the Debtor are located at 1941 Virginia Avenue, Connersville, Indiana 47331.

6. The Debtor's operations include a 46-bed residential substance abuse detoxification treatment facility known as North Star Recovery ("**North Star**") that opened for operations within the last few months.

7. The Debtor is also a 51% member in Fayette Regional Health System Pain Management, LLC, an Indiana limited liability company that operates a pain management clinic. The remaining 49% ownership in Fayette Regional Health System Pain Management, LLC, is held by Connersville Pain Management, LLC, an unrelated Ohio limited liability company.

8. At the time of filing, the Debtor had approximately 516 employees (389 full-time and 127 part-time). The Debtor also maintains independent contractor relationships with a variety of individuals and entities that provide healthcare services for the entity's patients.

9. The Debtor owns real property and improvements at 1941 Virginia Avenue, Connersville, Indiana 47331 (the "Hospital Property"), as well as real property and improvements at other locations in the area, and also leases certain properties for its operations.

2

**ORGANIZATIONAL STRUCTURE**

10. The Debtor is an Indiana not-for-profit corporation formed in 1913 is managed by its Board of Directors that in turn employs certain officers to oversee the day-to-day operations of the Debtor, including the following current officers:

   a. Randall White, Chief Executive Officer;

   b. Gary Ward, Interim Chief Financial Officer;

   c. Alison Gates, Chief Operating Officer; and

   d. Don Day, Vice President of Patient Care Services.

11. The Debtor provides both inpatient and outpatient services ranging from the typical hospital services to more specialized services. Services include: Physical Therapy & Rehabilitation, Ambulatory Care, Express Care, Hospice, Hospitalist services, Laboratory, Pharmacy, Pediatrics, Sleep Lab, Pain Management, Primary Care, Surgical Care, Pulmonology, ENT, Child/Adolescent Behavioral Health, Medical Detoxification, Dermatology, Cancer Care, Facial & Cosmetic procedures, Diagnostic Imaging, Emergency Care, Fitness & Wellness, Heart Care, and Women's Health.

**FINANCIAL STRUCTURE**

12. On November 1, 1992, the Debtor entered into a bond transaction with the Indiana Finance Authority more particularly described in that certain Master Trust Indenture with Fifth Third Bank of Central Indiana, as Trustee (the "**Master Trust Indenture**"). The Bank of New York Mellon Trust Company is the successor trustee to Fifth Third Bank of Central Indiana ("**BNY**" or the "**Bond Trustee**").

13. On August 21, 2013, the Debtor refinanced certain indebtedness associated with Series 2002 bonds previously issued by the Indiana Health Facility Financing Authority (the "**Authority**") under the Master Trust Indenture, with proceeds of $21,106,000 of Indiana Finance Authority Health

3

Facility Revenue and Refunding Bonds, Series 2013 (the "**2013 Bonds**") which were sold in a direct placement to Comerica Bank ("**Comerica**").

14. The proceeds of the 2013 Bonds were loaned by the Authority to the Debtor pursuant to a Loan Agreement dated as of August 1, 2013 (the "**2013 Loan Agreement**") and the Debtor issued its Series 2013A Note to the Bond Trustee to evidence its obligation under the Loan Agreement (the "**2013A Note**").

15. As described in the Trust Indenture dated August 1, 2013 (the "**2013 Bond Indenture**"), the proceeds of the 2013 Bonds were applied as follows:

   a. $18,825,691.11 to refinance the Debtor's obligations under the Series 2002 Bonds;

   b. $1,999,860.89 to be made available to the Debtor through the Fayette Memorial Hospital, Inc. Project Fund; and

   c. $280,448 to pay the costs of issuance of the 2013 Bonds.

16. On August 20, 2013, the Bond Trustee filed UCC-1 Financing Statement No. 201300007683353 (the "**2013 BNY UCC-1**") claiming a lien against the following:

> All of the Debtor's right title and interest in and to: (i) the Gross Revenues (subject in all cases to Permitted Encumbrances) as defined in the Master Trust Indenture between Fayette Memorial Hospital Association, Inc. and The Bank of New York Mellon Trust Company, N.A. (ultimate successor to Fifth Third Bank of Central Indiana), as Trustee (the "Trustee"), dated as of November 1, 1992 (as amended, the "Master Indenture"); and (ii) any and all moneys and securities held by the Trustee pursuant to the Master Indenture. Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Master Indenture."

