# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

IN RE: )
)    Case No. 18-07762-JJG-11
FAYETTE MEMORIAL HOSPITAL )
ASSOCIATION, INC. d/b/a FAYETTE )
REGIONAL HEALTH SYSTEMS, )
    Debtor. )
)

## DECLARATION OF SAMANTHA BELL-JENT
## IN SUPPORT OF FIRST DAY MOTIONS

1.  I am the immediate prior Chief Financial Officer for Fayette Memorial Hospital Association, Inc., d/b/a Fayette Regional Health Systems ("Fayette Regional" or the "Debtor").

2.  I am over the age of 18 and have personal knowledge of the matters set forth in this Declaration, including the matters about which I am informed based on my review of the files and documents under my control as an officer of the Debtor, which records were created in the ordinary course of business, on a substantially contemporaneous basis, by persons whose role it was to create such business records.

### DEBTOR'S BUSINESS OPERATIONS

3.  The Debtor is an Indiana not-for-profit corporation that does business as Fayette Regional Health Systems.

4.  The Debtor operates a 112-bed acute care hospital, and provides both inpatient, outpatient, emergency, and other ancillary services from its locations in Connersville, Fayette County, Indiana. The hospital and the primary business operations of the Debtor are located at 1941 Virginia Avenue, Connersville, Indiana 47331.

5. The Debtor's operations include a 46-bed residential substance abuse detoxification treatment facility known as North Star Recovery ("North Star") that opened for operations within the last few months.

6. The Debtor is also a 51% member in Fayette Regional Health System Pain Management, LLC, an Indiana limited liability company that operates a pain management clinic. The remaining 49% ownership in Fayette Regional Health System Pain Management, LLC, is held by Connersville Pain Management, LLC, an unrelated Ohio limited liability company.

7. At the time of filing, the Debtor had approximately 516 employees (389 full-time and 127 part-time). The Debtor also maintains independent contractor relationships with a variety of individuals and entities that provide healthcare services for the entity's patients.

8. The Debtor owns real property and improvements at 1941 Virginia Avenue, Connersville, Indiana 47331 (the "Hospital Property"), as well as real property and improvements at other locations in the area, and also leases certain properties for its operations.

**ORGANIZATIONAL STRUCTURE**

9. The Debtor is an Indiana not-for-profit corporation formed in 1913 and is managed by its Board of Directors that in turn employs certain officers to oversee the day-to-day operations of the Debtor, including the following current officers:

   a. Randall White, Chief Executive Officer;

   b. Gary Ward, Interim Chief Financial Officer;

   c. Alison Gates, Chief Operating Officer; and

   d. Don Day, Vice President of Patient Care Services.

10. Fayette Regional provides both inpatient and outpatient services ranging from the typical hospital services to more specialized services. Services include: Physical Therapy & Rehabilitation, Ambulatory Care, Express Care, Hospice, Hospitalist services, Laboratory, Pharmacy,

Pediatrics, Sleep Lab, Pain Management, Primary Care, Surgical Care, Pulmonology, ENT, Child/Adolescent Behavioral Health, Medical Detoxification, Dermatology, Cancer Care, Facial & Cosmetic procedures, Diagnostic Imaging, Emergency Care, Fitness & Wellness, Heart Care, and Women's Health.

**FINANCIAL STRUCTURE**

11.  On November 1, 1992, the Debtor entered into a bond transaction with the Indiana Finance Authority more particularly described in that certain Master Trust Indenture with Fifth Third Bank of Central Indiana, as Trustee (the "**Master Trust Indenture**"). The Bank of New York Mellon Trust Company is the successor trustee to Fifth Third Bank of Central Indiana ("**BNY**" or the "**Bond Trustee**").

12.  On August 21, 2013, the Debtor refinanced certain indebtedness associated with Series 2002 bonds previously issued by the Indiana Health Facility Financing Authority (the "**Authority**") under the Master Trust Indenture, with proceeds of $21,106,000 of Indiana Finance Authority Health Facility Revenue and Refunding Bonds, Series 2013 (the "**2013 Bonds**") which were sold in a direct placement to Comerica Bank ("**Comerica**").