17. The Master Indenture defines "Gross Revenues" as follows:

> "Gross Revenues" shall mean all cash and other receipts, present and future accounts, receivables, contracts and contract rights (including particularly those between the Hospital and each other Obligated Issuer and the State or any other state with respect to Medicaid, the Hospital and each other Obligated Issuer and third-party insurers of any patients of the Hospital and each other Obligated Issuer, and the Hospital and each other Obligated Issuer and the United States of America with respect to Medicare and all other equivalent insurance programs, or any state or federal program substituted in lieu thereof), general intangibles, documents and instruments, which are now owned or hereafter acquired by the Hospital and each other Obligated Issuer, and

4

all proceeds therefrom, whether cash or noncash, and which are derived by the Hospital and each other Obligated Issuer from the conduct of all or any part of their respective operations, and all revenue and income from the Hospital and each other Obligated Issuer from whatever source derived, including income from the principal of investments, leases and income from leases, and grants received by the Hospital and each other Obligated Issuer from any source, but excluding only Restricted Moneys of the Hospital and the other Obligated Issuers.

18. The Master Indenture defines "Restricted Moneys" as follows:

"Restricted Moneys" means the proceeds of any grant, gift, bequest, contribution or other donation (and, to the extent subject to the applicable restrictions, the investment income derived from the investment of such proceeds) specifically restricted by the donor or grantor to a special object or purpose which precludes the use by an Issuer thereof for debt service or for financing the costs, or for paying the operating, maintenance and repair expenses, of facilities operated by an Issuer holding or entitled to such proceeds.

19. The 2013 Bond Indenture was modified by: (a) Supplemental Trust Indenture No. 1 dated October 20, 2014, by which the interest rate on the 2013 Bonds was increased and the 2013 Bonds reissued; (b) Supplemental Trust Indenture No. 2 dated March 23, 2015, by which the interest rate on the 2013 Bonds was again increased and the 2013 Bonds reissued; and Supplemental Trust Indenture No. 3 dated May 27, 2016, by which the interest rate on the 2013 Bonds was again increased, and the 2013 Bonds reissued (together the "**Supplemental 2013 Bond Indentures**").

20. On May 27, 2016, as security for its obligations under the 2013A Note and also the 2013C Note (defined below), the Debtor entered into that certain Continuing Collateral Mortgage, Security Agreement, Assignment of Leases and Rents and Financing Statement (the "**2016 Mortgage**") by which the Debtor granted the Bond Trustee a first priority mortgage on the real property and improvements located at 1941 Virginia Avenue, Connersville, Indiana (the "**Hospital Real Property**") and a security interest on the personal property of the Debtor located at the Hospital

5

Property[1] (the "**Hospital Personal Property**").  The 2016 Mortgage was recorded with the official recorder for Fayette County Indiana on or about June 7, 2016 as Instrument No. 201600001599.

21. On June 1, 2016, the Bond Trustee filed UCC-1 Financing Statement No. 201600004326983 describing the Hospital Personal Property (the "**2016 BNY UCC-1**").

## THE COMERICA BANK DOCUMENTS

### The Continuing Covenants Agreement

22. In connection with the issuance of the 2013 Bonds and the agreement of Comerica to purchase the bonds, the Debtor and Comerica entered into that certain Continuing Covenants Agreement dated as of August 1, 2013, and the agreement was subsequently amended on October 3, 2013, December 31, 2013, February 28, 2014, October 20, 2014, and March 23, 2015 (as amended, the "**Continuing Covenants Agreement**").

23. Pursuant to the Continuing Covenants Agreement, the Debtor agreed to make the payments required of the Debtor pursuant to the 2013A Note, the 2013 Loan Agreement, the 2013 Bond Indenture (as supplemented) and related documents (together the "**2013 Bond Documents**"), and the Debtor agreed to maintain certain liquidity and debt service coverage ratios.

24. In accordance with the Continuing Covenants Agreement, the Debtor was also obligated to deposit monies into a Sinking Fund Account maintained with Comerica (Account x1466) (the "**Sinking Fund Account**") so that sufficient funds would be available in the Sinking Fund Account to pay the annual payments due pursuant to the 2013 Bond Documents.