13.  The proceeds of the 2013 Bonds were loaned by the Authority to the Debtor pursuant to a Loan Agreement dated as of August 1, 2013 (the "**2013 Loan Agreement**") and the Debtor issued its Series 2013A Note to the Bond Trustee to evidence its obligation under the Loan Agreement (the "**2013A Note**").

14.  As described in the Trust Indenture dated August 1, 2013 (the "**2013 Bond Indenture**"), the proceeds of the 2013 Bonds were applied as follows:

   e. $18,825,691.11 to refinance the Debtor's obligations under the Series 2002 Bonds;

3

  f. $1,999,860.89 to be made available to the Debtor through the Fayette Memorial Hospital, Inc. Project Fund; and

  g. $280,448 to pay the costs of issuance of the 2013 Bonds.

 15. On August 20, 2013, the Bond Trustee filed UCC-1 Financing Statement No. 201300007683353 (the "**2013 BNY UCC-1**") claiming a lien against the following:

> All of the Debtor's right title and interest in and to: (i) the Gross Revenues (subject in all cases to Permitted Encumbrances) as defined in the Master Trust Indenture between Fayette Memorial Hospital Association, Inc. and The Bank of New York Mellon Trust Company, N.A. (ultimate successor to Fifth Third Bank of Central Indiana), as Trustee (the "Trustee"), dated as of November 1, 1992 (as amended, the "Master Indenture"); and (ii) any and all moneys and securities held by the Trustee pursuant to the Master Indenture. Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Master Indenture."

 16. The Master Indenture defines "Gross Revenues" as follows:

> "Gross Revenues" shall mean all cash and other receipts, present and future accounts, receivables, contracts and contract rights (including particularly those between the Hospital and each other Obligated Issuer and the State or any other state with respect to Medicaid, the Hospital and each other Obligated Issuer and third-party insurers of any patients of the Hospital and each other Obligated Issuer, and the Hospital and each other Obligated Issuer and the United States of America with respect to Medicare and all other equivalent insurance programs, or any state or federal program substituted in lieu thereof), general intangibles, documents and instruments, which are now owned or hereafter acquired by the Hospital and each other Obligated Issuer, and all proceeds therefrom, whether cash or noncash, and which are derived by the Hospital and each other Obligated Issuer from the conduct of all or any part of their respective operations, and all revenue and income from the Hospital and each other Obligated Issuer from whatever source derived, including income from the principal of investments, leases and income from leases, and grants received by the Hospital and each other Obligated Issuer from any source, but excluding only Restricted Moneys of the Hospital and the other Obligated Issuers.

 17. The Master Indenture defines "Restricted Moneys" as follows:

> "Restricted Moneys" means the proceeds of any grant, gift, bequest, contribution or other donation (and, to the extent subject to the applicable restrictions, the investment income derived from the investment of such proceeds) specifically restricted by the donor or grantor to a special object or purpose which precludes the use by an Issuer thereof for debt service or for financing the costs, or for paying the operating, maintenance and repair expenses, of facilities operated by an Issuer holding or entitled to such proceeds.

4

18. The 2013 Bond Indenture was modified by: (a) Supplemental Trust Indenture No. 1 dated October 20, 2014, by which the interest rate on the 2013 Bonds was increased and the 2013 Bonds reissued; (b) Supplemental Trust Indenture No. 2 dated March 23, 2015, by which the interest rate on the 2013 Bonds was again increased and the 2013 Bonds reissued; and Supplemental Trust Indenture No. 3 dated May 27, 2016, by which the interest rate on the 2013 Bonds was again increased, and the 2013 Bonds reissued (together the "**Supplemental 2013 Bond Indentures**").