---

[1] The security interest claimed by the Bond Trustee, to the extent such interest was properly perfected and a valid lien against the Debtor's personal property, remains subject to the properly perfected purchase money security interests of certain of Debtor's other secured creditors.  The statements contained herein are not intended to suggest otherwise.

6

**The Revolving Loan Facility and Letter of Credit**

25.     In accordance with the 2013 Bond Documents, the Debtor entered into a revolving loan transaction with Comerica (the "**Comerica Revolving Loan**") originally evidenced by a Letter Agreement dated December 13, 2013 and a Master Revolving Note of even date providing for a revolving line of credit in the maximum principal amount of $5,000,000.  The Letter Agreement and the Note were modified on Amendment No. 1 to the Letter Agreement and a replacement Master Revolving Note dated as of February 28, 2014 increasing the line of credit to a maximum principal amount of $7,500,000 (the "**Comerica Revolving Loan Note**").  The Letter Agreement was again amended on March 23, 2015, to provide for the issuance of a Standby Letter of Credit in the amount of $200,000 naming Eastern Alliance Insurance Group as beneficiary (the "**Eastern Alliance LOC**"). The Letter Agreement, as amended on February 24, 2014 and March 23, 2015 is referred to as the "**Comerica Letter Agreement**".

26.     The Eastern Alliance LOC remains undrawn but still outstanding.

27.     In connection with the Comerica Letter Agreement and the Comerica Revolving Loan Note, and as security for the Comerica Revolving Loan, On December 31, 2013, the Debtor entered into a Security Agreement with Comerica whereby the Debtor granted Comerica a security interest in the following assets of the Debtor:

> (a)  all of Debtor's right, title and interest (including without limitation, security entitlement) in custodial securities account no. [x0696] maintained at [Comerica], all sub-account thereof (collectively, the "Accounts") and all cash, securities, investment property or financial assets now or hereafter deposited or maintained in, or credited to, the Account, and any and all securities accounts in substitution or replacement thereof;
>
> (b) all general intangibles (including without limit software) acquired or use in connection with the above; and
>
> (c) all additions, attachments, accessions, parts, replacements, substitutions, renewals, interest, dividends, distributions, rights of any kind (including but not limited to stock splits, stock rights, voting and preferential rights), products, and proceeds of or pertaining to the above including, without limit, cash or other property which

7

were proceeds and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by Debtor.

(the "**Comerica Collateral**").

28. On December 27, 2013, Comerica filed UCC-1 2013000011247930 by which Comerica claimed a lien against the Comerica Collateral (the "**Comerica UCC-1**").

29. The Security Agreement was amended in connection with the amendments to the Comerica Letter Agreement: (a) on February 28, 2014 to reference the increase in the principal balance of the Comerica Revolving Note; and (b) on March 23, 2015 to provide that the security interest was also granted to secure obligations related to letter of credit obligations of the Debtor (as amended, the "**Comerica Security Agreement**"). The Comerica UCC-1 was not amended, but was continued on July 30, 2018.

### The SWAP Agreement and Confirmation

30. Additionally, on or about October 1, 2013, the Debtor entered into a 2002 ISDA Master Agreement with Comerica (the "**2013 SWAP Agreement**") and an interest rate swap trade evidenced by confirmation No. SW2891 (the "**2013 SWAP Confirmation**").

31. On or about October 3, 2013, the Debtor issued its Series 2013C Note to Comerica to evidence its obligations under the 2013 SWAP Agreement and 2013 SWAP Confirmation (the "**SWAP Documents**"), which note was subsequently amended and restated on May 27, 2016, with an effective date of October 3, 2013 (as amended and restated, the "**2013C Note**").

### The 2016 Forbearance Agreement and 2016 Supplemental Indenture

32. On or about May 27, 2016, Comerica and the Debtor entered into a Forbearance Agreement (the "**2016 Comerica Forbearance**") and in connection therewith, the Debtor was obligated to enter into that certain Supplemental Master Indenture No. 12 with the Bond Trustee (the "**Supplemental Master Indenture No. 12**").