19. On May 27, 2016, as security for its obligations under the 2013A Note and also the 2013C Note (defined below), the Debtor entered into that certain Continuing Collateral Mortgage, Security Agreement, Assignment of Leases and Rents and Financing Statement (the "**2016 Mortgage**") by which the Debtor granted the Bond Trustee a first priority mortgage on the real property and improvements located at 1941 Virginia Avenue, Connersville, Indiana (the "**Hospital Real Property**") and a security interest on the personal property of the Debtor located at the Hospital Property[1] (the "**Hospital Personal Property**"). The 2016 Mortgage was recorded with the official recorder for Fayette County Indiana on or about June 7, 2016 as Instrument No. 201600001599.

20. On June 1, 2016, the Bond Trustee filed UCC-1 Financing Statement No. 201600004326983 describing the Hospital Personal Property (the "**2016 BNY UCC-1**").

THE COMERICA BANK DOCUMENTS

The Continuing Covenants Agreement

21. In connection with the issuance of the 2013 Bonds and the agreement of Comerica to purchase the bonds, the Debtor and Comerica entered into that certain Continuing Covenants Agreement dated as of August 1, 2013, and the agreement was subsequently amended on October 3,

---

[1] The security interest claimed by the Bond Trustee, to the extent such interest was properly perfected and a valid lien against the Debtor's personal property, remains subject to the properly perfected purchase money security interests of certain of Debtor's other secured creditors. The statements contained herein are not intended to suggest otherwise.

2013, December 31, 2013, February 28, 2014, October 20, 2014, and March 23, 2015 (as amended, the "**Continuing Covenants Agreement**").

22. Pursuant to the Continuing Covenants Agreement, the Debtor agreed to make the payments required of the Debtor pursuant to the 2013A Note, the 2013 Loan Agreement, the 2013 Bond Indenture (as supplemented) and related documents (together the "**2013 Bond Documents**"), and the Debtor agreed to maintain certain liquidity and debt service coverage ratios.

23. In accordance with the Continuing Covenants Agreement, the Debtor was also obligated to deposit monies into a Sinking Fund Account maintained with Comerica (Account x1466) (the "**Sinking Fund Account**") so that sufficient funds would be available in the Sinking Fund Account to pay the annual payments due pursuant to the 2013 Bond Documents.

## The Revolving Loan Facility and Letter of Credit

24. In accordance with the 2013 Bond Documents, the Debtor entered into a revolving loan transaction with Comerica (the "**Comerica Revolving Loan**") originally evidenced by a Letter Agreement dated December 13, 2013 and a Master Revolving Note of even date providing for a revolving line of credit in the maximum principal amount of $5,000,000. The Letter Agreement and the Note were modified on Amendment No. 1 to the Letter Agreement and a replacement Master Revolving Note dated as of February 28, 2014 increasing the line of credit to a maximum principal amount of $7,500,000 (the "**Comerica Revolving Loan Note**"). The Letter Agreement was again amended on March 23, 2015, to provide for the issuance of a Standby Letter of Credit in the amount of $200,000 naming Eastern Alliance Insurance Group as beneficiary (the "**Eastern Alliance LOC**"). The Letter Agreement, as amended on February 24, 2014 and March 23, 2015 is referred to as the "**Comerica Letter Agreement**".

25. The Eastern Alliance LOC remains undrawn, but still outstanding.

6

26. In connection with the Comerica Letter Agreement and the Comerica Revolving Loan Note, and as security for the Comerica Revolving Loan, on December 31, 2013, the Debtor entered into a Security Agreement with Comerica whereby the Debtor granted Comerica a security interest in the following assets of the Debtor:

> (a) all of Debtor's right, title and interest (including without limitation, security entitlement) in custodial securities account no. [x0696] maintained at [Comerica], all sub-account thereof (collectively, the "Accounts") and all cash, securities, investment property or financial assets now or hereafter deposited or maintained in, or credited to, the Account, and any and all securities accounts in substitution or replacement thereof;
>
> (b) all general intangibles (including without limit software) acquired or use in connection with the above; and
>
> (c) all additions, attachments, accessions, parts, replacements, substitutions, renewals, interest, dividends, distributions, rights of any kind (including but not limited to stock splits, stock rights, voting and preferential rights), products, and proceeds of or pertaining to the above including, without limit, cash or other property which were proceeds and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by Debtor.