33. In accordance with the terms of the 2016 Comerica Forbearance the Debtor was obligated to, and did, redeem a portion of the 2013 Bonds, as follows:

| Maturity | Principal | Redemption Price |
|---|---|---|
| October 1, 2016 | $737,000 | $737,000 |
| October 1, 2017 | $776,000 | $776,000 |
| October 1, 2031 | $1,136,000 | $1,136,000 |
| October 1, 2032 | $1,714,000 | $1,714,000 |
| **TOTAL REDEEMED**: | | **$4,363,000.00** |

34. The Debtor was also required to, and did, repay the entire outstanding balance under the Comerica Revolving Loan in the amount of $6,991,722.55, all outstanding interest obligations under the Continuing Covenants Agreement and the SWAP Documents, and all expenses and fees related to the transaction totaling $87,687.10.

35. Supplemental Trust Indenture No. 3 dated May 27, 2016 described above, and the 2016 Mortgage were entered into as a condition of the 2016 Comerica Forbearance.

## The Forbearance Amendments

36. On or about August 18, 2017, Comerica and the Debtor entered into the 1st Amendment to the 2016 Comerica Forbearance extending the forbearance termination date (the "**1st Comerica Forbearance Amendment**").

37. Pursuant to the terms of the 1st Comerica Forbearance Amendment, the Debtor was obligated to, and did, redeem an additional $1,000,000 of the 2013 Bonds, to be applied to the bonds with maturity dates of October 1, 2031 and October 1, 2030, thereby reducing the principal outstanding balance of the 2013 Bonds to $14,381,000.

38. The 1st Comerica Forbearance Amendment also required the Debtor to satisfy certain liquidity covenants, to make certain ongoing payments to the Sinking Fund Account on a quarterly basis to ensure sufficient funds would be available to make the annual 2013 Bond redemption

9

payments due on a go forward basis, and to pay a forbearance fee of $80,000 and reimburse $3,000 of Comerica's legal fees.

39. On or about November 29, 2017, Comerica and the Debtor entered into the 2nd Amendment to the 2016 Comerica Forbearance extending the forbearance termination date (the "**2nd Comerica Forbearance Amendment**") by which the liquidity covenants were further amended.

40. On or about June 1, 2018, Comerica and the Debtor entered into the 3rd Amendment to the 2016 Comerica Forbearance extending the forbearance termination date (the "**3rd Comerica Forbearance Amendment**") by which the liquidity covenants were again amended, the Debtor's obligation to make quarterly Sinking Fund Account deposits were adjusted, and certain reporting requirements were imposed on the Debtor.

41. The 2016 Forbearance Agreement as modified by the 1st Comerica Forbearance Amendment, the 2nd Comerica Forbearance Amendment, and the 3rd Comerica Forbearance Amendment, is hereinafter referred to as the Comerica Forbearance Agreement.

### The Indebtedness and Related Collateral

42. The Debtor is indebted to the Bond Trustee under the 2013 Bond Documents for the principal amount of $14,381,000 together with accrued interest at the rate specified in the 2013 Bond Documents (the "**2013 Bond Indebtedness**").

43. As collateral for the 2013 Bond Indebtedness, the Bond Trustee claims a mortgage on the Hospital Property, and a security interest in the Hospital Personal Property and the "Gross Revenues"

44. The Debtor has repaid all obligations to Comerica related to the Comerica Revolving Loan.

45. As collateral for the Debtor's remaining obligations to Comerica pursuant to the 2013 SWAP Documents, the Comerica Letter Agreement as it relates to the Eastern Alliance LOC, and the

10

Continuing Covenants Agreement (the "**Comerica Obligations**"), Comerica claims a security interest in the Comerica Collateral.

## THE CASH COLLATERAL

46. By virtue of the loan documents and the transactions described above, as collateral for the 2013 Bond Indebtedness, and specifically by virtue of the Master Indenture, the 2013 Bond Indenture, the 2013 Loan Agreement the 2013A Note, the 2016 Mortgage, the 2013 BNY UCC-1, the 2016 BNY UCC-1, BNY, as the Bond Trustee, claims a security interest in the Cash Collateral (defined below).

47. By virtue of the documents and transactions described above, as collateral for the Comerica Obligations, and specifically by virtue of the Comerica Letter Agreement, the Comerica Security Agreement, the 2013 Comerica UCC-1, and the Comerica Forbearance Agreement, Comerica claims a security interest in the Comerica Collateral consisting of Comerica Account x0696.