(the "**Comerica Collateral**").

27. On December 27, 2013, Comerica filed UCC-1 2013000011247930 by which Comerica claimed a lien against the Comerica Collateral (the "**Comerica UCC-1**").

28. The Security Agreement was amended in connection with the amendments to the Comerica Letter Agreement: (a) on February 28, 2014 to reference the increase in the principal balance of the Comerica Revolving Note; and (b) on March 23, 2015 to provide that the security interest was also granted to secure obligations related to letter of credit obligations of the Debtor (as amended, the "**Comerica Security Agreement**"). The Comerica UCC-1 was not amended, but was continued on July 30, 2018.

**The SWAP Agreement and Confirmation**

29. Additionally, on or about October 1, 2013, the Debtor entered into a 2002 ISDA Master Agreement with Comerica (the "**2013 SWAP Agreement**") and an interest rate swap trade evidenced by confirmation No. SW2891 (the "**2013 SWAP Confirmation**").

30. On or about October 3, 2013, the Debtor issued its Series 2013C Note to Comerica to evidence its obligations under the 2013 SWAP Agreement and 2013 SWAP Confirmation (the "**SWAP Documents**"), which note was subsequently amended and restated on May 27, 2016, with an effective date of October 3, 2013 (as amended and restated, the "**2013C Note**").

### The 2016 Forbearance Agreement and 2016 Supplemental Indenture

31. On or about May 27, 2016, Comerica and the Debtor entered into a Forbearance Agreement (the "**2016 Comerica Forbearance**") and in connection therewith, the Debtor was obligated to enter into that certain Supplemental Master Indenture No. 12 with the Bond Trustee (the "**Supplemental Master Indenture No. 12**").

32. In accordance with the terms of the 2016 Comerica Forbearance the Debtor was obligated to, and did, redeem a portion of the 2013 Bonds, as follows:

| Maturity | Principal | Redemption Price |
|---|---:|---:|
| October 1, 2016 | $737,000 | $737,000 |
| October 1, 2017 | $776,000 | $776,000 |
| October 1, 2031 | $1,136,000 | $1,136,000 |
| October 1, 2032 | $1,714,000 | $1,714,000 |
| **TOTAL REDEEMED**: | | **$4,363,000.00** |

33. The Debtor was also required to, and did, repay the entire outstanding balance under the Comerica Revolving Loan in the amount of $6,991,722.55, all outstanding interest obligations under the Continuing Covenants Agreement and the SWAP Documents, and all expenses and fees related to the transaction totaling $87,687.10.

34. Supplemental Trust Indenture No. 3 dated May 27, 2016 described above, and the 2016 Mortgage were entered into as a condition of the 2016 Comerica Forbearance.

### The Forbearance Amendments

35. On or about August 18, 2017, Comerica and the Debtor entered into the 1st Amendment to the 2016 Comerica Forbearance extending the forbearance termination date (the "**1st Comerica Forbearance Amendment**").

36. Pursuant to the terms of the 1st Comerica Forbearance Amendment, the Debtor was obligated to, and did, redeem an additional $1,000,000 of the 2013 Bonds, to be applied to the bonds with maturity dates of October 1, 2031 and October 1, 2030, thereby reducing the principal outstanding balance of the 2013 Bonds to $14,381,000.

37. The 1st Comerica Forbearance Amendment also required the Debtor to satisfy certain liquidity covenants, to make certain ongoing payments to the Sinking Fund Account on a quarterly basis to ensure sufficient funds would be available to make the annual 2013 Bond redemption payments due on a go forward basis, and to pay a forbearance fee of $80,000 and reimburse $3,000 of Comerica's legal fees.

38. On or about November 29, 2017, Comerica and the Debtor entered into the 2nd Amendment to the 2016 Comerica Forbearance extending the forbearance termination date (the "**2nd Comerica Forbearance Amendment**") by which the liquidity covenants were further amended.