48. The Debtor is unaware of any other creditors claiming a security interest in the Debtor's cash, bank accounts, and accounts receivable (the "**Cash Collateral**").

49. As of the Petition Date, the Debtor's bank accounts, other than Comerica Account x0696, held cash and securities in the amount of approximately $130,000.00.

50. As of the Petition Date, Comerica Account x0696, held cash and securities in the amount of approximately $198,000.

51. As of October 9, 2018, the Debtor believes its accounts receivable totaled approximately $18,734,410 of which, approximately $12,116,155 was under 90 days (the "**Accounts Receivable**").

## RELIEF REQUESTED

52. By this Motion, the Debtor seeks entry of an order authorizing the Debtor to utilize Cash Collateral, in accordance with the budget attached hereto as Exhibit A, and seeks authority to

11

provide adequate protection to BNY as the Bond Trustee, and to Comerica directly as more specifically set forth in this Motion.

**BASIS FOR RELIEF REQUESTED**

53. The statutory bases for the relief requested herein are Sections 105, 361, 363, and 364 of the Bankruptcy Code.

54. If the Debtor is not permitted to use the Cash Collateral to operate its business and maintain the property securing the Indebtedness, the Debtor will have to cease operations immediately.

55. In order to continue to generate income, and care for patients, the Debtor must continue to operate the hospital and related business operations, to pay wages/salaries to employees, to pay withholding obligations, to pay third party staffing agencies, and to acquire the supplies and equipment necessary to enable the hospital to continue to operate.

56. The Debtor believes the costs of continuing to operate its business are less than the income it will generate from such operations over time, thereby creating replacement collateral for the protection of its secured creditors, and posing no threat to its unsecured creditors.

57. The Debtor is without funds, credit or unencumbered assets with which to pay its employees or with which to deal with its trade creditors to secure necessary goods and services, and therefore requires the use of Cash Collateral to meet those operating expense requirements.

58. An immediate, urgent and ongoing need exists for Debtor to use Cash Collateral to meet payroll obligations to continue to operate as a going concern, including, but not limited to, the payment of payroll expenses incurred prior to the Petition Date.

59. In order to maintain the viability of the Debtor's business for the benefit of the estate and its creditors, and to maximize the value of said business, it is essential that the Debtor be granted authority to use Cash Collateral.

60. As adequate protection for the use of Cash Collateral as outlined in <u>Exhibit A</u>, the Debtor proposes the following:

   a. The Debtor will not use or seek to use the funds maintained in Comerica Account x0696;

   b. BNY as the Bond Trustee, will be granted replacement liens on post-petition receivables and accounts to the same extent and validity as such liens existed in the pre-petition Cash Collateral;

   c. The Debtor will continue to maintain appropriate insurance and pay tax obligations as they come due; and

   d. The Debtor will make periodic financial and operational reporting to the Bond Trustee and to Comerica.

### NOTICE AND NO PREVIOUS REQUEST

61. Pursuant to Bankruptcy Rule 4001(d)(1), notice of the relief requested in this Motion has been given to the Bond Trustee, Comerica, the Debtor's other secured creditors, the Debtor's twenty (20) largest unsecured creditors, and the Office of the United States Trustee.

62. No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, based on the foregoing, the Debtor respectfully requests that this Court enter an interim order authorizing the Debtor to use Cash Collateral substantially in accordance with the budget attached hereto, and scheduling a final hearing on the Debtor's request for authority to use Cash Collateral.

Respectfully submitted this 10th day of October, 2018,

                    */s/ Wendy D. Brewer*
Wendy D. Brewer (#22669-49)
FULTZ MADDOX DICKENS PLC
333 N. Alabama Street, Ste. 350
Indianapolis, IN 46204
Telephone: (317) 215-6220
wbrewer@fmdlegal.com

and

Phillip A. Martin
Laura M. Brymer (#30989-10)
FULTZ MADDOX DICKENS PLC
101 S. Fifth Street, Ste. 2700
Louisville, KY 40202
Tel: (502) 588-2000
E-mail: lbrymer@fmdlegal.com and
pmartin@fmdlegal.com

*Proposed Attorneys for the Debtor*