39. On or about June 1, 2018, Comerica and the Debtor entered into the 3rd Amendment to the 2016 Comerica Forbearance extending the forbearance termination date (the "**3rd Comerica Forbearance Amendment**") by which the liquidity covenants were again amended, the Debtor's obligation to make quarterly Sinking Fund Account deposits were adjusted, and certain reporting requirements were imposed on the Debtor.

9

40. The 2016 Forbearance Agreement as modified by the 1st Comerica Forbearance Amendment, the 2nd Comerica Forbearance Amendment, and the 3rd Comerica Forbearance Amendment, is hereinafter referred to as the Comerica Forbearance Agreement.

### The Indebtedness and Related Collateral

41. The Debtor is indebted to the Bond Trustee under the 2013 Bond Documents for the principal amount of $14,381,000 together with accrued interest at the rate specified in the 2013 Bond Documents (the "**2013 Bond Indebtedness**").

42. As collateral for the 2013 Bond Indebtedness, the Bond Trustee claims a mortgage on the Hospital Property, and a security interest in the Hospital Personal Property and the "Gross Revenues."

43. The Debtor has repaid all obligations to Comerica related to the Comerica Revolving Loan.

44. As collateral for the Debtor's remaining obligations to Comerica pursuant to the 2013 SWAP Documents, the Comerica Letter Agreement as it relates to the Eastern Alliance LOC, and the Continuing Covenants Agreement (the "**Comerica Obligations**"), Comerica claims a security interest in the Comerica Collateral.

### THE CASH COLLATERAL

45. By virtue of the loan documents and the transactions described above, as collateral for the 2013 Bond Indebtedness, and specifically by virtue of the Master Indenture, the 2013 Bond Indenture, the 2013 Loan Agreement, the 2013A Note, the 2016 Mortgage, the 2013 BNY UCC-1, and the 2016 BNY UCC-1, BNY, as the Bond Trustee, claims a security interest in the Cash Collateral (defined below).

46. By virtue of the documents and transactions described above, as collateral for the Comerica Obligations, and specifically by virtue of the Comerica Letter Agreement, the Comerica Security Agreement, the 2013 Comerica UCC-1, and the Comerica Forbearance Agreement, Comerica claims a security interest in the Comerica Collateral consisting of Comerica Account x0696.

47. The Debtor is unaware of any other creditors claiming a security interest in the Debtor's cash, bank accounts, and accounts receivable (the "**Cash Collateral**").

48. As of the October 9, 2018, the Debtor's bank accounts, other than Comerica Account x0696, held cash and securities in the amount of approximately $130,000.

49. As of the Petition Date, Comerica Account x0696, held cash and securities in the amount of approximately $198,000.

50. As of the Petition Date, the Debtor believes its accounts receivable totaled approximately $18,734,410 of which, approximately $12,116,155 was under 90 days (the "**Accounts Receivable**").

## THE DEBTOR'S BANK ACCOUNTS

A. The Debtor maintains the following bank accounts with Comerica, with the estimated Petition Date balances as set forth below:

| Account Name | Account No. | Approx. Petition Date Balance |
|---|---|---|
| Operating Account (the "Comerica Operating Account" | x0570 | $50,000 |
| Disbursement Account (Payables Account) | x0539 | $0 |
| Sinking Fund Account | x1466 | $204,500 |
| Cash Collateral Account for Letter of Credit | x0696 | $198,000 |
| Inactive Account (Insurance Claims Acct) | x0513 | $0 |
| Inactive Account (FSA Account) | x0521 | $0 |

(together, the "Comerica Bank Accounts")

51. The Debtor also maintains the following additional accounts, including the following:

11

| Bank | Account No. | Description |
|---|---|---|
| First Financial Bank | x7873 | Lockbox Account (old) |
| First Financial Bank | x6146 | Checking – Grant funds |
| Health Care Professional Federal Credit Union | x7410 | Savings Account |
| U.S. Bank | x5957 | Checking Account – Lockbox |
| U.S. Bank | x6599 | Checking Account - Operating |
| U.S. Bank | x6581 | Checking Account – Accounts Payable |

(the "Other Bank Accounts").

52.     The Debtor is also a signatory on First Financial Bank Checking Account x3027, which account belongs to Fayette Regional Health System Pain Management, LLC (the Pain Management Clinic joint venture).

## THE CASH MANAGEMENT SYSTEM

53.     The Debtor has contracted with Athenahealth, Inc. to provide electronic medical records services, as well as patient and third-party insurer billing and collection services. In exchange for the services provided, Athenahealth, Inc. receives a fee based on a percentage of collected receivables. To facilitate its billing and collection services, Athenahealth has access to Debtor's U.S. Bank Account x5957, and once a month, debits its fee from the account.

54.     Payments are received daily, primarily through the U.S. Bank lockbox account, via ACH, other electronic transfer and checks from multiple payor sources. Funds are then swept into the U.S. Bank Operating Account, and payroll and payables are processed from that account.

55.     The majority of the payments Debtor receives from Medicaid, Medicare, and Private Insurers are received by ACH or other electronic transfer.

## THE DEBTOR'S BUSINESS FORMS

56.     In the course of its everyday operations, the Debtor utilizes numerous pre-printed business forms bearing the name or logo of the Debtor, including but not limited to, invoices, account

12

statements, stationary, privacy notices, patient information forms, financial responsibility forms, informational brochures and flyers, etc.

57. The cost and administrative burden to the Debtor to require each of those forms to be modified to bear the reference to the Debtor as a "Debtor-in-Possession" far outweighs the benefit of doing so. Furthermore, the majority of the business forms referenced are not used in transactions with creditors, but instead in transactions with patients (i.e. customers) and insurers.

### THE DEBTOR'S EMPLOYEES

58. As of the Petition Date, the Debtor had approximately 516 employees comprised of 389 full-time and 127 part-time employees (collectively, the "**Employees**").

59. The Employees are paid on a bi-weekly basis in arrears, typically on Fridays, except for holidays. The next payroll date for the Debtor is Friday, October 19, 2018, for the payroll period of September 30, 2018 through October 13, 2018. As such, the Employees have worked some of the most recent payroll period prior to the Petition Date.

60. The Debtor utilizes the services of ADP to provide payroll processing services. Funds necessary to process payroll are transferred from Debtor's bank account to ADP two (2) business days prior to the scheduled pay date.

61. In addition to wages, some of the Employees also receive other forms of compensation, such as vacation pay, sick pay and other earned time off ("PTO"), and reimbursement of certain business expenses. These forms of compensation and expense reimbursement are usual, customary, and necessary if the Debtor is to retain qualified employees to operate its business.

62. In addition to the wages and other forms of compensation set forth above, Debtor withholds bi-weekly garnishment payments for certain employees and remits those payments to the Court directing such garnishments. The average amount of garnishments on a bi-weekly basis is approximately $1,829.17.

63. The total cost to the Debtor on a bi-weekly basis for payroll related expenses averages approximately $875,179.54, with payroll taxes being approximately $264,433.88 of that sum.

### Wages Salaries and Withholdings

64. The Debtor is obligated to the Employees as of the Petition Date for accrued and unpaid wages and salaries, including amounts that are required by law to be withheld from Employee payroll checks in respect of federal, state and local income taxes, garnishments, Social Security, and Medicare taxes, and amounts withheld for employee contributions to benefit plans (the "**Prepetition Wages**").

65. The Debtor also has certain liabilities to the Employees that arose under its vacation policies or practices prior to the Petition Date (the "**Prepetition PTO**"). If authorized to honor the Prepetition PTO of the Employees, the Debtor anticipates that the Employees will utilize such accrued Prepetition PTO in the ordinary course of business without resulting in any material cash flow requirements beyond the Debtor's normal payroll obligations.

### Garnishments

66. The Debtor has obligations to withhold and distribute certain funds each payroll period due to wage garnishments related to certain of its employees (the "**Prepetition Garnishments**") in an amount that varies from payroll period to payroll period, but is usually in the range of approximately $1,829.17 per bi-weekly payroll period.

### Business Expenses

67. Certain Employees are routinely reimbursed for certain expenses incurred within the scope of their employment, including expenses for travel, supplies and miscellaneous business expenses (collectively, the "**Business Expenses**").

68. Certain employees have not yet been reimbursed for Business Expenses incurred prior to the Petition Date. The Debtor estimates such reimbursements due to employees to be less than

14

$10,000.00 in total. It is critical that the Debtor be authorized to reimburse Employees for all such Business Expenses in the ordinary course of business.

### Benefit Plans

69.   The Debtor provides the following benefits for certain Employees:

   a.   Health insurance is offered through a self-insured benefit plan administered by SIHO Insurance Services. Premiums are deducted from employee paychecks on a bi-weekly basis and remitted to SIHO. Additionally, the Debtor is also obligated to fund the payment of employee health insurance claims processed and approved by SIHO over and above the obligation to remit the premium payments. As of the Petition Date, the Debtor's self-insured claims funding obligation totaled approximately $697,390.82 (the Self-Insured Claims Payment Obligations");

   b.   Dental insurance is offered through Delta Dental;

   c.   Vision insurance is offered through Avesis;

   d.   Life insurance, dependent and spouse life insurance, long term and short term disability coverage is provided through One America;

   e.   A health savings account option is offered through Wage Works; and

   f.   Employee critical illness insurance and accident coverage is offered through Colonial Insurance;

(the "**Benefit Plans**").

70.   Prior to the Petition Date, the Debtor withheld Employee payroll funds for Employee portions of the cost of the various Benefit Plans.

15

### Retirement Plan

71.     The Debtor maintains a 403(b) retirement savings plan with Mass Mutual for the Debtor's employees. In recent history, the Debtor has not made direct contributions to the 403(b) Plan, but many employees elect to have wages withheld and deposited into the 403(b) Plan.

### Workers' Compensation

72.     The Debtor provides workers' compensation benefits to all Employees. Failure to maintain this insurance could result in the institution of administrative or legal proceedings against the Debtor.

### Outstanding Payroll Checks from Prior Payroll Periods

73.     Occasionally, the Debtor issues live payroll checks to certain Employees when there are direct deposit errors, or other issues with the processing an individual's payroll. As of the Petition Date, some of those checks had not yet been deposited by Employees and therefore had not yet cleared the Debtor's bank ("**Outstanding Payroll Checks**").

74.     Debtor believes the Outstanding Payroll Checks total less than $2,000.00.

75.     The Debtor seeks authority to honor the Outstanding Payroll Checks or to re-issue those checks in the event they are dishonored as a result of the intervening Petition Date.

### Prepetition Obligations to Individual Employees do not Exceed $12,850.00

76.     With the exception of 2 employees who have accrued substantial PTO benefits, the total of the Prepetition Employee Obligations of the Debtor to any one Employee, inclusive of any Outstanding Payroll Checks, and accrued PTO, does not exceed the priority claim limitations set forth in 11 U.S.C. § 507(a)(4).

### UTILITY SERVICES

77.     The Debtor obtains electricity, water, telephone, communications, and other similar services (collectively, the "Utility Services") from various utility companies (each, a "Utility Company" and collectively, the "Utility Companies"). Utility Services are essential to the Debtor's ongoing operations and its reorganization efforts.

78.     A list of all, or substantially all, of the Utility Companies that the Debtor believes were providing services to it as of the Petition Date (the "Utility Service List") was attached to the First Day Utilities Motion.

I affirm under penalties of perjury, that the above and foregoing representations are true to the best of my knowledge and belief.

Date: 10/12/18                                        /s/ Samantha Bell-Jent
                                                      Samantha Bell-Jent, Former CFO