**SO ORDERED: July 3, 2019.**



**Jeffrey J. Graham**
**United States Bankruptcy Judge**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 18-07762-JJG-11 |
| FAYETTE MEMORIAL HOSPITAL | ) | |
| ASSOCIATION, INC. d/b/a FAYETTE | ) | |
| REGIONAL HEALTH SYSTEMS, | ) | |
|     Debtor. | ) | |
| | ) | |

---

**ORDER AUTHORIZING SALE OF CERTAIN OF DEBTOR'S ASSETS FREE AND CLEAR OF CLAIMS, LIENS, RIGHTS, INTERESTS, AND ENCUMBRANCES TO REID HOSPITAL & HEALTH CARE SERVICES, INC.**

---

This matter came before the Court upon the *Motion for Orders: (A) Scheduling a Bid Procedures Hearing; (B) Authorizing and Approving Bid Procedures and Approving Notice of Sale Hearing; and (C) Authorizing the Sale of Substantially all of the Debtor's Assets Free and Clear of Claims, Liens, Rights, Interests and Encumbrances* [DN 268] (the "**Sale Motion**") filed by Fayette Memorial Hospital Association, Inc., d/b/a Fayette Regional Health Systems ("**Fayette**" or the "**Debtor**"). By the Sale Motion[1], the Debtor sought the entry of three (3) orders, including an order authorizing the sale of substantially all

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

of the Debtor's assets free and clear of claims, liens, rights, interests, and encumbrances, to identified Successful Bidder(s), approving the form(s) of Successful Bidder APA(s) and authorizing and directing the Debtor to enter into the Successful Bidder APA(s).

The Court, having considered the relief requested in the Sale Motion, having conducted a hearing on May 13, 2019 and a continued hearing on May 15, 2019, having considered the evidence presented at the hearings, and having been otherwise fully advised in the premises, now finds that the relief requested in the Motion should be GRANTED as more specifically set forth herein.

Based on the record in this case and on the evidence introduced at the Sale Hearing, the Court **HEREBY FINDS** as follows:

A.       This Court has jurisdiction over the matters raised in the Sale Motion pursuant to 28 U.S.C. § 1334.  Venue of this case, and the Sale Motion in this District, is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(B)(2)(N).

B.       On March 22, 2019, this Court entered the *Order Authorizing and Approving Bid Procedures and Approving Notice of Sale Hearing* [DN 304] (the "**Bid Procedures Order**") by which this Court approved the form of Bid Procedures and the form of Sale Hearing Notice, and directed the Debtor serve the Sale Hearing Notice in accordance with Rule 2002 of the Federal Rules of Bankruptcy Procedure.

C.       On April 12, 2019, the Debtor filed its *Certificate of Service* and *Supplemental Certificate of Service* of the Sale Hearing Notice [DN 305] indicating that due and proper notice of the Sale Motion has been afforded in accordance with the Bankruptcy Code, the Bankruptcy Rules, the local rules of this Bankruptcy Court, and the orders of this Court.

D.       On April 2, 2019, the Debtor filed its *Notice of Submission of Form of Successful Bidder APA* [DN 317].

E.       On May 13, 2019, the Debtor announced in open court that it has identified the May 9, 2019 bid from Reid Hospital & Health Care Services, Inc. (the "**Reid Bid**") as the sole Qualified

Bid, and therefore the Successful Bid, subject to negotiation of the specific terms of the asset purchase agreement proposed by Reid, in substantially the form attached hereto as <u>Exhibit A</u>[2] (the "**Reid APA**").

     F.     The Reid Bid proposes to acquire the assets specifically described in the Reid APA (the "**Reid Sale Assets**").  Among the assets to be acquired by Reid are: (a) the real property and improvements comprising the hospital located at 1941 Virginia, Connersville, Indiana 47331; (b) all other real property and improvements owned by the Debtor with the exception of 3 excluded parcels commonly known as:  613 W. 35th Street, 2140 Indiana Ave., and 3135 Virginia Ave. (all in Connersville, Indiana); and (c) the equipment and inventory owned by the Debtor and used in the operation of the acquired real property and improvements.  The Reid Bid also contemplates that certain contractual rights of the Debtor will be assumed and assigned to Reid as part of the sale transaction.[3]

     G.     The Reid Bid does not contemplate the purchase of the Debtor's Accounts Receivable and certain other Excluded Assets (as defined in the Reid APA) and expressly excludes any obligation to take possession of the Debtor's medical records.

     H.     The Reid Bid, as described in more detail in the Reid APA, provides among other things, for a cash payment to the Debtor in the amount of $12.75 million, a closing deadline of July 15, 2019, and terms providing for Reid's payment of $250,000 of the costs incurred by the Debtor to comply with the provisions of Section 351 of the Bankruptcy Code with regard to the Debtor's patient records.

     I.     In accordance with the Bid Procedures, the cash component of the Reid Bid was allocated between the hospital assets and equipment located at 1941 Virginia Avenue, Connersville, Indiana (the "**Hospital Property**") and the other non-hospital real property and equipment being

---

[2] The Disclosure Schedules and Exhibits referenced within the APA are still being finalized and are not attached hereto.
[3] Such contractual rights are more fully described in the Debtor's *Omnibus Motion for Order Authorizing Assumption and Assignment of Executory Contracts and Leases to Reid Hospital and Health Care Services, Inc.*, filed on June 21 , 2019 [DN 427].

acquired by Reid (the "**Non-Hospital Property**") as follows:  (1) 62% or $7,905,000 allocated to the Hospital Property; and (2) 38% or $4,845,000 to the Non-Hospital Property (the "**Bid Allocation**").

J.        The Debtor sufficiently and actively marketed the Reid Sale Assets and conducted the sale process in compliance with the Bid Procedures Order, and the Debtor's determination that the Reid Bid was the highest and best bid(s) for the Reid Sale Assets, constitutes a valid and sound exercise of the Debtor's business judgment.

K.        The transactions contemplated in the Sale Motion, as approved and implemented herein, are in compliance with and satisfy all applicable provisions of the Bankruptcy Code, including but not limited to Bankruptcy Code § 363(b), (f) and (o).

L.        The Reid APA, in substantially the form attached hereto as Exhibit A, and subject to inclusion of the Exhibits and Schedules referenced in the Reid APA, is hereby approved.

M.        The terms and conditions of the Sale of the Reid Sale Assets to Reid as set out in the Reid APA, together with any other transactions described in the Reid APA, are approved by this Order as fair and reasonable.

N.        The Reid Bid as approved herein, is the highest and best offer(s) for the Reid Sale Assets.

O.        The purchase price offered by Reid constitutes full and adequate consideration and reasonably equivalent value for the Reid Sale Assets.

P.        The offer to purchase the Assets made by Reid, under the terms and conditions set forth in the Reid APA, would not have been made by Reid absent the protections afforded to Reid by the Reid APA, the Bankruptcy Code and this Order.

Q.        The transfer(s) of the Reid Sale Assets to Reid on the Closing Date (as defined in the Reid APA) is in the best interests of the Debtor, its bankruptcy estate, its creditors and all parties-in-interest.

4

R.     The transfer of the Reid Sale Assets to Reid represents an arm's length transaction and has been negotiated in good faith between the parties.

S.     Reid is not holding itself out to the public as a continuation of the Debtor and no common identity of directors, stockholders, members, or other equity holders exists between the Reid and the Debtor. The transactions described by the Reid APA contemplate Reid's purchase of a substantial portion, but less than all, of the Debtor's assets and do not contemplate a consolidation, merger, or de facto merger of Reid and the Debtor and/or the Debtor's bankruptcy estate.

T.     Reid is a good faith purchaser under Bankruptcy Code § 363(m) and, as such, is entitled to the full protection of Bankruptcy Code § 363(m).

U.     The Sale transaction has not been proposed or entered into fraudulently and Reid has not engaged in collusive bidding or otherwise violated the provisions of Section 363(n) of the Bankruptcy Code.

V.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

W.     To the extent any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

And the Court, having made the foregoing findings and being duly advised, now ORDERS as follows:

1.     Any objections to the relief requested in the Sale Motion that were not withdrawn or settled on the records are overruled.

2.     The terms and conditions of the Sale of the Reid Sale Assets to Reid as set out in the Reid APA, together with any other transactions described in the Reid APA, are approved by this Order as fair and reasonable.

5

3.       The Bid Allocation is binding on all parties in interest for all bankruptcy purposes. The specific allocation of the cash payment for tax purposes only will be determined prior to closing in accordance with the terms of the Reid APA.

4.       The Debtor shall be authorized and directed to fully perform all terms and conditions of the Reid APA, together with all additional instruments and documents which may be reasonably necessary, convenient or desirable in performing under the Reid APA, and to take any and all further actions (including any prorations, adjustments, payment of closing costs, and the like provided for in the Reid APA) as may be necessary or appropriate in performing the obligations as contemplated by the Reid APA, subject to the terms of the *Final Order Authorizing use of Cash Collateral and Provision of Adequate Protection* [DN 276] (the "**Cash Collateral Order**"), the *Order Authorizing Postpetition Financing* [DN 256] (the "**1ˢᵗ DIP Order**"), and the *Order Authorizing Additional Postpetition Financing* [DN 344] (the "**2ⁿᵈ DIP Order**").

5.       Subject to the fulfillment of the terms and conditions of the Reid APA, at the Closing, the Debtor, shall sell, transfer, assign and convey to Reid, all right, title and interest in and to the Reid Sale Assets.  The Debtor is authorized, empowered and hereby directed to deliver all bills of sale, assignments and other such documentation that may be necessary or reasonably requested by Reid to evidence the transfers required under the Reid APA.

6.       Each entity with a Claim (as herein defined) in any of the Reid Sale Assets has (i) consented to, or is deemed to have consented to, the Sale free and clear of such Claims, (ii) could be compelled in a legal or equitable proceeding to accept money in satisfaction of such Claims, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code and has been satisfied as to all such Claims. Those holders of Claims who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented to entry of this Order pursuant to section 363(f)(2) of the Bankruptcy Code. Each holder of a Claim that did not so object is adequately protected by having its Claims, if any, attach to the net cash proceeds of the Sale ultimately attributable to the

property against or in which it asserts a Claims, with same validity and priority, and to the same extent, as existed before the Sale, and subject to the terms of the instruments that created such Claims and to any claims and defenses the Debtor and its bankruptcy estate may possess with respect thereto. Therefore, approval of the Reid APA and consummation of the Sale free and clear of Claims is appropriate pursuant to section 363(f) of the Bankruptcy Code.

7.      Pursuant to sections 105 and 363(b) and (f) of the Bankruptcy Code, title to the Reid Sale Assets shall pass to Reid on the Closing Date, free and clear of any and all liens (including mechanics', materialmens', and other consensual and nonconsensual liens and statutory liens), security interests, encumbrances and claims (including, but not limited to, any "claim" as defined in section 101(5) of the Bankruptcy code), reclamation claims, mortgages, deeds of trust, pledges, any liabilities or obligations under any State or Federal WARN Act or similar law, any liabilities or obligations under COBRA, covenants, restrictions, hypothecations, charges, indentures, loan agreements, instruments, contracts, leases, licenses, options, rights of first refusal, rights of offset, recoupment, rights of recovery, judgments, orders and decrees of any court of foreign or domestic governmental entity, claims for reimbursement, contribution, indemnity or exoneration, assignment, debts, charges, suits, rights of recovery, interests, products liability, alter-ego, environmental, successor liability, tax and other liabilities, causes of action and claims, to the fullest extent of the law, in each case whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or noncontingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown, whether arising prior to, on, or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "Claims"). This Order is and shall be effective as a determination that, upon the Closing, all Claims existing as to all or any part of the Reid Sale Assets transferred pursuant to this Order, have been and are adjudged

and declared to be unconditionally released, discharged and terminated as against the Reid Sale Assets, with such Claims attaching to the sale proceeds from the sale of the applicable Reid Sale Assets.

8.     All Claims in or against the Reid Sale Assets shall attach to the net proceeds arising from the sale of the applicable Reid Sale Assets with the same force, validity, effect, priority and enforceability as such Claims had (if any) prior to such sale. Any disputes regarding the extent, validity, perfection, priority and enforceability of such Claims with respect to any net sale proceeds shall be determined by the Court upon proper application at a later date.

9.     Except as expressly provided in the Reid APA, Reid shall not be deemed to have assumed any Claims against the Debtor or the Reid Sale Assets.

10.    The terms and provisions of this Order shall be binding in all respects upon the Debtor, its employees, officers, and directors, their creditors, any parties having received notice of these proceedings (actual or constructive), any affected third parties and other parties in interest, any persons or entities asserting a Claim against, or an interest in, the Debtor's estate or to any of the Reid Sale Assets sold, conveyed and assigned pursuant to this Order, Reid, and all successors, transferees or assigns of the above-mentioned parties, including, but not limited to, a chapter 11 trustee or chapter 7 trustee.

11.    This Order is a final order (as opposed to an interlocutory order) and is enforceable upon entry.  As no unresolved objections to the Sale Motion remained at the time of the hearing on the Sale Motion, the Court orders that the 14-day automatic stay imposed by Bankruptcy Rules 6004(h) does not apply. Accordingly, this Order is subject to immediate execution and fulfillment by the Debtor and Reid.

12.    Effective on the Closing Date, all parties and/or entities asserting Claims against the Debtor and/or any of the Reid Sale Assets are hereby permanently enjoined and precluded from, with respect to such Claims: (i) asserting, commencing, or continuing in any manner any action against Reid

or against any of Reid's assets or properties, including without limitation against the Reid Sale Assets; (ii) the enforcement, attachment, collection, or recovery, by any manner or means, of any judgment, award, decree, or order against Reid or against any of Reid's assets or properties, including without limitation against the Reid Sale Assets; (iii) creating, perfecting, or enforcing any encumbrance of any kind against Reid or against any of Reid's assets or properties, including without limitation against the Reid Sale Assets; (iv) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due Reid; and (v) taking any action, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Order or the Reid APA. Neither Reid nor the Debtor is required to comply with any "bulk sale" or similar laws relating to the transfer of the Reid Sale Assets.

13.     Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Sale by the Debtor to Reid of the Reid Sale Assets and transactions related thereto, upon the Closing under the Reid APA, are authorized and approved in all respects. Nothing contained in any chapter 11 plan confirmed in the Debtor's bankruptcy case or the order confirming any chapter 11 plan, nor any order dismissing or converting the Debtor's bankruptcy shall conflict with or derogate from the provisions of the Reid APA, any documents or instrument executed in connection therewith, or the terms of this Order.

14.     The failure specifically to include any particular provisions of the Reid APA or any of the documents, agreements or instruments executed in connection therewith in this Order shall not diminish or impair the force of such provision, document, agreement, or instrument, it being the intent of the Court that the Reid APA and each document, agreement, or instrument be authorized and approved in its entirety.

15.     The Reid APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtor's bankruptcy estate.

16.     Any and all parties asserting liens or encumbrances against the relevant Reid Sale Assets shall, to the extent necessary, execute contemporaneously with Closing on the Reid APA (or as soon as reasonably practical thereafter as requested by Reid), any and all documents, releases or instruments necessary to release, remove or terminate the lien, liens or encumbrances which have been asserted against any one or all of the Reid Sale Assets transferred pursuant to this Order.

17.     The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

18.     To the extent there are any inconsistencies between the terms of this Order, the Reid APA, and any prior order or pleading with respect to the Sale Motion, the terms of this Order shall govern.

19.     Notwithstanding anything in Bankruptcy Rule 6004, each provision of this Order shall be effective immediately upon its entry by the Court unless a particular provision of this Order specifically provides otherwise.

###

# Exhibit A

**ASSET PURCHASE AGREEMENT**

**DATED AS OF [•], 2019,**
**BY AND BETWEEN**

**FAYETTE MEMORIAL HOSPITAL ASSOCIATION, INC.**
**D/B/A FAYETTE REGIONAL HEALTH SYSTEM,**
**AN INDIANA NONPROFIT CORPORATION**

**AND**

**REID HOSPITAL & HEALTH CARE SERVICES, INC.,**
**AN INDIANA NONPROFIT CORPORATION**

I\14554897.5

# TABLE OF CONTENTS

**Page**

Article I.  DEFINITIONS ............................................................................................... 2

    Section 1.01  Defined Terms ........................................................................... 2
    Section 1.02  Other Definitions and Interpretive Matters............................... 15

Article II.  PROPERTY DESCRIPTION AND BANKRUPTCY CASE ..................... 16

    Section 2.01  Assets........................................................................................ 16
    Section 2.02  Excluded Assets........................................................................ 18
    Section 2.03  Assumption of Liabilities......................................................... 20
    Section 2.04  Excluded Liabilities.................................................................. 21
    Section 2.05  Further Assurances ................................................................... 23
    Section 2.06  Bankruptcy Court Approval...................................................... 23
    Section 2.07  Bankruptcy Filings................................................................... 23
    Section 2.08  Assigned Contracts and Cure Costs......................................... 24

Article III.  PURCHASE PRICE ................................................................................... 25

    Section 3.01  Purchase Price........................................................................... 25
    Section 3.02  Good Faith Deposit.................................................................... 25
    Section 3.03  Reduction of Cash Purchase Price ............................................ 26
    Section 3.04  Adjustment of Purchase Price................................................... 26

Article IV.  REPRESENTATIONS AND WARRANTIES OF SELLER ................... 27

    Section 4.01  Organization; Good Standing of Seller...................................... 27
    Section 4.02  Authority; Validity; Consents .................................................. 28
    Section 4.03  No Conflict.............................................................................. 28
    Section 4.04  Affiliates and Minority Interests; Competitive Dynamics.......... 28
    Section 4.05  Contracts.................................................................................. 28
    Section 4.06  Title; Sufficiency of Assets; No Outstanding Rights................ 29
    Section 4.07  Financial Information ............................................................... 29
    Section 4.08  Permits and Approvals ............................................................. 29
    Section 4.09  Participation in Payment Programs............................................ 30
    Section 4.10  Health Regulatory Compliance................................................. 30
    Section 4.11  Compliance Programs............................................................... 31
    Section 4.12  Proceedings; Judgments........................................................... 31
    Section 4.13  Labor Matters........................................................................... 32
    Section 4.14  Real Property ........................................................................... 33
    Section 4.15  Personal Property ..................................................................... 35
    Section 4.16  Insurance.................................................................................. 36
    Section 4.17  Intellectual Property ................................................................ 36
    Section 4.18  Tax Matters.............................................................................. 36
    Section 4.19  Environmental Matters ............................................................ 37
    Section 4.20  Affiliate Transactions .............................................................. 38
    Section 4.21  Broker's or Finder's Fees......................................................... 38

# TABLE OF CONTENTS

Page

Article V.  REPRESENTATIONS AND WARRANTIES OF BUYER .......................................... 38

Section 5.01  Organization and Good Standing.................................................................. 38
Section 5.02  Authorization and Binding Effect of Transaction Documents ......................... 38
Section 5.03  Absence of Conflicts .................................................................................. 38
Section 5.04  Consents .................................................................................................. 39
Section 5.05  Broker's or Finder's Fees ........................................................................... 39
Section 5.06  Ability to Perform ..................................................................................... 39

Article VI.  COVENANTS ................................................................................................ 39

Section 6.01  Continuing Diligence and Inspection Rights .................................................. 39
Section 6.02  Conduct of Business Prior to the Closing ..................................................... 39
Section 6.03  Notification of Certain Matters ................................................................... 41
Section 6.04  Additional Financial Information .................................................................. 41
Section 6.05  Title; Additional Documents ....................................................................... 41
Section 6.06  Licensing ................................................................................................. 41
Section 6.07  Confidentiality .......................................................................................... 41
Section 6.08  Publicity .................................................................................................. 42
Section 6.09  Commercially Reasonable Efforts ............................................................... 42
Section 6.10  Reports .................................................................................................... 42
Section 6.11  Post-Closing Records Obligations of Seller ................................................... 42
Section 6.12  Permits and Approvals .............................................................................. 42
Section 6.13  Extension of Closing ................................................................................. 43
Section 6.14  Casualty .................................................................................................. 43
Section 6.15  Collection of Accounts Receivable .............................................................. 43

Article VII.  OTHER AGREEMENTS .................................................................................. 43

Section 7.01  Taxes ...................................................................................................... 43
Section 7.02  Allocation of Purchase Price ....................................................................... 45
Section 7.03  Bulk Sales ............................................................................................... 45
Section 7.04  Adequate Assurance and Performance; Security Arrangements ...................... 45
Section 7.05  Employee Matters .................................................................................... 46
Section 7.06  Post-Closing Books and Records and Personnel ............................................ 49
Section 7.07  Medical Records Retention......................................................................... 49
Section 7.08  Condemnation .......................................................................................... 50
Section 7.09  Payment of Broker and Finder's Fees .......................................................... 50

Article VIII.  CONDITIONS PRECEDENT TO THE
OBLIGATION OF BUYER TO CLOSE ................................................................................ 50

Section 8.01  Accuracy of Representations and Warranties; Closing Certificate ................... 50
Section 8.02  Performance of Agreement ........................................................................ 51
Section 8.03  Seller Closing Certificate ........................................................................... 51
Section 8.04  Conveyance of Property............................................................................. 51

# TABLE OF CONTENTS

Page

Section 8.05  Delivery of Closing Documents ................................................................ 51
Section 8.06  Required Approvals ................................................................................... 51
Section 8.07  Governmental Approvals .......................................................................... 51
Section 8.08  Cure Costs of Assigned Contracts ............................................................ 51
Section 8.09  Entry of Sale Order ................................................................................... 51
Section 8.10  No Material Adverse Effect ...................................................................... 51
Section 8.11  Title Commitment ..................................................................................... 51
Section 8.12  ALTA Survey ............................................................................................ 51
Section 8.13  Environmental Reports ............................................................................. 52
Section 8.14  Zoning Compliance ................................................................................... 52
Section 8.15  Estoppel Certificates ................................................................................. 52
Section 8.16  Additional Deliveries ............................................................................... 52

Article IX.  CONDITIONS PRECEDENT TO THE
OBLIGATION OF SELLER TO CLOSE ........................................................................ 52

Section 9.01  Accuracy of Representations and Warranties ............................................ 52
Section 9.02  Performance of Agreements ...................................................................... 52
Section 9.03  Buyer Closing Certificate ......................................................................... 52
Section 9.04  Delivery of Closing Documents ............................................................... 53
Section 9.05  Unfavorable Action or Proceeding ........................................................... 53
Section 9.06  Final Sale Order ........................................................................................ 53
Section 9.07  Cure Costs ................................................................................................. 53

Article X.  CLOSING ..................................................................................................... 53

Section 10.01  Closing Date and Place ........................................................................... 53
Section 10.02  Deliveries of Seller ................................................................................. 53
Section 10.03  Deliveries of Buyer ................................................................................ 55

Article XI.  SURVIVAL OF REPRESENTATIONS,
WARRANTIES AND COVENANTS ............................................................................. 56

Section 11.01  Survival .................................................................................................... 56
Section 11.02  Holdback Escrow Agreement .................................................................. 56
Section 11.03  Claims Against the Holdback Escrow Agreement ................................... 56

Article XII.  DEFAULT AND TERMINATION ............................................................ 57

Section 12.01  Termination Events .................................................................................. 57
Section 12.02  Effect of Termination .............................................................................. 58
Section 12.03  Remedies Upon Default........................................................................... 58
Section 12.04  Specific Performance .............................................................................. 59
Section 12.05  Obligations Upon Termination ............................................................... 59
Section 12.06  Sole and Exclusive Remedy ................................................................... 59

Article XIII.  MISCELLANEOUS ................................................................................. 59

## TABLE OF CONTENTS

**Page**

Section 13.01  Further Actions ............................................................................. 59
Section 13.02  Notices ........................................................................................... 60
Section 13.03  Entire Agreement ........................................................................... 61
Section 13.04  Binding Effect; Benefits ................................................................ 61
Section 13.05  Assignment .................................................................................... 61
Section 13.06  Amendments and Waivers; Governing Law; Consent to Jurisdiction and
              Venue; Jury Trial Waiver ...................................................... 61
Section 13.07  Amendments; Waivers ................................................................... 62
Section 13.08  Severability .................................................................................... 62
Section 13.09  Counterparts ................................................................................... 62
Section 13.10  References ...................................................................................... 62
Section 13.11  Disclosure Schedules; Schedules; Exhibits .................................. 62
Section 13.12  Closing Costs ................................................................................. 63
Section 13.13  Attorneys' Fees .............................................................................. 63
Section 13.14  Survival of Defined Terms ............................................................ 63
Section 13.15  Time of Essence ............................................................................. 63
Section 13.16  No Third-Party Beneficiary .......................................................... 63

## <u>TABLE OF CONTENTS OF DISCLOSURE SCHEDULES</u>

**SCHEDULES**

<u>Schedule 2.01(a)</u> - Real Property (Description of Real Property)

<u>Schedule 2.01(b)</u> – Personal Property

<u>Schedule 2.01(c)</u> - Assigned Contracts

<u>Schedule 2.02(a)</u> – Excluded Personal Property

<u>Schedule 2.02(b)</u> – Excluded Real Property

<u>Schedule 2.02(c)</u> - Excluded Intellectual Property Licenses

<u>Schedule 2.02(e)</u> - Excluded Deposit Accounts

<u>Schedule 2.02(p)</u> - Excluded Equipment Agreements

<u>Schedule 2.08(b)</u> - Cure Cost Cap

<u>Schedule 4.03</u> - No Conflict

<u>Schedule 4.04(a)</u> – Affiliates and Minority Interests

<u>Schedule 4.05</u> - All Contracts in Effect on Execution Date

<u>Schedule 4.06(a)</u> - No Outstanding Rights

<u>Schedule 4.07</u> - Historical Financial Information

<u>Schedule 4.08(a)</u> - Permits

<u>Schedule 4.08(b)</u> - Permit Revocation

<u>Schedule 4.09(a)</u> – Participation in Payment Programs

<u>Schedule 4.09(b)</u> - Participation in Payment Programs

<u>Schedule 4.09(c)</u> – Governmental Disputes

<u>Schedule 4.11</u> - Compliance Programs

<u>Schedule 4.12</u> - Proceedings; Judgments

<u>Schedule 4.13(a)</u> - List of Employees

<u>Schedule 4.13(b)</u> - Service Providers

Schedule 4.13(d) – WARN Act

Schedule 4.13(f) – Employees on COBRA

Schedule 4.14(a) – Real Property

Schedule 4.14(b) - Tenant Leases

Schedule 4.15(a) - Personal Property

Schedule 4.16 – Insurance

Schedule 4.17 - Registered Intellectual Property

Schedule 4.18 - Tax Matters

Schedule 4.18(h) – Property Tax Exemption

Schedule 4.19 - Environmental Defects

Schedule 4.20 - Affiliate Transactions

Schedule 4.21 - Broker's or Finder's Fees

Schedule 7.02 - Purchase Price Allocation

Schedule 7.04(c) - Security Arrangements

Schedule 7.05(c) - Employees Hired or Terminated After the Execution Date

Schedule 7.05(h) – Employee Plans

Schedule 8.07 - Required Approvals

**EXHIBITS**

Exhibit A      -      Bill of Sale, Assignment and Assumption Agreement

Exhibit B      -      Special Warranty Deed

Exhibit C      -      Certificate of Non-Foreign Status

Exhibit D      -      Holdback Escrow Agreement

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is dated the [•] day of [•], 2019 (the "Execution Date"), Fayette Memorial Hospital Association, Inc. d/b/a Fayette Regional Health System, an Indiana nonprofit corporation ("Seller"), and Reid Hospital & Health Care Services, Inc., an Indiana nonprofit corporation ("Buyer").

## RECITALS:

A.      Seller is the owner of certain real, personal and intangible property constituting that certain collection of health care Facilities known as "Fayette Regional Health System," which provides inpatient, outpatient, emergency, and other ancillary services from its locations in Connersville, Fayette County, Indiana, and which is primarily located at 1941 Virginia Avenue, Connersville, Indiana 47331(the "Facilities", and each a "Facility");

B.      On October 10, 2018 (the "Petition Date"), Seller filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Indiana (the "Bankruptcy Court"), thereby commencing the case captioned In re Fayette Memorial Hospital Association, Inc. d/b/a Fayette Regional Health Systems, Case No.: 18-07762-JJG-11 (the "Bankruptcy Case");

C.      Seller desires to sell, transfer and assign to Buyer, and Buyer desires to purchase, acquire and assume from Seller pursuant to this Agreement, the Sale Order, the Sale Motion and Sections 105, and 365 of Title 11 of the Bankruptcy Code, certain Assets as specifically provided herein;

D.      The execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of a final non-appealable Order of the Bankruptcy Court under, *inter alia*, Section 363 of the Bankruptcy Code;

E.      The Parties acknowledge and agree that the terms of the Contemplated Transactions are the result of arm's length negotiations;

F.      Seller has solicited bids for the Facilities and the Business to obtain the highest and best offer; and

G.      Seller has determined that the Buyer's offer to purchase the applicable Assets is the best offer received to date for said Assets and constitutes a fair and adequate purchase price for the applicable Assets.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer, intending to be legally bound, agree as follows:

**ARTICLE I.**
**DEFINITIONS**

**Section 1.01   Defined Terms**.  For purposes of this Agreement, the following terms shall have the meanings indicated:

"Accounts Receivable" means all accounts, notes, accounts receivable, and other rights to receive payment for goods and services provided by Seller in connection with the Business prior to the Effective Time, including any such accounts receivable that have been charged off as bad debts, whether billed or unbilled, or recorded or unrecorded, or collected after the Effective Time.

"Accrued PTO" shall have the meaning set forth in Section 7.05(f).

"Action" means any legal action, suit or arbitration, or any inquiry, proceeding, or investigation, by or before any Governmental Authority.

"Affiliate" means with respect to any specified person or entity, any other person or entity which, directly or indirectly controls, is controlled by, or is under common control with, the specified person or entity.

"Agreement" shall have the meaning set forth in the introductory paragraph.

"Allocated Value" shall have the meaning set forth in Section 7.02.

"Alternative Transaction" means any agreement or transaction, whether pursuant to a plan or otherwise, involving the sale or other transfer (in a single transaction or a series of related transactions) of all or substantially all of the Assets, or the issuance, sale or other transfer (in a single transaction or series of related transactions) of all or substantially all of the member interests of Seller or any of its successors, to any party other than Buyer or a designee of Buyer.

"Applicable Law" means any federal, state, municipal, county, local, foreign or other statute, law, ordinance, rule or regulation, administrative interpretation, or any order, writ, injunction, judgment, plan, decree or other requirement of any Governmental Authority.

"Approval" means any approval, authorization, consent, notice, qualification or registration, or any extension, modification, amendment or waiver of any of the foregoing, of or from, or any notice, statement, filing or other communication to be filed with or delivered to, any Governmental Authority.

"Assets" shall have the meaning set forth in Section 2.01.

"Asset Taxes" means all real estate, ad valorem, property, excise, severance, production or similar Taxes, but not franchise, income or similar Taxes.

"Assigned Contracts" shall have the meaning set forth in Section 2.01(c).

"Assumed Liabilities" shall have the meaning set forth in Section 2.03.

"Bankruptcy Case" shall have the meaning set forth in the Recitals.

"Bankruptcy Code" shall have the meaning set forth in the Recitals.

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Benefit Plans" means (i) all "employee benefit plans", as defined in Section 3(3) of ERISA (whether or not such plan is subject thereto), (ii) all employment, consulting or other individual compensation Contracts, and (iii) all bonus or other incentive, deferred or other compensation, profit sharing, pension, change-in-control, severance pay, separation, retention, sick leave, vacation pay, day or dependent care, salary continuation, disability, hospitalization, medical, life insurance, retiree healthcare, retiree life insurance, other retirement, scholarship, legal services, cafeteria, life, health, accident, disability, workers' compensation, paid time off, fringe benefit or other insurance or employee benefit programs, plans, policies or arrangements, whether written or oral, single employer, multiemployer or multiple employer, or whether for the benefit of a single individual or more than one individual, as to which Seller or any of its ERISA Affiliates contributes, has an obligation to contribute, or has any Liability, contingent or otherwise, with respect to, or otherwise provides to, any current or former Employee or Service Provider.

"Bid Procedures" shall have the meaning set forth in Section 2.07.

"Business" means the business of and operations of the Facilities, which is a general acute care hospital in Connersville, Indiana known as "Fayette Regional Health System," which provides inpatient, outpatient, emergency, and other ancillary services from its locations in Connersville, Fayette County, Indiana, and which is primarily located at 1941 Virginia Avenue, Connersville, Indiana 47331.

"Business Day" means any day other than (i) a Saturday, Sunday or any United States federal legal holiday, or (ii) any day on which banks in Indiana are not open for business.

"Buyer" shall have the meaning set forth in the Preamble.

"Buyer Closing Certificate" shall have the meaning set forth in Section 9.03.

"Buyer Employer" shall have the meaning set forth in Section 7.05(b).

"Cash Purchase Price" shall have the meaning set forth in Section 3.01(a).

"Claim" has the meaning set forth in Section 101(b) of the Bankruptcy Code, and any and all demands, losses, liabilities, damages, obligations, expenses, fines, penalties, costs, claims, causes of action and judgments for: (a) breaches of Contract; (b) loss or damage to Property, injury to or death of persons (including illness and disease), and other tortious injury; or (c) violation of Applicable Laws, orders, or any other legal right or duty actionable at law or equity. The term "Claims" also includes reasonable attorneys' fees, court costs, and other reasonable costs resulting from the investigation or defense of any claim.

-3-

"Closing" means the consummation of the purchase and sale of the Assets and Assumed Liabilities in accordance with the terms of this Agreement on the Closing Date, or at such earlier or later date and time as may be agreed upon by the parties.

"Closing Date" shall have the meaning set forth in Section 10.01.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contemplated Transactions" shall have the meaning set forth in Section 2.01.

"Contract" means any written contract, agreement, indenture, note, bond, note, sublease, lease (including any Personal Property lease or capital lease), conditional sales contract, mortgage, license, sublicense, franchise agreement, obligation, promise, undertaking, commitment, or other binding agreement, primarily pertaining to or used in connection with the Business (in each case, whether written or oral), along with any additional Contracts that are entered into after the date hereof but prior to the Closing.

"Contract Notice" shall have the meaning set forth in Section 2.08(e).

"Copyrights" means all United States and foreign copyright rights in any original works of authorship, whether registered or unregistered, including all copyright registrations and applications.

"Cure Costs" shall have the meaning set forth in Section 2.08(b).

"Cure Cost Cap" means the maximum amount that Buyer shall pay in the form of Cure Costs in connection with Assigned Contracts based on the aggregate amount of the Cure Costs for each Assigned Contract as set forth in the applicable orders from the Bankruptcy Court.

"Deed" means the special warranty deed in the form attached hereto as Exhibit B, which will be used to convey the Real Property.

"Designation Deadline" means 5:00 p.m., Eastern Standard Time, on the date that is five (5) Business Days prior to the Closing Date or such later date as Buyer and Seller shall mutually agree and as the Bankruptcy Court may authorize; *provided* that the Designation Deadline for any Executory Contract with respect to which a dispute regarding a Cure Cost exists on such date shall be five (5) days after the date of the resolution of such dispute.

"Disclosure Schedules" means the disclosure schedules provided by Seller in connection with this Agreement.

"Drop Dead Date" shall have the meaning set forth in Section 10.01.

"Effective Time" means 12:01 a.m. on the calendar day immediately following the Closing Day, unless otherwise agreed in writing by Seller and Buyer.

-4-

"Employee" means any individual employed by Seller to provide services to Seller in connection with the Business.

"Environmental Defect" means any condition of, in, on or under any of the Assets that either (i) requires monitoring, reporting, removal, restoration, remediation or resolution under applicable Environmental Laws or (ii) if known by a federal or state regulatory agency of competent jurisdiction, would reasonably be expected to cause such federal or state regulatory agency to assert that the Assets require monitoring, reporting, removal, restoration, remediation or resolution under applicable Environmental Laws.

"Environmental Laws" means any federal, state, or local Applicable Law relating to the prevention of pollution, protection of health or the environment or natural resources, restoration of environmental quality, or Releases of or exposure to Hazardous Substances or the handling, generation, treatment, transportation, storage, use, arrangement for disposal or disposal, manufacture, distribution, formulation, packaging or labeling of Hazardous Substances, including without limitation, the following federal statutes and the regulations promulgated thereunder: the Comprehensive Environmental Response, Compensation and Liability Act of 1980; the Emergency Planning and Community Right-To-Know Act; the Resources Conservation and Recovery Act; the Clean Air Act; the Clean Water Act; the Safe Drinking Water Act; the Oil Pollution Act; the Toxic Substances Control Act; the Hazardous Materials Transportation Act; the Federal Insecticide, Fungicide, and Rodenticide Act; and the regulations promulgated pursuant thereto and analogous State and local Applicable Laws.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity that, together with Seller, may be treated as a single employer under Section 4001 of ERISA or Section 414 of the Code.

"ERISA Affiliate Liability" means any actual or contingent Liability of Seller or its ERISA Affiliates under or in respect of any employee benefit plan pursuant to any statute or regulation that imposes Liability on a "controlled group" or similar basis as a result of being an ERISA Affiliate or successor prior to the Closing Date with respect to any other Person.

"Escrow Agent" means U.S. Bank National Association.

"Excluded Assets" shall have the meaning set forth in Section 2.02.

"Excluded Contracts" means every Contract that is not an Assigned Contract.

"Excluded Deposit Accounts" shall have the meaning set forth in Section 2.02(e).

"Excluded Employee Liabilities" means each of the following:

(a)      any and all Liabilities arising out of, relating to or resulting from any Proceeding with respect to any current or former Employee or Service Provider, based on facts occurring prior to or as of the Closing (even if not known until after the Closing), including relating to his/her employment or services, or termination of employment or services, with Seller, or any of its Affiliates, including as a result of the consummation of the Contemplated Transactions, but

-5-

excluding any Liabilities for failure-to-hire claims against Seller by any Employee who is not offered employment by Buyer or its Affiliate due to discriminatory criteria;

(b)    any and all actual or contingent Liabilities under, arising out of, relating to or resulting from any Benefit Plans;

(c)    any ERISA Affiliate Liability;

(d)    any and all Liabilities to provide continuation coverage pursuant to COBRA under any plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) with respect to a COBRA qualifying event that occurs prior to or on the Closing Date;

(e)    any and all Liabilities for any misclassification of any Person performing services for or on behalf of Seller prior to the Closing as an independent contractor rather than as an employee; and

(f)    any and all other Liabilities arising out of, relating to or resulting from the employment or prospective employment of or the termination of any relationship with any current, former or prospective Employees (including any Employee who does not accept an offer of employment with Buyer)) or Service Providers, based on facts occurring prior to or as of the Closing (even if not known until after the Closing), including, but not limited to, unemployment benefits, but excluding any failure-to-hire Liabilities of Seller or its Affiliates arising from or relating to Buyer's decision whether to offer employment to employees of Seller based on discriminatory criteria.

"Excluded Equipment Agreements" shall have the meaning set forth in Section 2.02(p).

"Excluded Intellectual Property Licenses" shall have the meaning set forth in Section 2.02(c).

"Excluded Liabilities" shall have the meaning set forth in Section 2.04.

"Excluded Personal Property" shall have the meaning set forth in Section 2.02(a).

"Excluded Real Property" shall have the meaning set forth in Section 2.02(b).

"Execution Date" shall have the meaning set forth in the Preamble.

"Executory Contract" means any executory Contract related to the Business or to which Seller is a party.

"Facilities" has the meaning set forth in the Recitals.

"Fayette Board" means the Board of Trustees of Fayette Memorial Hospital Association, Inc. d/b/a Fayette Regional Health System.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as to which the sooner to occur of (a) the time for appeal, Petition for

*Certiorari* or move for re-argument or re-hearing has expired, and as to which no appeal, Petition for *Certiorari*, or other proceeding for re-argument or re-hearing shall then be pending, or as to which any appeal, Petition for *Certiorari*, re-argument or re-hearing shall have been waived in writing, in form and substance reasonably satisfactory to the Seller and the Buyer, or in the event that an appeal, Writ of *Certiorari* or re-argument or re-hearing thereof has been sought, such order of the Bankruptcy Court, or other court of competent jurisdiction, shall have been determined by the highest Court to which such order was approved, or *certiorari*, re-argument or re-hearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, Petition for *Certiorari* or move for re-argument or re-hearing shall have expired, or (b) the transaction approved or authorized by such order has been consummated and no appeal, Petition for *Certiorari* or move for re-argument or re-hearing had, at the time of such consummation, been filed or commenced; provided however, that the possibility that a motion under Section 502(i) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous bankruptcy Applicable Law or applicable state court rules of civil procedure, may be, but have not been, filed with respect to such order shall not cause such order not to be a Final Order.

"Free and Clear" means free and clear of all Liens.

"Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances and other equipment (including medical equipment) and leasehold improvements owned by Seller, used by Seller in the conduct of the Business and located in the Ordinary Course of Business at the Facilities, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment (and, to the extent assignable by Seller, the telephone numbers associated therewith used in the Ordinary Course of Business), cubicles and miscellaneous office furnishings.

"GAAP" means generally accepted accounting principles in the United States.

"Governing Document" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. For example, the "Governing Documents" of a corporation would be its certificate of incorporation and bylaws, the "Governing Documents" of a limited partnership would be its certificate of formation and its limited partnership agreement and the "Governing Documents" of a limited liability company would be its certificate of formation and its limited liability company agreement or operating agreement.

"Governmental Authority" means any federal, state or local government, agency, court, arbitrator, department, commission, board, bureau, authority, instrumentality or other body, including, without limitation, any Person exercising executive, legislative, judicial, regulatory or administrative governmental powers or functions, in each case to the extent the same has jurisdiction over the Person, property or service in question.

"Government Programs" has the meaning set forth in Section 4.09(a).

"Guaranty Actions" has the meaning set forth in Section 2.01(g).

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

-7-

"Hazardous Substance" means petroleum and its byproducts, asbestos and any other material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" or otherwise regulated under any Environmental Law or for which Liability can be imposed under any Environmental Law.

"Healthcare Regulatory Consents" means in respect of Seller or Buyer, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Authority as shall be required to be obtained and such notifications to any Governmental Authority as shall be required to be given by such party in order for it to consummate the Contemplated Transactions in compliance with all Applicable Law relating to health care or healthcare services of any kind.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as codified at 42 U.S.C. Sections 1320d through d-8, as amended by the Health Information Technology for Economic and Clinical Health Act.

"Historical Financial Information" shall have the meaning set forth in Section 4.07(a).

"Holdback Escrow Agreement" shall have the meaning set forth in Section 11.02.

"Holdback Escrow Amount" shall have the meaning set forth in Section 11.02.

"Hospital" will have the meaning set forth in the Recitals of this Agreement.

"Improvements" shall have the meaning set forth in Section 2.01(a)(i).

"Inactive Employee" means an Employee who is on employer-approved leave of absence on the Closing Date as a result of military service, pregnancy or parental leave, disability leave, medical leave, jury duty or any other leave provided under Applicable Law.

"Indebtedness" means, without duplication, the outstanding principal amount of, accrued and unpaid interest on and other payment obligations (including any prepayment premiums or similar breakage costs payable as a result of the consummation of the Contemplated Transactions) with respect to (a) indebtedness for borrowed money or (b) indebtedness evidenced by any note, bond, debenture or other debt security. Notwithstanding anything to the contrary in the foregoing, "*Indebtedness*" shall not include: (i) trade payables and accrued expenses arising in the Ordinary Course of Business, (ii) deferred revenue, (iii) any obligations under any capital lease, (iv) any undrawn letters of credit, and (v) any payment or performance bonds.

"Information Privacy or Security Laws" means all Applicable Laws and self-regulatory guidelines that apply to the Seller concerning the privacy, protection or security of Personal Information (as defined in such Applicable Laws), including, where applicable, the HIPAA, and state data breach notification Laws.

"Intellectual Property" means all intellectual property, including all Copyrights, Patents, Trademarks, industrial designs, trade secrets, proprietary know-how and confidential business information owned, used or licensed by Seller and used or held for use in conducting the Business.

"Inventory" means all drugs, medications, food, janitorial, housekeeping and office supplies and other consumables located in or used in connection with the operation of the Business and or the operation of the Real Property.

"Knowledge" means (i) with respect to Seller, the actual knowledge of any of the following individuals: Randall A. White, President and Chief Executive Officer, Samantha Bell-Jent, Vice President of Finance & Chief Financial Officer, and Amanda Gilley, Chief Nursing Officer, after due inquiry of those persons directly reporting to him or her, and (ii) with respect to Buyer, the actual knowledge of any of the following individuals: Craig C. Kinyon, President and Chief Executive Officer, and Christopher D. Knight, Vice President Finance and Chief Financial Officer, after due inquiry of those persons directly reporting to him or her.

"Labor Laws" means all Applicable Laws relating to employment, employment standards and practices, employment of minors, employment discrimination, employee classification, employment-related immigration, workplace health and safety, labor relations, employment tax withholding, wages, hours, family and medical and other leave of absence, workplace insurance or pay equity.

"Land" shall have the meaning set forth in Section 2.01(a)(i).

"Liability" means any debt, obligation, duty or liability of any nature (including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), regardless of whether such debt, obligation, duty or liability would be required to be disclosed on a balance sheet prepared in accordance with GAAP and regardless of whether such debt, obligation, duty or liability is immediately due and payable.

"Licensing Surveys" means survey reports, waivers of deficiencies, plans of correction, and any other investigation reports issued by the applicable Governmental Authority with respect to the Real Property in respect of any Permits.

"Lien" means any mortgage, deed to secure debt, deed of trust, pledge, hypothecation, security, charge, Claims, causes of action, encumbrances, interests, pledges, security interests, rights of set-off, restrictions or limitations on use, successor liabilities, conditions, rights of first refusal, options or liens of any kind, obligations to allow participation, agreements or rights, rights asserted in litigation matters, rights asserted in adversary proceedings in the Bankruptcy Case, competing rights of possession, obligations to lend, matters filed of record that relate to, evidence or secure an obligation of the Seller (and all created expenses and charges) of any type under, among other things, any document, instrument, regulation, or administrative governmental powers or functions, in each case the same has jurisdiction over the Person or Property in question, whether voluntarily incurred or arising by operation of law or otherwise, affecting any assets or property, including any agreement to give or grant any of the foregoing, any conditional sale or other title retention agreement, and the filing of or agreement to give any financing statement with respect to any assets or property under the Uniform Commercial Code or Applicable Law.

"Loss" or "Losses" means any and all costs, obligations, liabilities, demands, claims, settlement payments, awards, judgments, fines, penalties, damages and reasonable out-of-pocket

expenses, including court costs and reasonable attorneys' fees, whether or not arising out of a third-party claim.

"Marks" means all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof.

"Material Adverse Effect" means (i) any effect, change, development, or state of facts that is reasonably determined to be materially adverse to the Assets or the Business (taken as a whole), including its assets, properties, results of operations or condition (condition or otherwise), or (ii) a material adverse effect on the ability of Seller to consummate the Contemplated Transactions or to perform its obligations under this Agreement, provided, however, that none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect: any adverse change, event, development, or effect arising from or relating to the following: (a) general business or economic conditions (including local competitive dynamics), to the extent not disproportionately affecting the hospital industry, (b) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (c) earthquake, tornado, hurricane, flood or other natural disaster, (d) changes in United States generally accepted accounting principles, (e) the taking of any action contemplated by this Agreement and the other agreements contemplated hereby, or (f) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or consummation of the Contemplated Transactions.

"Material Contracts" means the following Contracts to which Seller is a party or as to which any portion of any such Assets is subject:

     (i)     all Contracts involving aggregate consideration in excess of Five Thousand Dollars ($5,000) or requiring performance by any party more than six (6) months from the Execution Date;

     (ii)     all Contracts that cannot be cancelled without penalty or without more than thirty (30) days' notice;

     (iii)     all Contracts that contain non-competition or non-solicitation provisions restricting the conduct of the Business, or restricting the conduct of any Person potentially competing with the Business, in any geographic area or during any period of time;

     (iv)     all Contracts granting any exclusive rights, rights of first refusal, rights of first negotiation or similar rights to any Person;

     (v)     except for agreements relating to trade receivables, all Contracts relating to indebtedness (including guarantees), or imposing an Lien on an Asset;

(vi)        all managed care or Third Party Payor Contracts;

(vii)       all Contracts with any physician, any practitioner or licensed health care facility;

(viii)      all Contracts for medical direction, the provision of professional health care services, or medical supervision of the performance of health care services at the Facilities;

(ix)        all Contracts that provide for severance pay or any other material post-employment payment by, or financial obligation of, Seller to Employees or Service Providers;

(x)         all joint venture, partnership or similar Contracts that provide for the sharing of profits relating to the Business (excluding the organizational documents of Seller);

(xi)        all Contracts for the sale of any of the Assets or for the grant to any Person of any option, right of first refusal or preferential or similar right to purchase any of the Assets;

(xii)       all Contracts that provide for the indemnification of any Person or the assumption of any Tax, environmental or other Liability of any Person;

(xiii)      all Tenant Leases;

(xiv)      all confidentiality agreements, non-disclosure agreements or similar agreements;

(xv)       all agency agreements and powers of attorney; and

(xvi)      all other Contracts material to the Assets or the operation of the Business and not previously listed in a category set forth in subsections (i)-(xviii) of this definition.

"NPI" means national provider identifier.

"OIG" has the meaning set forth in Section 4.11.

"Offered Employees" shall have the meaning set forth in Section 7.05(b).

"Order" means any award, decision, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority, or by any arbitrator.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through the Execution Date consistent with past practice, subject, and, in respect of the period after the Execution Date, to those actions necessary in connection with the Bankruptcy Case.

-11-

"Outside Date" shall have the meaning set forth in Section 12.01(c).

"Patents" means all patents and application therefor, including continuations, divisionals, continuations-in-part, or reissues or patent applications and patents issuing thereon.

"Paying Party" shall have the meaning set forth in Section 7.01(c).

"Permits" means all certificates, licenses, and permits which under Applicable Law are required to be held in connection with the ownership, use, occupancy, operation, and maintenance of the Real Property as a licensed hospital which provides inpatient, outpatient, emergency, and other ancillary services or the Assets.

"Permitted Buyer-Assignee" shall have the meaning set forth in Section 13.05.

"Permitted Exceptions" means all Title Exceptions to which Buyer has not objected, and all title objections which Buyer has waived or accepted.

"Permitted Liens" means (a) Liens for Taxes not yet due and payable or which are being contested in good faith by appropriate proceedings; (b) any Lien that will be released by the Sale Order or otherwise discharged at Closing; and (c) the Permitted Exceptions.

"Person" means any natural person, firm, corporation, company, general or limited partnership, limited liability company, association, joint venture, business enterprise, trust, estate, Governmental Authority or other legal entity, in each case whether in its own or a Representative capacity.

"Personal Property" shall have the meaning set forth in Section 2.01(b)(i).

"Petition Date" shall have the meaning set forth in the Recitals.

"Post-Closing Licensee" means Buyer or its designee to whom all transferrable Permits will be transferred or otherwise obtained in accordance with Applicable Law for the operation of the Real Property.

"Proceeding" means any Action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Program Agreements" shall have the meaning set forth in Section 4.09(a).

"Proration Date" shall have the meaning set forth in Section 3.04(a).

"Proration Schedule" shall have the meaning set forth in Section 3.04(a).

"Purchase Price" shall have the meaning set forth in Section 3.01.

"Real Property" shall have the meaning set forth in Section 2.01(a).

-12-

"Records" means the books, records, accounts, files, logs, information, databases, ledgers, in-place policies and training materials, journals and architectural, mechanical and electrical plans and specifications pertaining to or used in the operation of the Business, however such data is stored.

"Refundable Deposit" shall have the meaning set forth in Section 3.02(a).

"Regulatory Approvals" has the meaning set forth in Section 6.06.

"Reimbursable Claims" has the meaning set forth in Section 11.03.

"Reimbursing Party" shall have the meaning set forth in Section 7.01(c).

"Reid Board" means the Board of Trustees of Reid Hospital & Health Care Services, Inc.,

"Release" means any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the environment (including the abandonment or discharging of barrels, containers and other closed receptacles containing any Hazardous Substance).

"Representatives" means employees, officers, directors, consultants, agents, contractors, counsel, accountants, investment advisers, regulators, lenders, partners, potential partners, investors and potential investors.

"Sale Hearing" has the meaning set forth in Section 2.07(c).

"Sale Order" means an Order of the Bankruptcy Court, in form and substance approved by the Buyer and the Seller (such approval not to be unreasonably withheld or conditioned so long as the Order is not inconsistent with, and does not limit the rights and protections under this Agreement; provided, however, the Seller's approval may be conditioned upon the consent of any lenders holding Liens on the Facilities) pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code (i) authorizing and approving, *inter alia*, the sale of the Assets to Buyer on the terms and conditions set forth herein, Free and Clear of all Liens and Liabilities (other than Permitted Liens and Assumed Liabilities) to the extent permissible under Section 363(f) of the Bankruptcy Code, (ii) finding that notice of the hearing concerning approval of this Agreement and of the Contemplated Transactions was given in accordance with the Bankruptcy Code and that such notice is appropriate under the particular circumstances, (iii) authorizing and approving the assumption and assignment of the Assigned Contracts to Buyer, (iv) containing a finding that Buyer has acted in "good faith" within the meaning of, and is entitled to the protections of, Section 363(m) of the Bankruptcy Code, (v) containing a finding that this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions, (vi) containing a finding that Seller and Buyer have not engaged in any conduct that would cause or permit this Agreement to be avoidable under Section 363(n) of the Bankruptcy Code, (vii) providing that this Agreement and the Contemplated Transactions may, subject to the terms set forth herein, be specifically enforced against and binding upon, and not subject to rejection or avoidance by Seller or its estate or any chapter 7 or chapter 11 Bankruptcy Code trustee of Seller or other Representative of its estate,  (viii) providing that neither Buyer nor any of its Affiliates shall be deemed a successor in interest to Seller, and (ix) providing that, upon

Buyer's payment of the consideration provided hereunder, Seller shall have received fair and reasonably equivalent value for the Assets.

"Security Arrangements" shall have the meaning set forth in Section 7.04(c).

"Seller" shall have the meaning set forth in the Preamble.

"Seller Closing Certificate" shall have the meaning set forth in Section 8.03.

"Seller's Obligations" shall have the meaning set forth in Section 7.04(c).

"Service Provider" means any individual or entity that is engaged by Seller to provide personal services to Seller pursuant to a consulting or other independent contractor relationship, directly related to the Business or the Assets.

"Software" means, except to the extent generally available for purchase from a third Person, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates; menus, buttons and icons, and (iv) all documentation including user manuals and other training documentation related to any of the foregoing, in each case, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business.

"Survey" means an ALTA survey of the Real Property from a surveyor chosen by Buyer, meeting minimum standard detail requirements, and depicting only those Title Exceptions that are reasonably satisfactory to Buyer.

"Straddle Periods" shall have the meaning set forth in Section 7.01(b).

"Tax Allocation" shall have the meaning set forth in Section 7.02.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, excise taxes, unrelated business income taxes, an estimated taxes, whether disputed or not, and (ii) all interest, penalties, tines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in subsection (i) of this definition.

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Tenant Leases" means a lease pursuant to which a Person leases all or a portion of the Real Property, and any amendments, modifications, supplements, renewals and extensions thereof.

"Third-Party Payor" shall have the meaning set forth in Section 2.04(j).

-14-

"Title Commitment" means a title commitment issued by Title Company and addressed to Buyer for an ALTA title policy (with coverage insuring over the printed exceptions normally found in such title policy) insuring fee simple title to the Real Property in the amount of the Purchase Price allocated to the Real Property.

"Title Company" means First American Title Insurance Company, Attn:  Monica Chavez, 211 N. Pennsylvania Street, Suite 1250, Indianapolis, Indiana 46204.

"Title Exceptions" means the exceptions set forth in the Title Commitment.

"Transaction Documents" means this Agreement, all Exhibits hereto, and all Exhibits and Schedules contained in the Disclosure Schedules, and each other agreement, certificate or instrument to be delivered pursuant to this Agreement.

"Transferred Employees" shall have the meaning set forth in Section 7.05(b).

"Transfer Taxes" shall have the meaning set forth in Section 7.01(a).

"Transition Patients" shall have the meaning set forth in Section 3.04(f).

"Unaudited Financial Information" has the meaning set forth in Section 4.07(a)(ii).

"WARN Act" means the Worker Adjustment and Retraining Notification Act.

**Section 1.02    Other Definitions and Interpretive Matters**.  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)    Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period (or if any other date specified in this Agreement for giving any notice or taking any action) is a day other than a Business Day, then the period (or date) in question shall end on (or be deemed to be) the next succeeding Business Day.

(b)    Dollars. Any reference in this Agreement to $ means United States dollars.

(c)    Gender and Number. Any reference in this Agreement to gender includes all genders, and words imparting only the singular number include the plural and vice versa.

(d)    Headings. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "*Section*" or "*Article*" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(e)     <u>Herein</u>. Words such as "*herein*," "*hereof*" and "*hereunder*" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(f)     <u>Including</u>. The word "*including*" or any variation thereof means "*including, without limitation,*" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(g)     <u>No Strict Construction</u>. Buyer, on the one hand, and Seller, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Seller, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE II.
## PROPERTY DESCRIPTION AND BANKRUPTCY CASE

**Section 2.01    Assets**. Upon and subject to the terms and conditions of this Agreement on the Closing Date and subject to entry of the Sale Order, Seller will sell, transfer, assign, convey and deliver to Buyer, and Buyer will purchase, acquire and accept from Seller all of Seller's respective right, title and interest in, to and under the Assets, Free and Clear of all Liens and Liabilities, other than Permitted Liens and any Assumed Liabilities (the "<u>Contemplated Transactions</u>"). The term, "Assets" means those certain assets, rights and properties pertaining to or used in connection with the Business as existing on the Closing Date wherever located as described on Schedules 2.01(a) and 2.01(b), other than the Excluded Assets, including, but not limited to, all right, title and interest of Seller in, to or under the following:

(a)     <u>Real Property</u>.

(i)     Fee title in and to the land, which is described on <u>Schedule 2.01(a)</u> of the Disclosure Schedules (the "<u>Land</u>"), and all buildings, structures, improvements and fixtures placed, located, constructed or installed on the Land, including without limitation, known as "Fayette Regional Health System," which provides inpatient, outpatient, emergency, and other ancillary services from its locations in Connersville, Fayette County, Indiana, together with related common areas, and all other improvements located thereon (collectively, the "<u>Improvements</u>," together with the Facility and the Land, are herein sometimes referred to as the "<u>Real Property</u>"), excluding the Excluded Real Property. As used in this Agreement, the term "Real Property" shall be deemed to include all beneficial easements, rights and appurtenances related to the Real Property. The term Real Property shall also include Seller's right, title and interest as landlord (whether named as such therein, or by assignment or otherwise) in the Tenant Leases and all amendments, modifications, supplements, renewals and extensions thereof.

-16-

(ii)      To the extent transferable, all existing warranties and guaranties (express or implied) issued to Seller in connection with the Improvements.

(b)      <u>Personal Property</u>.

(i)      All Furniture and Equipment (whether movable or attached to the Real Property), motor vehicles, Hardware, supplies, Inventory, linens, medicine, foodstuffs, consumable and other personal property of any type or description, including, without limitation, all beds, chairs, sofas, wheelchairs, tables, kitchen and laundry equipment associated with the Business and/or present at the Real Property described on <u>Schedule 2.01(b)</u> of the Disclosure Schedules, (collectively, the "<u>Personal Property</u>"), excluding the Excluded Personal Property.

(ii)      To the extent transferable, all existing warranties and guaranties (express or implied) issued to Seller in connection with the Personal Property described in <u>Section 2.01(b)(i)</u> above.

(iii)      All signs, marks, supplies, trademarks and materials located on or used in the operation of the Assets bearing the name "Fayette Regional Health System" and all of Seller's right, title and interest in and to such name.

(iv)      To the extent owned by and in Seller's possession, all site plans, surveys, geological and environmental and soils studies and reports, market studies and surveys and reports, architectural renderings and models, plans and specifications, engineering plans and studies, floor plans and other similar plans and diagrams relating thereto.

(c)      <u>Assigned Contracts</u>.  To the extent transferable, all of the Contracts specifically listed on <u>Schedule 2.01(c)</u> of the Disclosure Schedules (the "<u>Assigned Contracts</u>").  Notwithstanding the foregoing, as used in this Agreement, the term "Assigned Contracts" expressly excludes any contracts, leases, agreements, commitments and other arrangements, and any amendments, modifications, supplements, renewals and extensions entered into by Seller after the Execution Date and prior to the Closing in breach of <u>Section 6.02</u>.  Buyer shall have no obligations under the Assigned Contracts unless such Assigned Contracts are listed on <u>Schedule 2.01(c)</u> of the Disclosure Schedules or Buyer otherwise in writing agrees to assume such Assigned Contracts.

(d)      <u>Tenant Leases</u>.  Except as provided herein, all rights of Seller in, to, and under the Tenant Leases assigned to Buyer pursuant to this Agreement, and all security deposits and rents and proceeds accruing therefrom as of the Closing Date.

(e)      <u>Records</u>.  Seller's right, title and interest to copies of all Records, except that Buyer shall not acquire, and Seller shall retain, all medical records related to services provided to patients, and Buyer shall not acquire Seller's financial records, including payroll records.

(f)    Permits.  To the extent transferable, Seller's right, title and interest to any and all Permits now held in the name of Seller, or any Affiliate(s) of Seller, and any renewals, extensions, amendments or modifications thereof.

(g)    Claims and Causes of Action.  All rights in and to any claims or causes of action to the extent they are in the nature of enforcing a guaranty, warranty, or a contract obligation to complete improvements, make repairs, or deliver services to the Seller specifically with regard to the Assets to be acquired by Buyer (the "Guaranty Actions"). For the avoidance of doubt, this does not include any causes of action arising under the Bankruptcy Code.

(h)    Intellectual Property.  With the exception of the Excluded Intellectual Property Licenses and any license or software rights to an executory contract that is not being assumed, any and all rights of Seller or its Affiliates with respect to the use of (i) all trade names, trademarks, service marks, copyrights, patents, jingles, slogans, symbols, logos, inventions, computer software, operating manuals, designs, drawings, plans and specifications, marketing brochures, or other proprietary material, process, trade secret or trade right used by Seller or its Affiliates in the operation of the Assets or the Business, and (ii) all registrations, applications and licenses for any of the foregoing.  Buyer shall cooperate with Seller to provide reasonable access to software and licenses necessary to allow Seller to pursue recovery of Accounts Receivable and bill for services rendered through the Effective Time.

(i)    Name.  Seller's right, title and interest to the name "Fayette Regional Health System" and any derivative name in the operation of the Facilities.

**Section 2.02    Excluded Assets**.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the following assets to Buyer, and Seller shall retain all right, title and interest to, in and under the following assets (the "Excluded Assets"):

(a)    The Personal Property identified on Schedule 2.02(a) of the Disclosure Schedules (the "Excluded Personal Property");

(b)    The Real Property identified on Schedule 2.02(b) of the Disclosure Schedules (the "Excluded Real Property");

(c)    The Intellectual Property identified on Schedule 2.02(c) of the Disclosure Schedules (the "Excluded Intellectual Property Licenses");

(d)    The Excluded Contracts, which included any and all Contracts that are not listed as an Assigned Contract on Schedule 2.01(c) of the Disclosure Schedules ( the "Excluded Contracts");

(e)    All deposit accounts listed on Schedule 2.02(e) of the Disclosure Schedules hereto (the "Excluded Deposit Accounts"), all pre-closing Accounts Receivable, all cash, cash equivalents, bank deposits or similar cash items of Seller, all marketable securities owned by Seller and all documents related thereto;

-18-

(f)     Any other Contract to which Seller is a party or under which it has rights, in each case, that is not used primarily in the Business;

(g)     Any (i) personnel files; (ii) files or communications (including e-mail communications) subject to the attorney-client or similar privilege; (iii) other books and records that Seller is required by Applicable Law to retain; (iv) Transaction Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligations owed to any third party (other than any patient confidentiality obligation referred to in the foregoing clause (ii)); (v) books and records and other Transaction Documents related to malpractice prevention programs, credentialing, incident reporting or quality assurance to the extent confidential under Applicable Law that Seller elects or is required to retain; (vi) documents relating to proposals to acquire the Business by Persons other than Buyer; (vii) any Transaction Documents primarily related to or that are required to realize the benefits of any Excluded Assets; (viii) documents necessary to prepare tax returns and cost reports; (ix) Seller's Governing Documents and other organizational record books and minute books; and (x) documents relating exclusively to an Excluded Asset, provided, however, that Buyer shall have the right to make copies of such retained books and records referenced in Section 2.02(g), (iii) and (v), or of portions thereof, that relate to the Business as existed before the Closing (except for privileged materials or Assets as prohibited by Applicable Law);

(h)     any pre-Closing claim, right or interest, of Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom;

(i)     all insurance policies (except as provided in Section 4.16);

(j)     rights for refunds for unearned insurance premiums and rights to proceeds with respect to Excluded Assets and other Excluded Liabilities;

(k)     all of Seller's deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(l)     all rights, claims or causes of action of Seller, including, but not limited to, any rights, claims or causes of action of Seller against third parties relating to the Excluded Assets, and any and all actions or claims under Sections 544, 545, 547, 548, 549, 550, 551 and 724(a) of the Bankruptcy Code, but excluding the Guaranty Actions;

(m)     any right to receive or expectancy of Seller in any charitable gift, grant, bequest or legacy (including any income or remainder interest in or under any trust or estate);

(n)     any rights, claims or causes of action of Seller against third parties arising out of events occurring prior to the Closing, including and, for the avoidance of doubt, arising out of events occurring prior to the Petition Date, and including any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Seller, provided, however, that to the extent Buyer is subject to any third party Liability resulting

-19-

from the Contemplated Transaction arising out of events that occurred prior to Closing, Buyer may assert any rights, claims or causes of action of Seller against third parties that relate to such Liability;

(o)      all deposits remaining at the Closing Date (other than with respect to the Assigned Contracts) and prepaid charges and expenses of Seller;

(p)      any Contract that relates to the purchase or leasing of Equipment that is identified on <u>Schedule 2.02(p)</u> of the Disclosure Schedules (the "<u>Excluded Equipment Agreements</u>");

(q)      all Benefit Plans;

(r)      the Purchase Price and all rights of Seller under this Agreement;

(s)      all rights, claims and choses of action of Seller and its Affiliates with respect to periods prior to the Effective Time, and any payments, awards or other proceeds resulting therefrom, subject to the rights of Buyer established in <u>subsection (m)</u> above;

(t)      all licenses or Permits that are not transferrable;

(u)      all of Seller's Membership Interest in Fayette Regional Health Systems Pain Management, LLC;

(v)      all medical records maintained by Seller, except Buyer may request access to such records in connection with providing medical care to patients after the Closing;

(w)      all financial records of Seller, including payroll records;

(x)      all rights with respect to Proceedings pending at the Effective Time;

(y)      Notes receivable and related claims of the Debtor including, but not limited to, those identified in Section 71 of Schedule B filed in the Bankruptcy Case; and

(z)      The Seller's 457(b) Deferred Compensation Plan, including any funds maintained as part of that plan, and any trust, including a rabbi trust, that may have been established under such plan.

At any time prior to the Closing, Buyer may, in its discretion by written notice to Seller, designate any of the Assets as additional Excluded Assets, which notice shall set forth in reasonable detail the Assets so designated. Buyer acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to designate any Assets as Excluded Assets. Notwithstanding any other provision thereof, all Liabilities of Seller under or related to any Asset which is an Excluded Asset at any time will constitute Excluded Liabilities.

**<u>Section 2.03</u>   <u>Assumption of Liabilities</u>.**  Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer shall execute and deliver to Seller the Bill of Sale, Assignment and Assumption Agreement in the form attached hereto as <u>Exhibit A</u>, pursuant to

which Buyer shall assume and agree to discharge when due (in accordance with their respective terms and subject to the respective conditions thereof), only the following Liabilities of Seller (except to the extent constituting and excluding for all purposes, the Excluded Liabilities) and no other Liabilities (collectively, the "Assumed Liabilities") set forth in the following:

(a)     Assigned Contracts. All of Seller's Liabilities under the Assigned Contracts, except such Liabilities that are satisfied or discharged by payment of Cure Costs (including, for the avoidance of doubt, any Assigned Contracts for which the Cure Costs were set at $0.00 and approved as such by virtue of the Sale Order or such other order authorizing the assumption by Seller and assignment to Buyer of such Assigned Contracts).

(b)     Cure Costs. All Cure Costs related to the Assigned Contracts, in all cases up to and not to excess of, in the aggregate, the Cure Cost Cap.

The assumption by Buyer of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

**Section 2.04   Excluded Liabilities**.  Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of Seller, and Seller shall retain and be solely and exclusively liable with respect to, all Liabilities of Seller, except for only the Assumed Liabilities, (such Liabilities other than Assumed Liabilities collectively, the "Excluded Liabilities"), which Excluded Liabilities shall include, without limitation, the following:

(a)     Any Liabilities to the extent based upon any wrongful or negligent act or omission of Seller on or prior to the Closing;

(b)     Any Liability associated with any Excluded Assets;

(c)     all Indebtedness of Seller; all guarantees of third party obligations by Seller and reimbursement obligations to guarantors of Seller's obligations or under letters of credit; and all Liabilities of Seller to any owner or former owner of capital stock or warrants, or holder of Indebtedness;

(d)     except as specifically set forth as an Assumed Liability, all operating expenses of the Business or the Assets, to the extent attributable or otherwise related to the ownership, operation, use, or maintenance of any of the Assets prior to the Effective Time;

(e)     all Taxes of Seller, other than Taxes related to the ownership, operation, use, or maintenance of any of the Assets from and after the Effective Time with the understanding that Buyer shall be responsible for all Transfer Taxes related to the transfer of the Real Property or the Personal Property;

(f)     all Actions and Proceedings set forth on Schedule 4.12 of the Disclosure Schedules;

(g)     all Excluded Employee Liabilities;

(h)    all Liabilities under the WARN Act with respect to plant closings or mass layoffs of Employees that occur prior to or at the time of the Closing;

(i)    any Liability to the extent relating to any breach of contract, breach of warranty, tort, infringement, or violation of Applicable Law by Seller;

(j)    any Liability to the extent arising out of events or omissions occurring prior to the Effective Time from or relating to any overpayment, duplicate payment, refunds, discounts or adjustments due to any healthcare cost reimbursement program, health plan or insurance coverage (each a "Third-Party Payor");

(k)    any Liability related to claims of medical malpractice and/or other professional liability of Seller, or any of its employees, attending physicians, agents or independent contractors to the extent arising out of events or omissions occurring on or prior to the Closing Date;

(l)    any Liability arising out of or in connection with any Proceedings (whether instituted prior to or after Closing) to the extent arising from acts or omissions which occurred or alleged to have occurred on or prior to the Closing Date;

(m)    any Liability related to penalties, fines, settlements, interest, costs and expenses to the extent arising out of or incurred as a result of any violation by Seller on or prior to the Closing Date of any Applicable Law;

(n)    all Liabilities relating to amounts required to be paid by Seller hereunder;

(o)    all claims, demands, Liabilities or obligations arising out of any duty or violation of any applicable Environmental Law, rules, regulations or obligations by Seller or the Business, or related to the Assets to the extent occurring on or prior to the Closing Date;

(p)    all Liabilities and obligations of Seller to Buyer under this Agreement or with respect to or arising out of the Contemplated Transactions;

(q)    all Liabilities arising out of events or omissions occurring on or prior to the Closing Date from or relating to any overpayment, duplicate payment, refunds, discounts or adjustments due to any Third-Party Payor or under any Government Program.

(r)    all Liabilities consisting of legal, accounting, financial advisory, valuation, investment banking and other third party advisory or consulting fees and expenses incurred by or on behalf of Seller in connection with or arising from the Bankruptcy Case or the Contemplated Transactions or the other Transaction Documents;

(s)    all Liabilities related to the handling, retention, storage and/or destruction of medical records and personal health information of Seller, with the exception of the obligations of Buyer set forth in Section 7.07;

-22-

(t)    all Liabilities existing prior to the filing of the Bankruptcy Case that are discharged under the Bankruptcy Case; and

(u)    all Liabilities and obligations of Seller under this Agreement and the other Transaction Documents.

**Section 2.05    Further Assurances**.  From time to time following the Closing, Seller and Buyer shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate (a) to assure fully to Buyer and its respective successors or assigns, all of the Assets and properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement, (b) to assure fully to each Seller and its Affiliates and their successors and assigns, the assumption of the Assumed Liabilities by Buyer under this Agreement, and (c) to otherwise make effective the Contemplated Transactions; *provided*, *however*, nothing in this Section 2.05 shall require Buyer or any of their respective Affiliates to assume any Liabilities other than the Assumed Liabilities. Notwithstanding the foregoing, nothing in this Section 2.05 shall prohibit Seller from ceasing operations or winding up its affairs following the Closing.

**Section 2.06    Bankruptcy Court Approval**.

(a)    Seller and Buyer acknowledge that this Agreement and the sale of the Assets and the assumption and assignment of the Assigned Contracts are subject to Bankruptcy Court approval. Seller and Buyer acknowledge that (i) to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest and otherwise best offer possible for the Assets, and that such demonstration shall include giving notice of the Contemplated Transactions to creditors and other interested parties as ordered by the Bankruptcy Court, and (ii) Buyer must provide adequate assurance of future performance under the to-be-assigned Executory Contracts.

(b)    From and after the Execution Date and prior to the Closing or the termination of this Agreement in accordance with Article XII, Seller shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order or this Agreement.

**Section 2.07    Bankruptcy Filings**.

(a)    After substantial negotiations between Seller and Buyer, Seller has selected Buyer as the Buyer for the sale of the Assets.

(b)    On March 1, 2019, Seller filed a *Motion for Orders: (A) Scheduling a Bid Procedures Hearing; (B) Authorizing and Approving Bid Procedures and Approving Notice of Sale Hearing; and (C) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of Claims, Liens, Rights, Interests and Encumbrances* pursuant to Section 363 and 365 of the Bankruptcy Code as applicable (the "Sale Motion").

(c)     The Bankruptcy Court entered an *Order Scheduling Bid Procedures Hearing* on March 4, 2019, by which such hearing was scheduled for March 20, 2019.  The Bankruptcy Court entered an *Order Authorizing and Approving Bid Procedures and Approving Notice of Sale Hearing* on March 22, 2019, pursuant to which the Bid Procedures attached thereto were approved and a hearing on the Sale Motion was scheduled for May 13, 2019 at 9:30 AM EDT (the "Sale Hearing").

(d)     The Seller's full and complete implementation of the Bid Procedures, except as otherwise approved by the Bankruptcy Court.

(e)     Notwithstanding the foregoing, any resulting changes to this Agreement or any other Transaction Document or resulting material changes to the proposed Sale Order shall be subject to the approval of Buyer in its reasonable discretion. Sellers shall (i) provide Buyer with drafts of any and all other pleadings and proposed orders to be filed or submitted in connection with this Agreement and the Contemplated Transactions, and such pleadings and proposed orders shall be in form and substance reasonably acceptable to Buyer and (ii) make best efforts to consult and cooperate with Buyer regarding any discovery taken in connection with seeking entry of the Sale Order (including any depositions).

(f)     Seller shall use its best efforts to obtain entry of an order(s) approving the Sale Motion (the "Sale Order") as set forth in Section 8.09.

(g)     In the event that the entry of a Sale Order is appealed or a stay pending appeal is sought, Seller shall oppose the appeal or the stay pending appeal and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, re-argument, reconsideration or revocation).

**Section 2.08**   **Assigned Contracts and Cure Costs**.

(a)     Subject to the approval of the Bankruptcy Court by Final Order, the Assigned Contracts will be assumed by the Seller and assigned to the Buyer on the Closing Date, in accordance with Section 365 of the Bankruptcy Code. The final determination of which Contracts shall be Assigned Contracts shall be within the Buyer's sole discretion. The Cure Costs of the Assigned Contracts and shall be paid by the Buyer in accordance with the provisions herein, including the Cure Cost Cap.

(b)     At the Closing (or, if the applicable Assigned Contract is not assigned to Buyer at Closing pursuant to the terms of this Agreement, then at the time of the assignment of such Assigned Contract to Buyer, if ever), Buyer shall pay, pursuant to Section 365 of the Bankruptcy Code and the Sale Order, any and all cure and reinstatement costs or expenses that are required to be paid under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts that is executory (the "Cure Costs"), up to, in the aggregate, the Cure Cost Cap. For the avoidance of doubt, (i) Buyer shall pay all Cure Costs, up to the Cure Cost Cap in cash at Closing, (ii) the Cure Costs are separate and apart from, and in addition to, the Cash Purchase Price and, (iii) Buyer shall not be required to make any payment of Cure Costs

-24-

for, and shall not assume any Liabilities with respect to, any Contract that is not an Assigned Contract.  In addition, Buyer shall have the ability to negotiate with the other party to an Assigned Contract in an effort to reduce the Cure Cost for a particular contract and any Cure Cost for said contract will be based on the agreement between the Buyer and the other party to the contract.

(c)    Notwithstanding anything in this Agreement to the contrary, a Contract that is validly rejected or otherwise not assumed and assigned to the Buyer pursuant to this Section 2.08 shall constitute an Excluded Asset.

(d)    Schedule 2.08(b) of the Disclosure Schedules sets forth each Executory Contract, Seller's good faith estimate of the amount of the Cure Costs payable in respect of each such Executory Contract (and if no Cure Cost is estimated to be payable in respect of any particular Executory Contract, the amount of such Cure Cost designated for such Contract shall be "*$0.00*").

(e)    At any time prior to the Designation Deadline, Buyer shall have the right, which may be exercised in Buyer's sole discretion, to provide written notice to Seller (each such notice, a "Contract Notice") of Buyer's election to designate any Executory Contract (including any Contract that is an Assigned Contract immediately before such designation) (1) as an Excluded Contract, and upon such designation such Contract shall constitute an Excluded Contract and, if applicable, shall cease to constitute an Assigned Contract or (2) to the extent not already rejected, as an Assigned Contract and upon such designation such Contract shall constitute an Assigned Contract and shall cease to constitute an Excluded Contract.

(f)    If Buyer exercises its rights in Section 2.08(e) above to designate a Contract, including a Contract that was an Assigned Contract immediately before such designation, as an Excluded Contract, there shall be no reduction in the Cash Purchase Price as a result of such designation or change in designation.

## ARTICLE III.
## PURCHASE PRICE

**Section 3.01    Purchase Price**.  The purchase price for the purchase, sale, assignment and conveyance of Seller's right, title and interest in, to and under Assets shall consist of the following (collectively, as adjusted as provided in Section 3.04 hereof, the "Purchase Price"):

(a)    Cash in an amount equal to Twelve Million Seven Hundred Fifty Thousand and No/100 Dollars ($12,750,000.00) (the "Cash Purchase Price"); and

(b)    the assumption by Buyer of the Assumed Liabilities.

**Section 3.02    Good Faith Deposit.**

(a)    Buyer has deposited the sum of One Million Two Hundred Seventy-Five Thousand and No/100 Dollars ($1,275,000) ((the "Refundable Deposit")) with the Seller in accordance with the Bid Procedures;.

(b)    The Refundable Deposit shall for all purposes be treated, applied, returned or retained, as applicable, as provided in the Bid Procedures.

**Section 3.03    Reduction of Cash Purchase Price**.  Notwithstanding anything to the contrary contained herein, the Cash Purchase Price shall be reduced by the following:

(a)    The Refundable Deposit, which shall be treated by the Seller as a credit against the Purchase Price.

(b)    The Holdback Escrow Amount, which shall be paid to the Escrow Agent, from the Cash Purchase Price.

**Section 3.04    Adjustment of Purchase Price**.

(a)    All income and expenses (including prepaid expenses) of the Assets and Business shall be prorated on a daily basis between Seller and Buyer as of 11:59 p.m. on the date (the "Proration Date") immediately preceding the Closing. Such items to be prorated shall include, without limitation:

(i)    Utility charges, if any, based on utility charges for the month immediately preceding the Closing; and

(ii)    Taxes, which for the year 2019 shall be pro-rated based upon the actual 2019 tax amounts, if available and, if not available, then upon the assessed value for 2019 as of the Proration Date and applying either (A) the applicable 2019 tax rate(s) or (B) to the extent the 2019 tax rate(s) is or are unavailable, the 2018 tax rate(s).

Buyer and Seller shall prepare a proposed Schedule (the "Proration Schedule") prior to Closing that shall include the items listed above and any other applicable income and expenses with regard to the Assets and Business. Seller and Buyer will use all reasonable efforts to finalize and agree upon the Proration Schedule at least two (2) Business Days prior to Closing.

(b)    Any escrow accounts held by any utility companies, and any cash deposits made by Seller or Seller's Affiliates to any utility company prior to Closing to secure obligations under Assumed Liabilities shall be assigned to Buyer and Seller shall receive a credit at Closing for any such deposits. Seller and Buyer shall finalize and agree upon the cash deposits and credits due Seller at least two (2) Business Days prior to Closing.

(c)    Seller shall receive all income from and shall be responsible for all expenses of the Assets and Business attributable to the period prior to the Proration Date, including accounts payable whether known or unknown, and Accounts Receivable, unless otherwise provided for in this Agreement. Buyer shall cooperate with Seller as reasonably required in order to help facilitate Seller's efforts to collect the Accounts Receivable post-Closing, including, but not limited to, providing Seller with reasonable access to any information technology systems owned by Buyer post-Closing upon reasonable request by Seller for access to such systems.  In the event Buyer or Buyer's Affiliates receive any payment from

-26-

a Tenant for rent due for any period prior to the Proration Date or payment of any other receivable of Seller, Buyer shall apply such payment first to the obligations then owing from Seller to Buyer for its period of ownership, remitting the balance, if any, promptly to Seller. Buyer shall provide Seller with evidence of the obligations owing from the Seller to Buyer that have been offset.

(d)     Buyer shall receive all income from and shall be responsible for all expenses of the Assets attributable to the period from and after the Proration Date, unless otherwise provided for in this Agreement. In the event Seller or Seller's Affiliates receive any payment from a Tenant for rent due for any period from and after the Proration Date, Seller shall apply such payment first to the obligations then owing from Buyer to Seller for its period of ownership and to costs of collection, remitting the balance, if any, promptly to Buyer. Seller shall provide Buyer with evidence of the obligations owing from the Buyer to Seller that have been offset.

(e)     Buyer and Seller shall be liable for, on an equal basis (fifty percent (50%) each), any escrow fees with respect to the Title Company and the Holdback Escrow Agreement.

(f)     As necessary with respect to patients admitted to the Facilities' before the Closing but who are discharged after Closing (the "Transition Patients"), the parties shall take measures to ensure that Seller and Buyer each receive an appropriately pro-rated portion of any payment for items and services furnished to such Transition Patients.

(g)     The parties agree that any amounts that may become due under this Section 3.04 shall be paid at Closing as can best be determined. A post-Closing reconciliation of pro-rated items shall be made by Buyer and Seller within ninety (90) days after Closing and any amounts due at that time shall be promptly forwarded to the respective party in a lump sum payment. Any additional amounts which may become due after such determination shall be forwarded at the time they are received. Any amounts due under this Section 3.04 which cannot be determined within ninety (90) days after Closing shall be reconciled as soon thereafter as such amounts can be determined. Notwithstanding anything herein, neither party shall have any obligation to the other under this Section 3.04 one (1) year after Closing.

(h)     This Section 3.04 shall survive the Closing.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF SELLER

As of the Execution Date and as of the Closing Date, and as a material inducement to Buyer entering into this Agreement and to consummate the Contemplated Transactions, Seller represents and warrants to Buyer, as follows:

**Section 4.01   Organization; Good Standing of Seller**.  Seller is a nonprofit corporation organized and validly existing under the laws of the State of Indiana. Seller has the requisite corporate power and authority to own or lease and to operate and use its properties and to carry on the Business as now conducted. Seller is duly qualified or licensed to do business in each

-27-

jurisdiction where the character of its Business or the nature of its properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed as would not, individually or in the aggregate, have a Material Adverse Effect.

       **Section 4.02**   **Authority; Validity; Consents**.  Seller has, subject to requisite Bankruptcy Court approval, the requisite corporate power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which Seller is a party and to consummate the Contemplated Transactions and thereby, and, subject to requisite Bankruptcy Court approval, the execution, delivery and performance of this Agreement and such other Transaction Documents by Seller and the consummation by Seller of the Contemplated Transactions and therein have been duly and validly authorized by all requisite corporate action, none of which actions have been modified or rescinded and all of which actions remain in full force and effect. This Agreement has been duly and validly executed and delivered by each Seller and each other Transaction Document required to be executed and delivered by Seller at the Closing will be duly and validly executed and delivered by Seller at the Closing. Subject to requisite Bankruptcy Court approval, this Agreement and the other Transaction Documents constitute the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms (subject to the effect of bankruptcy, insolvency fraudulent conveyance, reorganization, moratorium and similar laws affecting creditor's rights and remedies generally, and to limitations imposed by general principles of equity, whether applied by a court of law or of equity).

       **Section 4.03**   **No Conflict**.  Other than as set forth in <u>Schedule 4.03</u> of the Disclosure Schedules, and except for any notices, filings and consents required in connection with the consummation of the Contemplated Transactions hereby, upon obtaining requisite Bankruptcy Court approval the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Seller under (a) any material Permit or Material Contract by which Seller or any Asset is bound, (b) the Governing Documents of Seller, (c) subject to entry of the Sale Order, any applicable Order or Applicable Law.

       **Section 4.04**   **Affiliates and Minority Interests; Competitive Dynamics**.  Except as set forth in <u>Disclosure Schedule 4.04(a)</u>, Seller does not own any wholly-owned or partially owned subsidiary, or any minority interests in any Person.

       **Section 4.05**   **Contracts**.  <u>Schedule 4.05</u> of the Disclosure Schedules lists all Contracts in effect as of the Execution Date. Seller has made available to Buyer accurate and complete copies from Seller's Records of each Contract listed on <u>Schedule 4.05</u> of the Disclosure Schedules. The Assigned Contracts are listed on <u>Schedule 2.01(c)</u> of the Disclosure Schedules. Subject to the Orders of the Bankruptcy Court and the payment of any Cure Costs, and except as separately described on <u>Schedule 4.05</u> of the Disclosure Schedules, each Assigned Contract is a valid and binding agreement of Seller enforceable in accordance with its terms against Seller, and to Seller's Knowledge, against each other party thereto.  No currently effective written notices have been received by Seller of the exercise of any premature termination, price redetermination, market-out, shut-in or curtailment of or under any of the Assigned Contracts.

**Section 4.06    Title; Sufficiency of Assets; No Outstanding Rights**.

(a)    Except as set forth on Schedule 4.06(a) of the Disclosure Schedules, there are no outstanding rights (including any rights of first refusal or offer) or rights of reverter, options, or Contracts giving any Person any current or future right to require Seller or, following the Closing Date, Buyer, to sell or transfer to such Person or to any third party, any interest in Seller or any of the Assets.

(b)    Seller owns and holds good and marketable title to all tangible assets and valid title to all intangible assets included in the Assets, Free and Clear of all Liens, other than the Permitted Liens. Seller is the sole record and beneficial owner of the Assets. Immediately prior to the Closing, Seller shall continue to own and hold good and marketable title to all assets, real, personal or mixed, whether tangible or intangible, constituting or associated with the Assets.

(c)    To Seller's Knowledge, there are no facts or conditions affecting the Assets that could, individually or in the aggregate, interfere with the use, occupancy or operation of the Assets as currently used, occupied or operated, or their adequacy for such use. All tangible Assets are in good operating condition and repair, normal wear and tear excepted.

**Section 4.07    Financial Information**.

(a)    Schedule 4.07 of the Disclosure Schedules hereto contains the following financial statements and financial information (collectively, the "Historical Financial Information"):

(i)    audited balance sheets, statements of operations, statements of changes in net deficit, and statements of cash flows of Seller, as of, and for the 12-month periods ended on September 30, 2017, September 30, 2016 and September 30, 2015; and

(ii)    Unaudited balance sheets and statements of operations of Seller for the twelve-month period ended on September 30, 2018 (the "Unaudited Financial Information").

**Section 4.08    Permits and Approvals**.

(a)    The Facilities are duly licensed in accordance with the Applicable Law of the State of Indiana, and all other ancillary departments or services located at a Facilities, as applicable, or operated for the benefit of a Facilities that are required to be separately licensed are duly licensed by the appropriate Governmental Authority. Set forth on Schedule 4.08(a) of the Disclosure Schedules is a complete list of all Permits and Approvals currently issued or granted by a Governmental Authority and owned or held by or issued to Seller in connection with the Assets or the Business, and such Permits and Approvals constitute all material Permits and Approvals necessary for the conduct of the Business and operation of the Assets as currently conducted and for the ownership of the Assets by Seller and operation and use of the Assets by Seller or the Post-Closing Licensee, all of which are in full force and effect. Seller has provided accurate and complete copies

-29-

to Buyer of each Permit and Approval described on <u>Schedule 4.08(a)</u> of the Disclosure Schedules.

(b)     Seller is in compliance in all material respects with the terms of all Permits and Approvals that are required by Applicable Law with respect to the Assets and the Business, and there are no provisions in, or agreements relating to, any Permit or Approval that preclude or limit Seller from operating the Assets conducted. There is not now pending nor, to the Knowledge of Seller, threatened, any Proceeding or Action by or before any Governmental Authority to revoke, cancel, rescind, suspend, restrict, modify or refuse to renew any of the Permits and Approvals, and all of the material Permits and Approvals are unrestricted, in good standing, in full force and effect. Except as set forth on <u>Schedule 4.08(b)</u>, no event has occurred and to Seller's Knowledge, no facts exist with respect to any Permit or Approval that allows, or after notice or the lapse of time or both, would allow the suspension, revocation, termination or restriction of any such Permit or Approval, or would result in any other material impairment in the rights of any holder thereof. Seller has not received any written notice or communication from any Governmental Authority regarding any violation of any Permit or Approval (other than any surveys or deficiency reports for which Seller has submitted a plan of correction that has been accepted or approved by the applicable Governmental Authority). Seller has delivered to Buyer accurate and complete copies of all survey reports, deficiency notices, plans of correction, and related correspondence received by Seller since January 1, 2016, in connection with the Permits and Approvals owned or held by Seller.

**Section 4.09    Participation in Payment Programs.**

(a)     Seller is certified to participate in the Medicare program and other Government Programs as set forth in <u>Schedule 4.09(a)</u> of the Disclosure Schedules and has current and valid contracts for participation in each such Government Program (the "<u>Program Agreements</u>").

(b)     Set forth on <u>Schedule 4.09(b)</u> of the Disclosure Schedules is a list of all National Provider Identifiers and all provider numbers of Seller under the Government Programs (including the Medicare CMS Certification Number (CCN)) and Seller's largest five (5) private third party payor programs, including any insurance company or healthcare provider (such as a health maintenance organization, preferred provider organization, or any other managed care program).

(c)     Except as set forth on <u>Schedule 4.09(c)</u> The Seller has not received notice, and the Seller has no Knowledge of the existence, of any pending dispute between the Seller and any Governmental Entity or the Medicare fiscal intermediary regarding any open cost reports, other than with respect to adjustments thereto made in the ordinary course of business.  The Seller has not received written notice of, and the Seller has no Knowledge of the existence of, any claims against the Seller by any third-party payors other than routine Medicare and Medicaid audit adjustments.

**Section 4.10    Health Regulatory Compliance.**

-30-

(a)    To Seller's Knowledge, except as set forth in <u>Section 4.10(a)</u> of the Disclosure Schedules, none of the Seller, its directors, managers, officers, employees or contractors, or any member of the medical staff of Seller (a) has been excluded or suspended from participation in any Federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)) or been disbarred, suspended or otherwise determined ineligible to participate in federal programs, nor to the Knowledge of Seller is any such exclusion threatened; (b) has had a civil monetary penalty assessed against it under Section 1128A of the Social Security Act or any regulations promulgated thereunder; (c) has been convicted of, charged with, indicted or investigated for a Federal health care program related offense, or convicted of, charged with, indicted or investigated for a violation of federal or state law relating to fraud, theft, embezzlement, breach of fiduciary responsibility, financial misconduct, obstruction of an investigation or controlled substances; or (d) has committed any offense which may reasonably serve as the basis for any such exclusion, suspension, disbarment or other ineligibility.

(b)    Except as set forth in <u>Section 4.10(b)</u> of the Disclosure Schedules, neither the Seller nor to the Seller's Knowledge any of its respective officers, directors, agents, or employees, is presently, or has, at any time during the previous five (5) years, been convicted of, been charged with, been investigated for, or engaged in any activities relating to Seller that are prohibited, or are cause for criminal or civil penalties or mandatory or permissive exclusion from Medicare or Medicaid, including, but not limited to, under §§1320a-7, 1320a-7a, 1320a-7b, 1320a-8 or 1395nn of Title 42 of the United States Code or the regulations promulgated thereunder, or any substantially similar state or local statutes or regulations.

**Section 4.11    Compliance Programs**.  Seller (a) is not a party to a Corporate Integrity Agreement with the Office of the Inspector General of the U.S. Department of Health & Human Services (the "OIG"); (b) does not have any reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority; (c) to Seller's Knowledge, has not been the subject of any Government Program investigation conducted by any Governmental Authority; (d) except as set forth on <u>Schedule 4.11</u> of the Disclosure Schedules has not been a defendant in any qui tam/False Claims Act litigation (other than by reason of a sealed complaint of which Seller has no Knowledge); (e) has not been served with or received any search warrant, subpoena, civil investigation demand, contact letter, by or from any Governmental Authority; and (f) except as disclosed in <u>Schedule 4.11</u> of the Disclosure Schedules has not received any complaints with respect to the Facilities through such Seller's compliance "*hotline*" from employees, independent contractors, vendors, patients, or any other persons that could reasonably be considered to indicate that such Seller has violated, or is currently in violation of, any Applicable Law. For purposes of this Agreement, the term "*compliance program*" refers to provider programs of the type described in the compliance guidance published by the OIG.

**Section 4.12    Proceedings; Judgments**.  Except for the Bankruptcy Case (including any adversary proceedings filed in the Bankruptcy Case) and as set forth on <u>Schedule 4.12</u> of the Disclosure Schedules and in the Schedules and Statement of Financial Affairs filed by the Seller in the Bankruptcy Case, (a) there are no Proceedings pending or, to Seller's Knowledge, threatened against Seller with respect to or that affect any of the Assets or the Business or that involve or relate to any of the Contemplated Transactions or the other Transaction Documents, (b) there is no

-31-

investigation, proceeding, charge or audit pending, of which Seller has received written notice, or to Seller's Knowledge threatened, before or by any Governmental Authority with respect to any Assets or the Business;

     (a)    there has been no settlement or other similar agreement or Order with respect to the ownership or operation of the Assets or the Business that is or could reasonably be expected to be material; and

     (b)    Seller has not received any written notice or written claim for tort or violation of any applicable Order, or an investigation thereof with respect to its ownership or operation of the Assets or the Business. Except as set forth on <u>Schedule 4.12</u> of the Disclosure Schedules, there are no judgments presently outstanding and unsatisfied against the Assets and Business, Seller or any of Seller's assets.

**Section 4.13** **Labor Matters**.

     (a)    <u>Schedule 4.13(a)</u> of the Disclosure Schedules sets forth an accurate and complete list as of the Execution Date of each Employee's (i) name, (ii) employer, (iii) job title or function, (iv) job location, (v) salary or wage rate, (vi) bonus, commission or incentive compensation accrued in 2018 and 2019, (vii) date of hire, (viii) exempt v. non-exempt classification, (ix) full-time versus part-time status, (x) temporary or regular status and (xi) active or leave status. Except as set forth on <u>Schedule 4.13(a)</u> of the Disclosure Schedules, no Employee works outside the United States.

     (b)    <u>Schedule 4.13(b)</u> of the Disclosure Schedules sets forth a true, correct and complete list of each Service Provider's (i) name, (ii) function or services provided, (iii) job location, and (iv) current compensation structure. Seller is, and for the past four (4) years has been, in compliance in all material respects with all applicable Labor Laws for all Employees and Service Providers. Except as set forth on <u>Schedule 4.13(b)</u> of the Disclosure Schedules, there is no pending, nor, to the Knowledge of Seller, threatened, Proceeding reasonably likely to give rise to a material Liability asserting that Seller has committed an unfair labor practice, act of discrimination or other similar complaints with respect to any Employee or Service Provider.

     (c)    Seller is not a party to any labor, collective bargaining, union and similar Contracts with respect to any Employee or Service Provider. No collective bargaining or any other labor-related Contract with any labor union or labor organization is currently being negotiated by Seller with respect to any Employee or Service Provider. There is no pending or, to the Knowledge of Seller, threatened organized effort or demand for recognition or certification or attempt to organize the Employees by any labor organization. During the past four (4) years, there have been no strikes, slow-downs, work stoppages, other labor disturbance or other concerted action by any union or other group of employees or other persons against or involving Seller nor is any such strike, slow-down, work stoppage, other labor disturbance or other concerted action by any union or other group of employees, to the Knowledge of Seller, threatened against or involving Seller.

-32-

(d)     Except as set forth on Schedule 4.13(d), there has been no "*mass layoff*" or "*plant closing*" (as defined by the WARN Act) with respect to any Employee in the past ninety (90) days before the Execution Date or the Closing Date. Seller has not incurred any Liability under the WARN Act that remains unpaid or unsatisfied.  Notwithstanding the foregoing, Buyer acknowledges that Seller has advised Buyer that Seller issued a WARN Notice to all employees on May 3, 2019.

(e)     With respect to any Service Provider performing services prior to the Closing, Seller has no Liability with respect to any misclassification of such Service Provider as an independent contractor rather than as an employee (within the meaning of the Fair Labor Standards Act of 1938, as amended), or with respect to such Service Provider's status as a leased employee.

(f)     Except as set forth in Schedule 4.13(f), as of the Execution Date, there are no Employees on COBRA.

**Section 4.14    Real Property**.

(a)     Schedule 4.14(a) of the Disclosure Schedules contains an accurate and complete legal description, street address and tax parcel identification number for the Real Property. Seller holds good and indefeasible fee simple title to all of the Real Property. Seller does not lease any portion of the Real Property as a tenant or subtenant. Seller agrees that title to the Real Property shall not be altered between the date of this Agreement and Closing. Except as set forth on Schedule 4.14(a), other than the right of Buyer pursuant to this Agreement, there are no outstanding agreements, options, rights of first offer, rights of first refusal, or any other grant to any third party to sell, purchase, lease, sublease, use, occupy, or enjoy the Real Property or any portion thereof or interest therein.

(b)     Schedule 4.14(b) of the Disclosure Schedules sets forth an accurate and complete list of all Tenant Leases, and Seller has made available to Buyer a true, correct and complete copies of the Tenant Leases, together with all amendments and modifications thereto, extension notices and other material correspondence, fair market value analyses, estoppel certificates, and subordination, non-disturbance and attornment agreements related thereto. Except as set forth in Schedule 4.14(b) of the Disclosure Schedules, (i) each Tenant Lease is valid, binding and enforceable in accordance with its terms and is in full force and effect, (ii) there are no assignments or subleases of any of the Tenant Leases, and each Tenant Lease was validly authorized and entered into, (iii) the Contemplated Transactions shall not require the consent of any other party to such Tenant Lease, and to Seller's Knowledge, the Contemplated Transactions will not otherwise cause such Tenant Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing; (iv) there are no ongoing disputes with respect to any Tenant Lease and no tenant thereunder has a defense to enforcement of such Tenant Lease; (v) none of Seller, or to Seller's Knowledge, any other party to such Tenant Lease is in breach or default under such Tenant Lease and, no event has occurred or circumstance exists which, with notice or the passage of time, would result in a breach or default by such Seller or the other party thereunder, (vi) no rent, additional rent, fees or any other changes, after being billed therefor, payable under any of the Tenant Leases is more than thirty (30)

days in arrears of the date that the same is required to be paid under the terms of such Tenant Lease, (vii) no tenant under such Tenant Leases is entitled to any allowance or free rent period, (viii) no rents due under any Tenant Lease is presently assigned, hypothecated or encumbered by Seller, other than in connection with any mortgage encumbering the Real Property which shall be satisfied prior to or in connection with Closing.

(c)     Seller has not received written notice from any Governmental Authority of (and otherwise has no Knowledge of): (i) any pending or threatened condemnation Proceedings affecting the Real Property, or any part thereof; (ii) asserting or alleging any violations or potential violations of any Applicable Laws (including zoning and land use ordinances, building codes and similar requirements) with respect to the Real Property, or any part thereof, which have not heretofore been cured; or (iii) any pending or threatened injunction, decree, order, writ or judgment outstanding, nor any claims, litigation, administrative actions or similar proceedings against Seller or any Affiliate of Seller or the Real Property, relating to the ownership, lease, use or occupancy of such Real Property or any portion thereof which is reasonably likely to result in a material change in the condition of the Real Property or the ownership or operation of the Real Property. Seller has not received any notice of any pending zoning or other land use change affecting the Real Property.

(d)     Neither Seller nor, to Seller's Knowledge, any other person is in violation of a condition or agreement contained in any easement, restrictive covenant or any similar instrument or agreement affecting any of the Real Property in any material respect.

(e)     To Seller's Knowledge other than in the ordinary course, there is no proposed reassessment of any Real Property by any taxing authority and there is no threatened or pending special assessment or Litigation that could give rise to a material increase in real property Taxes or assessments against any of the Real Property.

(f)     No brokerage or leasing commissions or other compensation are due or payable to any Person, firm, corporation or other entity with respect to, or on account of, any Tenant Lease, or any extensions or renewals thereof.

(g)     The existing water, sewer, gas and electricity lines, storm sewer and other utility systems on or serving the Real Property are reasonably adequate to serve the utility needs of the Real Property. All approvals, licenses and permits required for said utilities have been obtained and are in force and effect. All of said utilities are installed and operating, and all installation and connection charges have been paid in full.

(h)     There are no special or other assessments for public improvements or otherwise now affecting the Real Property, no pending or, to Seller's Knowledge, threatened, special assessments affecting the Real Property, and no contemplated improvements affecting the Real Property that may result in special assessments affecting the Real Property.

(i)     To the Seller's Knowledge, the location, construction, occupancy, operation and use of the Real Property (including the improvements which are a part of the Real

-34-

Property) are in compliance in all material respects with Applicable Laws or determinations of any Governmental Authority, judicial precedent or any restrictive covenant or deed restriction (recorded or otherwise) affecting the Real Property or the location, construction, occupancy, operation or use thereof, including all Applicable Laws. All Improvements located on the Real Property are located within boundary lines and do not encroach onto any setback or easement areas (as established by applicable zoning laws or recorded covenants), and there are no encroachments onto the Real Property by buildings or other structures located on adjacent parcels. There are no boundary disputes with respect to the Real Property. Seller has not received any notice from any Governmental Authority requiring any work, repairs, construction, alterations or installations on or in connection with the Real Property.

(j)    Seller has paid for all work, labor and materials furnished to Seller or its Affiliates in connection with the Real Property prior to the Closing Date, and there is no mechanic's or materialmen's lien, filed or otherwise claimed, in connection with any such work, labor and materials performed on or furnished in connection with the Real Property prior to the Closing Date.

(k)    Seller has no management, service, equipment, supply, maintenance, concession, or other agreements with respect to or affecting the Real Property, which will be binding upon Buyer after Closing or which are not terminable upon thirty (30) days' notice without penalty.

(l)    To the Knowledge of Seller, there are not any material structural or latent defects in any of the buildings or other Improvements which are a part of the Real Property. Such buildings and Improvements which are a part of the Real Property, and all parts thereof and appurtenances thereto, including the heating, ventilation, air conditioning, electrical, mechanical and plumbing systems, and the drainage at, or servicing, the Real Property and all Facilities and equipment relating thereto, are in good condition, working order and repair, adequate in quantity and quality for the normal operation of the Real Property, and reasonably fit for their present uses.

(m)    Seller is not a "foreign person" within the meaning of Section 1445 of the Code and the Regulations issued thereunder.

**Section 4.15    Personal Property**. Except as disclosed on Schedule 4.15(a) of the Disclosure Schedules, since the Execution Date, Seller has not sold or otherwise disposed of any item or items of plant, property or equipment related to the Business having a value (individually or in the aggregate) in excess of $15,000 (other than Inventory items sold, used or disposed of in the Ordinary Course of Business). Except as set forth on Schedule 4.15(a) of the Disclosure Schedules, Seller presently owns and will hold on the Closing Date good title to all tangible personal property assets and valid title to all intangible assets included in the Assets, Free and Clear of all Liens (except for Permitted Liens) and the rights of owners under Contracts or under leases or licenses of assets leased or licensed in the Ordinary Course of Business. No Person other than Seller owns any Personal Property, except for (a) items leased by Seller or improvements to items leased by Seller pursuant to a lease agreement identified on Schedule 2.01(c) of the Disclosure Schedules, and (b) personal property of Seller's employees, tenants, patients or visitors.

**Section 4.16   Insurance**.   Schedule 4.16 of the Disclosure Schedules sets forth an accurate and complete list of all insurance policies or self-insurance funds (if any) maintained by Seller as of the date of this Agreement covering the ownership and operation of the Business, indicating the types of insurance, policy numbers, terms, identity of insurers and amounts and coverages (including applicable deductibles).   All of such policies or similar replacement policies in the case of current policies expiring prior to the Closing Date are now and will be until the Closing in full force and effect on a claims made basis, with no premium arrearages.   Seller shall, with no additional consideration paid by Buyer, assign to Buyer, on a non-recourse basis and with no warranty or representation other than provided in this Section 4.16 and by general form of assignment, all insurance policies and/or self-insurance funds (if any) which do or may provide to Seller or Buyer, as assignee, any benefits, including in regard to Environmental Defects or Environmental Matters as described in Section 4.19 of this Agreement.   Nothing herein shall prevent Seller from recovering unearned premiums under applicable insurance policies.

**Section 4.17   Intellectual Property**.   Seller owns or has the right to use all Intellectual Property used in connection with the ownership or operation of the Assets. Schedule 4.17 of the Disclosure Schedules lists all of the registered Intellectual Property owned by Seller. Except as set forth on Schedule 4.17 of the Disclosure Schedules or as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Business, the conduct of the Business does not infringe or otherwise violate any Intellectual Property or other proprietary rights of any other Person, and there is no action pending or, to the Knowledge of Seller, threatened, alleging any such infringement or violation or challenging Seller's rights in or to any of its Intellectual Property.

**Section 4.18   Tax Matters**.   Except as set forth on Schedule 4.18 of the Disclosure Schedules:

(a)   All Taxes due and owing by Seller (whether or not shown on any Tax Return) have been timely paid when due, including all Taxes with respect to the Assets and Taxes subject to extensions.

(b)   There are no Tax liens on any of the Assets other than liens for Taxes not yet due and payable.

(c)   Proper and accurate amounts have been withheld by Seller in compliance with the payroll Tax and other withholding provisions of all Applicable Laws, and all of such amounts have been timely remitted to the proper taxing authority.

(d)   Seller has timely filed all Tax Returns required to be filed by it, including, but not limited to, all Tax Returns relating to the Assets (all of which are true, complete and correct in all material respects). Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency. Seller is not currently the beneficiary of any extension of time within which to file any Tax Return.

(e)   To Seller's Knowledge, no deficiencies for Taxes have been claimed, proposed or assessed by any Governmental Authority for which Seller may have any

-36-

Liability or which may attach to the Assets. There are no pending or, to Seller's Knowledge, threatened proceedings for or relating to any Liability in respect of Taxes for which Seller may have any Liability or which may attach to the Assets. There are no matters under discussion by Seller with any Governmental Authority with respect to Taxes that may result in an additional amount of Taxes for which Seller may have any Liability or which may attach to the Assets. No Governmental Authority has notified Seller that it has conducted an audit of any Taxes that may be due and owing by Seller or as the result of the Business audited by Seller.

(f)     None of the Assets is an interest in a joint venture, partnership or other arrangement that is or should be treated as a partnership for Tax purposes.

(g)     Seller (i) is an organization described in Section 501(c)(3) of the Code and exempt from taxation to the extent described in Section 501(a) of the Code, (ii) is not a private foundation within the meaning of Section 509(a) of the Code, (iii) is in possession of a determination letter from the Internal Revenue Service regarding its federal income Tax exemption, which determination letter has not been revoked or otherwise modified, (iv) is in compliance in all material respects with all Applicable Laws pertaining to the operation of an organization described in Section 501(c)(3) of the Code, including, requirements as to private benefit, private inurement, unrelated business use and other applicable requirements, and (v) has not entered into any transaction which has constituted or may constitute an "*excess benefit transaction*" within the meaning of Section 4958 of the Code and the Treasury Regulations thereunder.

(h)     Except as set forth on Schedule 4.18(h), Seller has received an exemption from all real property Taxes for the Real Property.

**Section 4.19   Environmental Matters**.   Except as set forth on Schedule 4.19 of the Disclosure Schedules: (a) there are no material Environmental Defects on or affecting any of the Assets, (b) except for any noncompliance that has been remediated in accordance with applicable Environmental Law, to the Knowledge of Seller, Seller has at all times operated the Assets and conducted the Business and, during the period that Seller owned the Assets and any third party operated any such Assets, such third party operated the Assets, in each case, in material compliance with all applicable Environmental Laws and all Permits required thereunder or issued pursuant thereto; (c) to Seller's Knowledge, there are no Proceedings pending or threatened before any Governmental Authority or any other actual claims form any party, including, but not limited to, individual citizens with respect to Seller's ownership or operation of the Real Property alleging material violations of Environmental Laws, or claiming material remediation obligations under applicable Environmental Laws, and Seller has not received any written notice of any alleged or actual material violation or non-compliance with any Environmental Law or of material non-compliance with the terms or conditions of any environmental Permits, arising from, based upon, associated with or related to the Real Property or the ownership or operation thereof; and (d) Seller has provided Buyer access to accurate and complete copies of all final written environmental reports, studies and notices prepared by any third party on behalf of, or delivered by a Governmental Authority to, Seller with respect to the Real Property, that identify or allege any Environmental Defect on or affecting the Real Property.

**Section 4.20    Affiliate Transactions**.  Except as set forth on <u>Schedule 4.20</u> of the Disclosure Schedules or for Contracts or arrangements that will terminate or be waived on prior to Closing, no current or, to the Knowledge of Seller, former director, officer, employee, Affiliate or Representative of Seller (nor any spouse or child of any of such Persons, or any trust, partnership or corporation in which any of such Persons has a material economic interest) (a) owns any property, assets, interests and rights, tangible or intangible, that is an Asset or that is otherwise material to the conduct of the Business as currently conducted, (b) has filed or otherwise has any Proceeding against the Business, or (c) except pursuant to any Benefit Plan, is a party to or the beneficiary of any Contract with the Business.

**Section 4.21    Broker's or Finder's Fees**.  Except as disclosed on <u>Schedule 4.21</u> of the Disclosure Schedules, no agent, broker, investment banker, or other person or firm acting on behalf of Buyer or any of its Affiliates or under its authority, is or will be entitled to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, from Buyer or any of its Affiliates in connection with the Contemplated Transactions.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as of the Execution Date and as of the Closing as follows:

**Section 5.01    Organization and Good Standing**.  Buyer is a nonprofit corporation duly organized, validly existing and in good standing under the laws of the State of Indiana. Buyer has all requisite corporate power to own, and operate and as the same will be conducted following the Closing.

**Section 5.02    Authorization and Binding Effect of Transaction Documents**.  Buyer has the requisite corporate power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which Buyer is a party and to consummate the Contemplated Transactions. The execution and delivery of this Agreement and the other Transaction Documents and the performance of Buyer's obligations hereunder and thereunder (including consummation of the Contemplated Transactions) has been duly authorized by all requisite corporate action of Buyer, and this Agreement constitutes the valid and binding obligation and agreement of Buyer, enforceable in accordance with its terms (subject to the effect of bankruptcy, insolvency fraudulent conveyance, reorganization, moratorium and similar laws affecting creditor's rights and remedies generally, and to limitations imposed by general principles of equity, whether applied by a court of law or of equity).

**Section 5.03    Absence of Conflicts**.  Neither the execution and delivery or performance of this Agreement, nor compliance with the terms and provisions hereof, will (i) conflict with or result in any breach of any of the terms, conditions or provisions of, (ii) constitute a default under, (iii) result in a violation of, or (iv) give any third party the right to modify, terminate, or accelerate any obligation under, the provisions of the Governing Documents of Buyer and/or its Affiliates, any indenture, mortgage, lease, loan agreement or other agreement or instrument to which Buyer and/or its Affiliates is bound or affected, or any Applicable Law to which Buyer and/or its Affiliates is subject or any Applicable Law.

**Section 5.04    Consents**.  The execution, delivery and performance by Buyer and/or its Affiliates of this Agreement and the other Transaction Documents, and consummation by Buyer and/or its Affiliates of the Contemplated Transactions and thereby, do not and will not require the authorization, consent, approval, exemption, clearance or other action by or notice or declaration to, or filing with, any court or administrative or other Governmental Authority, or the consent, waiver or approval of any other person or entity, excluding consents that Seller is obligated to obtain under Section 8.06 below.

**Section 5.05    Broker's or Finder's Fees**.  No agent, broker, investment banker, or other person or firm acting on behalf of Buyer or any of its Affiliates or under its authority, is or will be entitled to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, from Buyer or any of its Affiliates in connection with the Contemplated Transactions.

**Section 5.06    Ability to Perform**.  Buyer has the ability to obtain funds in cash in amounts equal to the Purchase Price by means of credit Facilities or otherwise, has arranged to have by the Closing Date financing that is not subject to any material contingency, and will at the Closing have immediately available funds in cash, which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the Contemplated Transactions.

## ARTICLE VI.
## COVENANTS

**Section 6.01    Continuing Diligence and Inspection Rights**.  Seller shall, commencing on the Execution Date of this Agreement, provide access to Buyer of all of Seller's assets, books, accounting records, correspondence and files of Seller (to the extent related to the operation of the Assets) for examination by Buyer, its Representatives, with the right to make copies of such books, records and files or extracts therefrom. Such access will be available to Buyer during normal business hours, upon notice, in such manner as will not unreasonably interfere with the conduct of the Business of the Assets. Seller will make available to Buyer and its Representatives such additional data and other available information regarding the Assets as Buyer deems necessary or desirable to comply with Buyer's internal requirements or the requirements of Buyer's lenders, investors or members, including, without limitation, further inspection of title, survey, environmental and structural aspects, assessments of the compliance of the Assets or Business with all Applicable Laws, and customary pre-closing walk-throughs. Those books, records and files which relate to Seller's assets that are not transferred to Buyer shall be preserved and maintained by Seller for one (1) year after the Closing, or such greater amount of time required by Applicable Law, and those books, records and files relating to the Assets the possession of which is being transferred to Buyer hereunder shall be maintained and preserved by Buyer for a period of seven (7) years after the Closing, or such greater amount of time required by Applicable Law. Notwithstanding anything to the contrary in the foregoing, Seller shall provide all patient records requested by Buyer to Buyer in the format requested by Buyer to the extent that Seller can provide the records at minimal expense to Seller..

**Section 6.02    Conduct of Business Prior to the Closing**.  Seller and Buyer agree to work together after the entry of the Sale Order and the Execution Date to discuss transition issues, including what parts of the Business can be shut down prior to the Closing; however, Buyer shall

have the final decision related to any issue Buyer reasonably believes could negatively impact the Assets.  Subject to the foregoing sentence, Seller covenants and agrees that, from the Execution Date through the Closing, unless Buyer provides its prior written consent thereto, to:

(a)     Operate the Assets and Business in the Ordinary Course of Business consistent with how it is operated as of the Execution Date, including (i) incurring expenses consistent with the past practices, (ii) using commercially reasonable efforts to preserve the Assets and Seller's present business operations, organization and goodwill and its relationships with patients, customers, employees, advertisers, suppliers and other contractors, (iii) maintaining the Permits listed on Schedule 4.08(a) of the Disclosure Schedules, and (iv) timely filing accurate cost reports, claims and documents required under the Government Programs and Third-Party Payor programs for participation and for reimbursement of services;

(b)     Use commercially reasonable efforts to maintain all insurance policies with the same coverages and amounts as of the Execution Date;

(c)     Operate, maintain and repair the Real Property and otherwise conduct business in substantial compliance with the terms or conditions of the Permits listed on Schedule 4.08(a) of the Disclosure Schedules, all Applicable Laws having jurisdiction over any aspect of the operation of the Real Property and all applicable insurance requirements;

(d)     Maintain the books and records for the Assets and the Business;

(e)     Not sell, lease, grant any rights in or to or otherwise dispose of, or agree to sell, lease or otherwise dispose of, the Real Property in whole or in part;

(f)     Use commercially reasonable efforts to maintain the Personal Property currently in use in reasonably good operating condition and repair, except for ordinary wear and tear and damage by casualty, in a manner consistent with past practices;

(g)     Not amend or modify the Assigned Contracts, enter into new Assigned Contracts, or take or fail to take any action thereunder outside the Ordinary Course of Business;

(h)     Not make any alterations or improvements to the Real Property or make any capital expenditure with respect to the Assets in excess of Ten Thousand Dollars ($10,000.00) individually, other than those that are required by Applicable Law, required by Section 6.14, for health, welfare or safety, or that are necessary to preserve the coverage under or comply with the terms of any insurance policy with respect to the Assets;

(i)     Other than agreements with respect to reimbursements for insurance policies, not enter into any agreement which calls for annual payments in excess of Twenty-Five Thousand Dollars ($25,000.00) or for a term in excess of one year, unless such agreement can be terminated by Buyer without liability on or after the Closing Date;

(j)     Not grant any bonus, free months' rental, or other concession to any present or future tenant of the Real Property (except (i) in the Ordinary Course of Business and (ii)

to the extent that all such bonuses or concessions shall be paid or credited prior to Closing unless otherwise approved by Buyer);

       (k)    Not terminate the employment of any Employee other than for cause, or hire any employee who would be an Employee, in each case, other than in the Ordinary Course of Business or after consultation with Buyer; and

       (l)    Not increase the level of wages, bonus, compensation on other benefits of any Employee in any material respect, except for increases in the Ordinary Course of Business.

    **Section 6.03**   **Notification of Certain Matters**.  From the Execution Date to the Closing Date, Seller shall give prompt written notice to Buyer of (a) the occurrence, or failure to occur, of any event that causes any representation or warranty of Seller contained in this Agreement to be untrue, and (b) any failure of Seller to comply with or satisfy, in any material respect, any covenant, condition or agreement to be complied with or satisfied by it under this Agreement. Such notice shall provide a reasonably detailed description of the relevant circumstances and shall include the amount that such Seller believes, based on facts known to such Seller, would impact the Contemplated Transactions. The content of any notice or update delivered by Seller to Buyer prior to the Closing pursuant to this Section 6.03 shall not be deemed to modify the applicable representations, warranties and covenants for purposes of determining whether applicable conditions precedent in Article VIII are satisfied.

    **Section 6.04**   **Additional Financial Information**.  Seller will deliver to Buyer copies of the monthly operating results reports Seller is to submit to the Bankruptcy Court and other financial information reasonably requested by Buyer.

    **Section 6.05**   **Title; Additional Documents**.  At the Closing, Seller shall transfer and convey to Buyer good and indefeasible fee simple title to the Real Property, Free and Clear of any Liens except Permitted Liens. At the Closing, Seller's right, title and interest to all warranties and guaranties, to the extent assignable or transferable, relating to the Real Property shall be assigned and transferred by Seller to Buyer and shall be held and owned by Buyer.

    **Section 6.06**   **Licensing**.  Buyer shall use commercially reasonable efforts to obtain prior to the Closing Date (or as soon thereafter as practicable): all consents, approvals and licenses necessary to permit the consummation of the transactions contemplated by this Agreement including, but not limited to, such licensure and certification approval as may be necessary to enable Seller to lawfully operate the Facilities as Buyer deems appropriate ("Regulatory Approvals"). Seller shall cooperate in all reasonable respects with Buyer and Post-Closing Licensee (if other than Buyer) in their efforts to obtain such consents, approvals and licenses.

    **Section 6.07**   **Confidentiality**.  Any and all nonpublic information, documents, and instruments delivered to Buyer by Seller or its agents or Affiliates and any and all nonpublic information, documents, and instruments delivered to Seller by Buyer or its agents or Affiliates are of a confidential and proprietary nature. Buyer and Seller agree that prior to Closing, each will maintain the confidentiality of all such confidential information, documents or instruments delivered to each by the other party or its agents in connection with the negotiation of, or in

-41-

compliance with, this Agreement, and only disclose such information, documents, and instruments to their duly authorized officers, directors, representatives and agents, or as otherwise required by Applicable Law, including the Bankruptcy Code. Buyer and Seller further agree that if the Contemplated Transactions are not consummated and this Agreement is terminated, each will return all such documents and instruments and all copies thereof in their possession to the other party or destroy them. This Section 6.07 shall survive as to both Seller and Buyer in the event this Agreement is terminated prior to Closing and shall survive as to Seller (and not Buyer) following Closing.

Section 6.08    Publicity.    Except for a jointly coordinated press release or staff announcement after the bid process, the parties agree that no public release or announcement concerning the Contemplated Transactions shall be issued by any party prior to Closing except as required by Applicable Law, including the Bankruptcy Code, as Seller reasonably determines is in the best interests of the Seller's estate in the Bankruptcy Case, or as mutually agreed by the Buyer and Seller. Buyer and Seller will jointly prepare and approve, through counsel, announcements to staff and the public.

Section 6.09    Commercially Reasonable Efforts.    Seller and Buyer shall use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Contemplated Transactions, including using commercially reasonable efforts to accomplish the following: (i) the taking of all reasonable acts necessary to cause the conditions precedent set forth in Article VIII and Article IX to be satisfied, (ii) the obtaining, at the earliest practicable date, of all necessary Approvals and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority, and (iii) the execution or delivery of any additional instruments necessary to consummate the Contemplated Transactions and to fully carry out the purposes of this Agreement.

Section 6.10    Reports.  Seller shall file on a current and timely basis until the Closing, all reports and documents required to be filed with respect to the Permits set forth in Schedule 4.08(a) of the Disclosure Schedules. Accurate and complete copies of all such reports filed as of the Execution Date and continuing through the Closing shall be promptly supplied to Buyer by Seller.

Section 6.11    Post-Closing Records Obligations of Seller.  Following Closing, Seller shall use, and shall cause Seller's Affiliates to use, reasonable diligent efforts to cooperate with Buyer and its Affiliates to the extent not previously transferred to Buyer, to provide any records in Seller's custody or control which may be requested of Buyer by any authorized Governmental Authority. This Section 6.11 shall survive the Closing.

Section 6.12    Permits and Approvals.  Seller shall be responsible for facilitating the transfer of all applicable transferred Permits and Approvals from Seller to Buyer or, at Buyer's request, to Post-Closing Licensee, and Buyer and Post-Closing Licensee shall be responsible for obtaining all other new licenses and permits (to the extent the existing Permits and Approvals are not transferable) to enable Buyer to operate the facilities as Buyer deems appropriate. Seller shall, at its sole cost and expense, promptly submit after the Sale Order (unless earlier as otherwise

-42-

agreed by Seller and Buyer) all necessary applications and other materials to the appropriate Governmental Authority and take such other actions to effect the transfer of the transferred applicable Permits or issuance of new permits as of the Closing, and Seller shall reasonably cooperate with Buyer to cause the transferred Permits to be transferred or new permits to be issued to Buyer or Post-Closing Licensee.

**Section 6.13    Extension of Closing**.  Closing Date shall occur no later than July 15, 2019, however, notwithstanding anything to the contrary contained herein, Buyer and Seller may extend the date of Closing upon mutual agreement and subject to the approval of the Bankruptcy Court.

**Section 6.14    Casualty**.  The risk of any loss or damage to the Assets by fire or other casualty before the Closing shall continue to be borne by Seller. Seller shall promptly give Buyer written notice of any fire or other casualty (in any event within five (5) days after Seller first has knowledge of the occurrence of same), which notice shall include a description thereof in reasonable detail and an estimate of the cost of time to repair. If any portion of the Assets is damaged by fire or casualty after the Execution Date, Buyer may, at Buyer's option, and in its sole discretion, either: (a) terminate this Agreement by notice to Seller on or before the earlier of the Closing or the tenth (10th) day after receipt of such notice described above, in which event no party shall have any further liability to the party under this Agreement and the Refundable Deposit shall be returned to Buyer, (b) receive a credit at Closing of the estimated cost or repairs to the Assets, as determined by the an independent adjuster, plus any reasonably estimated lost revenue following Closing arising from such fire or casualty; or (c) receive from Seller at Closing (I) an assignment, without representation or warranty by or recourse against Seller, of all insurance claims and proceeds with respect thereto, plus (II) an amount equal to Seller's insurance deductible, plus (III) a credit for the amount of any reasonably estimated lost revenue following Closing arising from such fire or casualty. The parties' obligations, if any, under this Section 6.14 shall survive the expiration or any termination of this Agreement.

**Section 6.15    Collection of Accounts Receivable.**  Notwithstanding anything in this Agreement to the contrary, Buyer agrees to provide Seller and Bank of New York Mellon, as Bond Trustee, or their agents with reasonable access to computers, software, licenses, medical records (if any), patient payor source information, claims submission/rejection/status information and remittance advices, and all other assets and information, owned or controlled by Seller prior to Closing and owned or controlled by Buyer post-Closing, as reasonably necessary so that Buyer can attempt to properly bill and collect for all services rendered prior to the Effective Time. Buyer shall not be required to incur more than minimal out-of-pocket expense to provide such access. Where more than minimal out-of-pocket expense is required, such access will be provided if Seller, Bank of New York Mellon, as Bond Trustee, or their agents, pays such out-of-pocket expense to Buyer.  For the avoidance of doubt and notwithstanding anything herein to the contrary, Buyer shall have no responsibility for the collection of the accounts receivable and no liability related to the ability or inability to collect the accounts receivable or any portion.

**ARTICLE VII.**
**OTHER AGREEMENTS**

**Section 7.01    Taxes**.

-43-

(a)     Any transfer, documentary, sales, use, stamp, registration and other similar non-income Taxes, and all conveyance fees, recording charges and other similar fees and charges (including any penalties and interest) incurred in connection with the consummation of the Contemplated Transactions, but excluding for all purposes, the Asset Taxes (collectively, the "Transfer Taxes") shall be borne by Buyer. Seller and Buyer shall use commercially reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Assets from any Transfer Taxes, including under Section 1146(a) of the Bankruptcy Code. Buyer will, at its own expense, file all necessary Tax Returns and other documentation with respect to all Transfer Taxes, and, if required by Applicable Law, the Parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation.

(b)     Seller shall retain responsibility for, and shall bear and pay, all Asset Taxes based upon operation or ownership of the Assets and the Business for (i) any period ending prior to the Effective Time and (ii) the portion of any Straddle Period ending prior to the Effective Time. Buyer shall bear and pay all Asset Taxes assessed with respect to the Assets for (i) any taxable period beginning on or after the Effective Time and (ii) the portion of any Straddle Period beginning on or after the Effective Time. For purposes of allocation between the Parties of Asset Taxes assessed with respect to the Assets that are payable with respect to any Tax periods beginning before and ending after the Effective Time ("Straddle Periods"), the portion of any such Taxes that are attributable to the portion of the Straddle Period that ends prior to the Effective Time shall be allocated pro rata per day between the period prior to the Effective Time (which shall be Seller's responsibility) and the period from and after the Effective Time (which shall be Buyer's responsibility). At the Closing, Asset Taxes with respect to each Asset for the applicable Straddle Period shall be prorated in accordance with the foregoing provisions based on the Asset Tax assessment for such Asset for such Straddle Period, if available, or if otherwise, based on the Asset Taxes paid with respect to such Asset during the preceding Tax period. With respect to any not yet delinquent Taxes relating to a Tax year ending after the Closing Date, Buyer will assume responsibility for the actual payment of all such Taxes to the applicable Governmental Authority.

(c)     Seller, on the one hand, or Buyer, on the other hand, as the case may be (the "Reimbursing Party"), shall provide reimbursement for any Tax paid by the other (the "Paying Party") all or a portion of which is the responsibility of the Reimbursing Party in accordance with the terms of this Section 7.01(c) or which represents an overpayment for Taxes by the Paying Party. Within a reasonable time prior to the payment of any such Tax, the Paying Party shall give notice to the Reimbursing Party of the Tax payable and the Paying Party's and Reimbursing Party's respective Liability therefor, although failure to do so will not relieve the Reimbursing Party from its Liability hereunder except to the extent the Reimbursing Party is prejudiced thereby.

(d)     Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Assets (including access to books and records and Tax Returns and related working papers dated before Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing

-44-

authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any federal, state or local business Tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the Assets are located; *provided*, *however*, that neither Buyer nor Seller shall be required to disclose the contents of its income Tax Returns to any Person. Any expenses incurred in furnishing such information or assistance pursuant to this Section 7.01(d) shall be borne by the Party requesting it.

**Section 7.02   Allocation of Purchase Price**.  Within ten (10) days prior to the Closing Date, the Buyer shall deliver a proposed Schedule 7.02 of the Disclosure Schedules setting forth a proposed allocation of the Purchase Price among the Assets, and Buyer and Seller will use commercially reasonable efforts to agree prior to the Closing Date on a final Schedule 7.02 of the Disclosure Schedules. The portion of the Purchase Price allocated to each Asset is referred to herein as the "Allocated Value" of such Asset. For purposes of this Agreement, Seller and Buyer agree to be bound by the Allocated Values set forth in any final Schedule 7.02 of the Disclosure Schedules, as required by Applicable Law. Seller and Buyer further agree that for the purpose of making any filings required to be made pursuant to Section 1060 of the Code, and the regulations thereunder, the purchase price as determined for federal income tax purposes shall be allocated among the Assets in a manner consistent with the Allocated Values, as set forth on any final Schedule 7.02 of the Disclosure Schedules (the "Tax Allocation"). If required to make any such filing, Seller and Buyer each agree (i) to report, and to cause their respective Affiliates to report, the federal, state and local income and other Tax consequences of the transactions contemplated herein as required by Section 1060(b) of the Code, and (ii) if required by U.S. federal income tax law, to jointly prepare Form 8594 (Asset Acquisition Statement under Section 1060 of the Code) as promptly as possible following the Closing Date and in a manner consistent with the Tax Allocation as revised to take into account subsequent adjustments to the purchase price as determined for applicable purposes, and (iii) to not take any position inconsistent with any such required Tax return, or any refund claim, litigation, investigation, or otherwise, unless required to do so by any Applicable Order after notice to and discussions with the other Party, or with such other Party's prior consent; *provided, however,* that nothing contained herein shall prevent Buyer or Seller from settling any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the Tax Allocation, and neither Buyer nor Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Authority challenging the Tax Allocation.

**Section 7.03   Bulk Sales**.  To the extent applicable, Buyer and Seller hereby waive compliance with all "*bulk sales*," "*bulk transfer*" and similar Applicable Law that may otherwise be applicable with respect to the sale and transfer of any or all of the Assets to Buyer.

**Section 7.04   Adequate Assurance and Performance; Security Arrangements**.

(a)      Buyer shall provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer of the Assigned Contracts. Buyer and Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and

other documents or information for filing with the Bankruptcy Court and making Buyer's and Seller's employees and Representatives available to testify before the Bankruptcy Court.

(b)    Buyer shall pay, perform or satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with their respective terms.

(c)    Without limiting the provisions of Section 7.04(a) and Section 7.04(b), Buyer acknowledges that the bonds, surety bonds, letters of credit, guarantees, and/or cash deposits, set forth on Schedule 7.04(c) of the Disclosure Schedules (collectively the "Security Arrangements") have been provided by Seller and/or its Affiliates to secure the payment and/or performance of certain obligations related to the Assets. Buyer acknowledges that Seller has no duty to maintain any Security Arrangements after the Closing. To the extent Seller and/or any of their Affiliates have any obligations pursuant to any Security Arrangement or have pledged or otherwise provided any property that secures any such Security Arrangement (collectively, the "Seller's Obligations"), Seller shall take such actions, prior to Closing, as are necessary to cause Seller's Obligations and the Security Arrangements to be released and terminated, and any of Seller's property pledged or otherwise provided to secure such Security Arrangements returned to Seller, concurrent with the Closing.

## Section 7.05    Employee Matters.

(a)    No later than ten (10) Business Days before the Closing Date, Seller shall update the list of Employees on Schedule 4.13(a) of the Disclosure Schedules to reflect any and all employment hirings or terminations occurring prior to the Closing Date.   In connection therewith, Seller will provide Buyer with Schedule 7.05(a) of the Disclosure Schedules, which is the list of all Employees hired or terminated after the Execution Date and prior to the Closing Date. In addition, Seller shall provide Buyer no later than five (5) Business Days following the Closing Date, with an accurate and complete list of any and all employment losses (within the meaning of the WARN Act) incurred during the ninety (90) day period prior to the Closing Date.

(b)    Seller shall cause Buyer to receive, after the Sale Order, access to the Employees at times and in a manner requested by Buyer and reasonably acceptable to Seller, and with information reasonably requested by Buyer with respect to compensation and benefits of the Employees. Subject to Buyer's or its Affiliate's standard employment policies, and such employees' successful completion of Buyer's or its Affiliate's hiring processes, including but not limited to criminal background checks, drug screening, verification of licensure (to the extent required for the job), and excluded persons screening, no fewer than ten (10) Business Days prior to the Closing Date, Buyer shall offer (or shall cause one of its Affiliates to offer) employment effective as of the Closing (or with respect to Inactive Employees, from and after the date any such Inactive Employee returns to active employment) to the Employees it shall determine in its sole discretion, and on such terms and conditions as it shall determine in its sole discretion (the "Offered Employees"). All such Employees, if any, who (i) are offered employment from Buyer or

one of its Affiliates (the "Buyer Employer"), (ii) accept such offer of employment from the Buyer Employer and (iii) commence employment with the Buyer Employer shall be referred to herein as the "Transferred Employees." Seller understands and acknowledges that Buyer does not intend to operate the assets of the Business as a going concern or as operated by Seller and that Buyer does not agree or intend to offer employment to all or any specific number, of Seller's employees. Buyer specifically does not agree nor does it intend to offer employment to or hire a sufficient number of employees to avoid a plant closing or mass layoff as such terms are defined by the WARN Act. Accordingly, Seller agrees that it shall provide notice to all affected employees (and any other Persons, offices, or entities as required by the WARN Act) not less than sixty (60) days prior to the Closing Date or termination date of such employees if earlier than the Closing Date. Seller and Buyer shall cooperate to identify affected employees, but in any event and regardless of the preceding statement, Seller shall at all times remain solely and exclusively responsible for providing notice to any and all affected employees (and any other Persons, offices, or entities as required by the WARN Act), and Buyer shall have no obligation for providing such notice and shall not be responsible for any liability arising out of a failure to give such notice. Accordingly, Seller agrees to indemnify and hold harmless Buyer with respect to any costs (including reasonable attorneys' fees and costs), liabilities, judgments, or any other sums or amounts as a result of or arising from a failure to provide any and all notices required under the WARN Act.

(c)     The employment of each Transferred Employee with the Buyer Employer shall commence immediately upon the Effective Time (except for Inactive Employees whose employment with the Buyer Employer shall commence from and after the day any such Inactive Employee returns to active employment) and shall be deemed, for all purposes, consistent with Applicable Law, to have occurred with no interruption or break in service; *provided, however*, that any Inactive Employee who accepts an offer of employment from the Buyer Employer shall not be considered a Transferred Employee unless and until such Inactive Employee returns to active status pursuant to the following sentence, and notwithstanding anything herein to the contrary, Buyer and its Affiliates shall only be responsible for Liabilities relating to the Inactive Employee from and after the date such Inactive Employee becomes a Transferred Employee. The employment of any Inactive Employee with the Buyer Employer shall be effective upon his or her return to active work, *provided that* the Inactive Employee reports to work with the Buyer Employer within fifteen (15) days after the end of any such approved leave and, to the extent permitted by Applicable Law, in no event later than three hundred sixty-five (365) days following the Closing Date, and, as of such date, such Inactive Employee shall be a Transferred Employee. Each Transferred Employee shall be hired on an "*at will*" basis unless otherwise agreed by Buyer.

(d)     Seller shall terminate the employment of all Transferred Employees effective as of immediately before the Effective Time or, with respect to any Inactive Employee who becomes a Transferred Employee after the Closing Date in accordance with Section 7.05(c), upon their return to active work with the Buyer Employer. Subject to, and effective as of, the Closing, Seller hereby waives and releases each of the Transferred Employees from any and all contractual, common law or other restrictions related to non-competition or non-solicitation enforceable by Seller with respect to the employment, of

-47-

such individuals by Buyer Employer after their termination of employment with Seller except with respect to obligations related to confidentiality and trade secrets and except to the extent that Buyer seeks to enforce such obligations in accordance with the terms of the Assigned Contracts.

(e)    Pursuant to the "*Standard Procedure*" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320, (i) Buyer and the applicable Seller shall report on a predecessor/successor basis as set forth therein, (ii) Seller will not be relieved from filing a Form W-2 with respect to any Transferred Employees for any tax period ending immediately prior to the Closing Date and the tax year including the Closing Date with respect to the portion of such year that such Transferred Employee was employed by Seller, and (iii) Buyer will undertake to file (or cause to be filed) a Form W-2 for each such Transferred Employee with respect to the portion of the year during which such Transferred Employees are employed by Buyer, excluding the portion of such year that such Transferred Employee was employed by Seller and its Affiliates.

(f)    With respect to any accrued but unused vacation, paid time-off or similar benefits ("Accrued PTO") to which any Transferred Employee is entitled pursuant to the vacation policy or other arrangement applicable to such Transferred Employee immediately prior to the Closing, Seller shall cash out such Accrued PTO upon or in connection with Seller's termination of such Transferred Employee's employment with Seller.  Buyer shall assume no liability for any Accrued PTO for any employee of Seller regardless of whether the employee is an Offered Employee, Transferred Employee, or neither. Seller shall be solely responsible, and Buyer shall have no obligations whatsoever for, any such Accrued PTO payable to such Transferred Employee, and Seller shall pay all such amounts to all entitled persons on or prior to the Closing Date.

(g)    Nothing herein, express or implied, shall confer upon any other Persons (including any current or former employee or contractor of Seller, Buyer or any of their respective Affiliates) any rights or remedies hereunder, including any right to employment or continued employment for any specified period or continued participation in any Benefit Plan or other benefit plan, or any nature or kind whatsoever under or by reason of this Agreement. Nothing herein restricts or precludes the right of Buyer to terminate the employment of any Transferred Employee. Buyer and Seller agree that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third party, including any current or former Employee or Service Provider.

(h)    Schedule 7.05(h) of the Disclosure Schedules contain a list of each Employee Plan.

(i)    Seller shall offer COBRA continuation coverage (within the meaning of Section 4980B of the Code and the Treasury regulations thereunder) to all individuals who are "M&A qualified beneficiaries" (within the meaning of Treasury Regulation Section 54.4980B-9, Q&A-4) with respect to the Contemplated Transactions for the duration of the period to which such individuals are entitled to such coverage.

-48-

**Section 7.06   Post-Closing Books and Records and Personnel**.  At Closing, Seller will make available to Buyer all electronic copies of the Records that are maintained by or in the control of Seller, and, promptly following Closing and in any event no later than five (5) Business Days following Closing, Seller shall make available to Buyer all originals of the Records; provided, however, that Seller shall be entitled to retain any originals of the Records that are required to be retained as a result of the Bankruptcy Case, for such period of time sufficient to allow all matters under the Bankruptcy Case to be finally determined, and provided further that Buyer shall promptly receive copies of such originals that are required to be retained by Seller as a result of the Bankruptcy Case at its sole cost and expense. Subject to the foregoing, Seller shall be entitled to retain a copy of the Records delivered to Buyer, at Seller's sole cost and expense. For one (1) year after the Closing Date (or such longer period as may be required by any Governmental Authority or ongoing claim), (a) Buyer shall not destroy or dispose of any material Records received hereunder and (b) Buyer shall allow Seller (including, for clarity, any trust established under a chapter 11 plan of Seller or any other successors of Seller) and any of their Representatives reasonable access during normal business hours, at Seller's sole expense and upon reasonable advance notice, to all Records included in the Assets and in the possession or control of Buyer, for purposes relating to the Bankruptcy Case, the wind-down of the operations of Seller, the functions of any such trusts or successors, or other reasonable business purposes, and Seller (including any such trust or successors) and such Representatives shall have the right to make copies of any Records.  For the avoidance of doubt, Seller shall retain and remain responsible for all medical records and other health records of Seller's patients, as further described in Section 7.07.

**Section 7.07   Medical Records Retention**.  Seller shall retain responsibility for and ownership of all medical records and other health records of Seller's patients, and shall provide access to such records to Buyer upon written request as necessary for Buyer to provide medical care for such patients.  Seller acknowledges that for purposes of 11 U.S.C. § 351, Seller does not have a sufficient amount of funds to pay for the storage of patient records in the manner required under applicable Federal or State law.  As a result, the Parties agree as follows:

(a)   Seller shall, prior to Closing, publish the notice required by 11 U.S.C. §351(1)(A);

(b)   Seller shall, prior to Closing, provide the notices required by 11 U.S.C. §351(1)(B);

(c)   Buyer shall, prior to Closing, assist Seller in identifying and engaging a qualified third party to undertake the Seller's obligations under 11 U.S.C. § 351(2) and (3) as an agent of Seller;

(d)   Buyer shall, at Closing, and in addition to the Purchase Price, pay Seller an amount not to exceed Two Hundred Fifty Thousand Dollars ($250,000.00) towards the actual expenses incurred by Seller in engaging a third party to discharge its obligations under this Section 7.07 and 11 U.S.C. § 351(2) and (3); and

(e)   To the extent required for Seller to satisfy its obligations under 11 U.S.C. § 351 and other state and/or federal obligations, Buyer shall cooperate with Seller as

-49-

reasonably required so that Seller can access medical records (including electronic medical records), in the control of Buyer, if any, post-Closing.

**Section 7.08    Condemnation**.  The risk of any loss or damage to the Real Property by condemnation before the Closing shall continue to be borne by Seller. In the event any condemnation proceeding is commenced or threatened prior to the Closing, Seller shall promptly give Buyer written notice thereof (in any event within five (5) days after Seller first has knowledge of the occurrence of same), together with such reasonable details with respect thereto as to which Seller may have knowledge. If, prior to Closing, there is a material taking by eminent domain at the Real Property, this Agreement shall become null and void at Buyer's option, and upon receipt by Seller of the written notice of an election by Buyer to treat this Agreement as null and void, this Agreement shall be deemed null and void. If Buyer elects to proceed and to consummate the purchase despite said material taking, or if there is less than a material taking prior to Closing, there shall be no reduction in or abatement of the Purchase Price and Buyer shall be required to purchase the Real Property in accordance with the terms of this Agreement, and Seller shall assign to Buyer, without representation of warranty by or recourse against Seller, all of Seller's right, title and interest in and to any award made or to be made in the condemnation proceeding (in which event Buyer shall have the right to participate in the adjustment and settlement of any insurance claim relating to said damage). For the purpose of this Section 7.08, the term "*material*" shall mean any taking which would have the effect of (i) reducing the square footage of the Facilities, (ii) reasonably require the demolition, reconstruction, or reconfiguration of the Facilities,  or (iii) reducing the gross acreage of the Real Property by at least fifteen percent (15%). The parties' obligations, if any, under this Section 7.08 shall survive the expiration or any termination of this Agreement.

**Section 7.09    Payment of Broker and Finder's Fees**.  Subject to any approval process required under the Bankruptcy Case, Seller shall pay all of the fees and costs and expenses due to its brokers, finders, and investment bankers, at the Closing. The Seller's obligations under this Section 7.09 shall survive the expiration or any termination of this Agreement.

**ARTICLE VIII.**
**CONDITIONS PRECEDENT TO THE**
**OBLIGATION OF BUYER TO CLOSE**

Buyer's obligation to close pursuant to the terms of this Agreement is subject to the satisfaction, on or prior to the Closing, of each of the following conditions, unless waived by Buyer in writing, and if there is a failure of any of these conditions to be met, then Buyer can terminate this Agreement without penalty and receive the Refundable Deposit back on a timely basis:

**Section 8.01    Accuracy of Representations and Warranties; Closing Certificate**. Except for any changes permitted by the terms of this Agreement or consented to in writing by Buyer, each of the representations and warranties made by Seller in this Agreement or in any Transaction Document shall be true and correct on the Execution Date and shall be true and correct as of the Closing Date, as though such representations and warranties were made or given on and as of the Closing, unless such representation and warranty speaks only as of a specific date in which case it shall be true and correct as of such date.

-50-

**Section 8.02    Performance of Agreement**.  Seller shall in all material respects have performed or complied with all its covenants, agreements and obligations required by this Agreement to be performed or complied with by Seller prior to or upon the Closing.

**Section 8.03    Seller Closing Certificate**.  Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Seller, that each of the conditions set forth in Section 8.01 and Section 8.02 have been satisfied (the "Seller Closing Certificate").

**Section 8.04    Conveyance of Property**.  Seller shall have conveyed to Buyer the Real Property, Free and Clear of all Liens, except Permitted Liens.

**Section 8.05    Delivery of Closing Documents**.  Seller shall have delivered or caused to be delivered to Buyer on the Closing each of the Transaction Documents required to be delivered pursuant to Section 10.02.

**Section 8.06    Required Approvals**.  All of consents and approvals of any Person set forth in Schedule 8.07 of the Disclosure Schedules shall have been received.

**Section 8.07    Governmental Approvals**.  Seller shall have obtained all authorizations, Permits, Approvals, consents, orders, or approvals of, shall have made all declarations or filings with, and shall have allowed the expiration of waiting periods imposed by, any Governmental Authority or other third party necessary for the consummation of the Contemplated Transactions and operation of the Assets.

**Section 8.08    Cure Costs of Assigned Contracts**.  If the actual costs in connection with the assumption of the Assigned Contracts, in the aggregate, exceed the aggregate Cure Cost Cap based on the orders from the Bankruptcy Court, then Buyer shall have the option to (a) pay the excess amounts, or (b) remove an agreement or agreements from the Assigned Contracts list and thereupon any such Contract shall be deemed to be an Excluded Contract.

**Section 8.09    Entry of Sale Order**.  The entry of Sale Order on or before July 5, 2019 or as provided in Section 2.07(f), and such Sale Order becoming a Final Order on or before July 15, 2019 or will become a Final Order upon consummation of the Contemplated Transactions.

**Section 8.10    No Material Adverse Effect**.  No Material Adverse Effect shall have occurred with respect to Seller or the Business or the Assets prior to the Closing.

**Section 8.11    Title Commitment**.  Buyer shall have received the Title Commitment from Title Company and shall have satisfied itself with those matters reflected thereon and any documentation provided by the Title Company and related thereto.  The Title Commitment shall be updated as of the Closing insuring that portion of the Purchase Price allocated to the Real Property.

**Section 8.12    ALTA Survey**.  Buyer shall have received the Survey and shall have satisfied itself with those matters reflected thereon.  The cost of the Survey shall be paid by Buyer. Buyer shall order the Survey within five (5) days after entry of the Sale Order.

-51-

**Section 8.13    Environmental Reports**.  Buyer shall have obtained an environmental site assessment of the Real Property and buildings from an environmental consultant selected by Buyer (which shall include, but not be limited to, a Phase I, air quality test and mold contamination tests), indicating that the Real Property is free from any material environmental hazards or contamination. The Cost of the site assessment obtained by Buyer, and any subsequent testing, shall be paid by Buyer.  Buyer shall order any required Environmental Reports (except as to follow up reports Seller deems necessary based on the results of the initial reports) within five (5) business days after entry of the Sale Order.

**Section 8.14    Zoning Compliance**.    Buyer shall have obtained confirmation from applicable Governmental Authorities that the Real Property is zoned to allow the Real Property to be used for inpatient, outpatient, emergency, and other ancillary services, and other similar healthcare and residential uses, and will continue to permit such uses after Closing.

**Section 8.15    Estoppel Certificates**.    Buyer shall have received estoppel certificates executed by the tenants under the Tenant Leases set forth on Schedule 4.14(b), evidencing whether or not (i) the Tenant Lease is in full force and effect, (ii) the Tenant Lease has been amended in any way, (iii) there are any existing defaults on the part of Seller thereunder and specifying the nature of such defaults, if any, (iv) the date to which rent, and other amounts due thereunder, if any, have been paid, and (v) such other information as may be reasonably requested by Buyer.

**Section 8.16    Additional Deliveries**.    Seller shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO THE
## OBLIGATION OF SELLER TO CLOSE

The obligation of Seller to close pursuant to the terms of this Agreement is subject to the satisfaction, on or prior to the Closing, of each of the following conditions, unless waived by Seller in writing:

**Section 9.01    Accuracy of Representations and Warranties**.  The representations and warranties of Buyer contained in this Agreement shall be true and correct on the Execution Date and shall be true and correct, in all material respects, as of the Closing Date as though such representations and warranties were made or given on and as of the Closing Date, unless such representation and warranty speaks only as of a specific date in which case it shall be true and correct as of such date.

**Section 9.02    Performance of Agreements**.  Buyer shall have performed in all material respects all of its covenants, agreements, and obligations required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or upon the Closing.

**Section 9.03    Buyer Closing Certificate**.  Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in Section 9.01 and Section 9.02 have been satisfied (the "Buyer Closing Certificate").

**Section 9.04    Delivery of Closing Documents**.  Buyer shall have delivered or caused to be delivered to Seller on the Closing each of the Transaction Documents required to be delivered pursuant to Section 10.03.

**Section 9.05    Unfavorable Action or Proceeding**.  On the Closing Date, no Orders, decrees, judgments or injunctions of any court or Governmental Authority shall be in effect, and no claims, Actions, suits, Proceedings, arbitrations or investigations shall be pending, which challenge or seek to challenge, or which could prevent or cause the rescission of, the consummation of the Contemplated Transactions.

**Section 9.06    Final Sale Order**.  The Sale Order (a) shall have been entered by the Bankruptcy Court, and (b) shall have become a Final Order or will become a Final Order upon consummation of the Contemplated Transactions.

**Section 9.07    Cure Costs**.  Buyer shall have paid the Cure Costs of the Assigned Contracts up to the aggregate Cure Cost Cap, together with any additional Cure Costs it has elected to pay.

**ARTICLE X.**
**CLOSING**

**Section 10.01  Closing Date and Place**.  The Closing shall take place on the date that is two (2) Business Days after the satisfaction of all conditions to Closing contained in Article VIII and Article IX, but in no event later than July 15, 2019 (the "Drop Dead Date"), or at such earlier or later date and time as may be expressly agreed upon in writing by Buyer and Seller (the "Closing Date"). Time is of the essence in the performance of this Agreement. The Closing shall be accomplished by Buyer and Seller depositing the Closing Documents into escrow with the Title Company and Buyer and Seller issuing their respective instructions to the Title Company without the need for attending in person unless the parties mutually agree otherwise.

**Section 10.02  Deliveries of Seller**.  At the Closing, Seller shall deliver or cause to be delivered to Buyer and/or other Persons the following, in each case in form and substance reasonably satisfactory to Buyer, and to the extent required, executed by a duly authorized officer of Seller:

(a)    A governmental certificate, dated as of a date as near as practicable to the Closing, showing that Seller (i) is duly organized and in good standing in the state of organization of Seller, and (ii) is qualified to do business in the state in which the Real Property is located.

(b)    A certificate of the secretary (or the equivalent thereto if none) of Seller attesting as to the incumbency of each manager, officer, and authorized Representative of Seller who executes this Agreement and any of the other Transaction Documents, certifying that resolutions and consents necessary for Seller to act in accordance with the terms of this Agreement have been adopted or obtained (with copies thereof attached) and to similar customary matters.

(c)    A copy of the Sale Order.

(d)     A Deed conveying the Real Property, free of all Liens other than the Permitted Liens, in substantially the form attached hereto as Exhibit B.

(e)     A Bill of Sale, Assignment and Assumption Agreement transferring the Assets (other than the Real Property) and Assumed Liabilities to Buyer, free of all Liens other than the Permitted Liens, in substantially the form attached hereto as Exhibit A.

(f)     A certificate of non-foreign status under Section 1445 of the Code, complying with the requirements of the Income Tax Regulations promulgated pursuant to such Section, in substantially the form attached hereto as Exhibit C.

(g)     The Seller Closing Certificate.

(h)     The Holdback Escrow Agreement, in substantially the form attached hereto as Exhibit D.

(i)     A base owner's title insurance policy to Buyer at Closing (such expense to be paid by Seller), in the amount of the Purchase Price in accordance with the Title Commitment, subject only to the Permitted Exceptions, and which shall delete the standard exceptions, and provide extended coverage, insuring fee simple title to the Real Property in Buyer, for the full amount of the Purchase Price, each in a form available in the State of Indiana (the "Title Insurance Policy"). Seller shall pay for any endorsements to the Title Insurance Policy required to cure any objections of Buyer to the Title Commitment or Survey, and Buyer shall pay for any other endorsements required by it or its lender.

(j)     A certificate or affidavit in form and substance reasonably required by the Title Company to delete the standard non-survey exceptions to the Title Insurance Policy.

(k)     Seller's counterpart to the Indiana Sales Disclosure Form.

(l)     Seller shall comply with Section 7.06.

(m)     A counterpart of the Preliminary Settlement Statement.

(n)     All Consents and Approvals from all third parties, Governmental Authority, and the Bankruptcy Court necessary for consummation of the Contemplated Transactions.

(o)     Such additional information, materials, affidavits and certificates as Buyer shall reasonably request to evidence the satisfaction of the conditions to Seller's obligations hereunder, including without limitation, title affidavits, such affidavits and indemnities as the Title Insurer may reasonably require to issue the Title Insurance Policy, the gap coverage and all endorsements and any other documents expressly required by this Agreement to be delivered by Seller at Closing, or as may be reasonably required by the Title Company.

(p)     Amounts due and owing to Seller's broker, which will be paid by Seller to Seller's broker out of proceeds from the Cash Purchase Price.

-54-

**Section 10.03 Deliveries of Buyer**.  At the Closing, Buyer shall deliver or cause to be delivered to Seller and/or other Persons, the following, in each case in form and substance reasonably satisfactory to Seller, and to the extent required, executed by a duly authorized officer of Buyer:

(a)     The Cash Purchase Price by wire transfer in accordance with Section 3.01, subject to the adjustments under Section 3.04.

(b)     The Cure Costs in accordance with Section 2.08.

(c)     The payment provided for in Section 7.07(d).

(d)     The Bill of Sale, Assignment and Assumption Agreement transferring the Assets (other than the Real Property) and the Assumed Liabilities to Buyer, Free and Clear of all Liens other than the Permitted Liens, in substantially the form attached hereto as Exhibit A.

(e)     Resolutions of the Executive Committee of the Board of Directors of Buyer and/or the Board of Directors of Buyer approving the transaction.

(f)     The Holdback Escrow Agreement, in substantially the form attached hereto as Exhibit D.

(g)     Buyer's counterpart to the Indiana Sales Disclosure Form.

(h)     A governmental certificate, dated as of a date as near as practicable to the Closing, showing that Buyer is (i) duly organized and in existence in the state of its formation, and (ii) is qualified to do business in the state where the Real Property is located.

(i)     A certificate of the secretary (or the equivalent thereto if none) of Buyer attesting as to the incumbency of each manager, officer, and authorized Representative of Buyer who executes this Agreement and any of the other Transaction Documents, certifying that resolutions and consents necessary for Buyer to act in accordance with the terms of this Agreement have been adopted or obtained (with copies thereof attached) and to similar customary matters.

(j)     A counterpart of the Preliminary Settlement Statement.

(k)     Such additional information, materials, affidavits and certificates as Seller shall reasonably request to evidence the satisfaction of the conditions to Seller's obligations hereunder, including without limitation, any documents expressly required by this Agreement to be delivered by Buyer or its Affiliates at Closing.

**ARTICLE XI.**
**SURVIVAL OF REPRESENTATIONS,**
**WARRANTIES AND COVENANTS**

**Section 11.01  Survival**.  All covenants and agreements contained in this Agreement or any other Transaction Document which by their terms are to be performed in whole or in part, or which prohibit actions, at or subsequent to the Closing shall survive the Closing hereunder until the date following ninety (90) days after all applicable statute of limitations or for such shorter period explicitly specified therein. The party that breaches such covenants and agreements (the "Breaching Party") shall be liable to, and shall hold harmless, the other party after the Closing for any Losses suffered or incurred by such other party as the result of the breach of such covenants and agreements by such Breaching Party. Subject to the foregoing, and excluding in the case of fraud or intentional misconduct, all other covenants and agreements contained in this Agreement to be performed prior to the Closing, and all representations and warranties contained in this Agreement or in any certificates delivered at Closing, shall not survive the Closing and shall thereupon terminate, excluding any Proceedings for damages in respect of any breach thereof.

**Section 11.02  Holdback Escrow Agreement**.  The parties agree that at Closing, in connection with any and all Reimbursable Claims, Buyer shall pay to the Escrow Agent the amount of Five Hundred and Fifty Thousand Dollars ($550,000) (the "Holdback Escrow Amount") to be held in escrow and disbursed by the Escrow Agent pursuant to an escrow agreement based on the form attached hereto as Exhibit D (the "Holdback Escrow Agreement").  As set forth in Section 3.03(b), the Holdback Escrow Amount shall be paid from the Cash Purchase Price otherwise due to Seller at Closing.  On the second (2nd) year anniversary of the Closing Date, the Holdback Escrow Amount, minus any amount due to the Buyer pursuant to Section 11.03 for Reimbursable Claims, shall be disbursed to the Seller (or its designee), subject to and in accordance with the terms of the Holdback Escrow Agreement.

**Section 11.03  Claims Against the Holdback Escrow Agreement**.  Buyer, acting in good faith, shall have the right to be reimbursed and made whole by the Escrow Agent from the Holdback Escrow Amount under the Holdback Escrow Agreement in the event that Buyer suffers or incurs, or will likely suffer or incur, any Claims or Losses as the result of or in connection with the following ("Reimbursable Claims"):  (a) to satisfy any expenses or losses, including reasonable attorneys' fees, Buyer incurs to defend against a claim for COBRA continuation coverage from a former Seller employee or applicable dependents, (b) to pay for COBRA-related health claims incurred by any such individual, and/or (c) to otherwise resolve a complaint or other demand from any such individual related to COBRA continuation coverage; and (d) any and all Proceedings, demands, assessments, audits or judgments arising out of any of the foregoing.  Buyer shall have the right to notify the Escrow Agent of any Reimbursable Claim at any time prior to the second year anniversary of the Closing Date, and shall specify in reasonable detail the nature of such Reimbursable Claims, the amount, if known, or if not known, a good faith estimate of the amount of the Reimbursable Claim.  Buyer shall first serve upon the Debtor (or its designee), the Committee, and Bank of New York-Mellon a copy of any submission for payment of a Reimbursable Claim Buyer intends to serve upon the Escrow Agent.  Buyer's service of the submission upon the Escrow Agent is subject to the Debtor's consent, which consent shall not be unreasonably delayed, conditioned or withheld.  If Debtor (or its designee) consents to the submission in writing  or fails to object to the submission within five (5) business days from the

Debtor's (or its designee's) receipt of the submission ("Consent"), Buyer may serve the submission upon the Escrow Agent for immediate payment. If the Debtor (or its designee) objects to any submission, any party may request adjudication of the objection by the Bankruptcy Court on not less than three (3) business days' notice. Upon Consent, or, if applicable, the entry of a final order of the Bankruptcy Court, Escrow Agent shall reimburse Buyer the amount of the Reimbursable Claim pursuant to the terms set forth in the Holdback Escrow Agreement. If the Bankruptcy Court determines that Debtor or its designee unreasonably delayed, conditioned or withheld its consent, Buyer shall be entitled to include its reasonable attorney's fees as part of the Reimbursable Claim and be paid for such fees out of the escrow. If the Bankruptcy Court determines that Debtor's or its designee's decision to delay, condition or withhold its consent was reasonable, Buyer shall pay the reasonable attorney's fees of the Debtor or its designee. Excluding any actions resulting from fraud or intentional misconduct, recovery against the Holdback Escrow Agreement shall be Buyer's sole remedy for Reimbursable Claims. For purposes of this <u>Section 11.03</u>, the term "Debtor" shall mean Fayette Memorial Hospital Association, Inc., the debtor in the Bankruptcy Case, and shall include its successors and assigns.

## ARTICLE XII.
## DEFAULT AND TERMINATION

**<u>Section 12.01</u> <u>Termination Events</u>**.

(a)    by either Seller or Buyer, if a Governmental Authority issues a final, non-appealable ruling or Order prohibiting the Contemplated Transactions where such ruling or Order was not requested, encouraged or supported by any of Seller or Buyer;

(b)    by mutual written consent of Seller and Buyer;

(c)    by either Seller or Buyer, if the Closing shall not have occurred by 5:00 p.m. Eastern Prevailing Time on July 15, 2019 (the "<u>Outside Date</u>"); *provided*, *however*, (i) Buyer shall be permitted to terminate this Agreement pursuant to this <u>Section 12.01(c)</u> only if Buyer is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions), and (ii) Seller shall be permitted to terminate this Agreement pursuant to this <u>Section 12.01(c)</u> only if Seller is not in material breach of any of its representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions);

(d)    by either Party, if the Bankruptcy Court enters an Order dismissing, or converting into a case under chapter 7 of the Bankruptcy Code, the case commenced by Seller under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Case;

(e)    by Buyer in the event of any breach by Seller of any of Seller's agreements, covenants, representations or warranties contained herein and where such breach (i) results or will result in the failure of a condition set forth in <u>Section 8.01</u> or <u>Section 8.02</u> to be

satisfied and (ii) has not been cured by the earlier of (A) fifteen (15) Business Days after the giving of written notice thereof by Buyer to Seller (which notice shall specify the nature of such breach and be given as promptly as practicable) or (B) the Outside Date; *provided*, *however*, that Buyer shall not be permitted to terminate this Agreement pursuant to this Section 12.01(e) if Buyer is itself in material breach of any of its representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions);

(f)    by Seller in the event of any breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein and such breach (i) would result in the failure of a condition set forth in Section 9.01 or Section 9.02 to be satisfied and (ii) has not been cured by the earlier of (A) fifteen (15) Business Days after the giving of written notice thereof by Seller to Buyer (which notice shall specify the nature of such breach and be given as promptly as practicable) and (B) the Outside Date; *provided*, *however*, that Seller shall not be permitted to terminate this Agreement pursuant to this Section 12.01(f) if Seller is itself in material breach of any of Seller's representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions);

(g)    by Buyer if the Sale Order does not become a Final Order by July 15, 2019 prior to the Closing;

(h)    by Buyer if Buyer exercises its termination rights under Article VIII;

(i)    by Seller if Buyer is not pursuing the Closing in a reasonably diligent manner so that the Closing can occur by the Outside Date as determined by the Bankruptcy Court; or

(j)    by Buyer if any material Permit issued to the Seller has been revoked by such Governmental Authority prior to the Closing as the result of the Seller's insolvency and such revocation materially impacts or would be likely to materially impact the Buyer's ability to obtain such Permit to operate the Assets after the Closing.

**Section 12.02  Effect of Termination**.  Subject to Section 6.07, Section 6.14, Section 12.01, Section 12.03, Section 12.04, Section 12.05, and Section 12.06, in the event of termination of this Agreement by Buyer or Seller pursuant to this Section 12.02, all rights and obligations of the Parties under this Agreement (except for any obligations pursuant to their terms are to continue post-Closing or after the termination of this Agreement) shall terminate without any Liability of any party to any other party. The provisions of this Section 12.02, (and, to the extent applicable to the interpretation or enforcement of such provisions, Article I and Article VIII), shall expressly survive the termination of this Agreement. Notwithstanding the foregoing, in the event of termination of this Agreement for any reason pursuant to Section 12.01 other than Section 12.01(f), Buyer, in each case, shall receive a refund of the Refundable Deposit.

**Section 12.03  Remedies Upon Default**.

-58-

(a)    If Seller defaults on its obligation to close the Contemplated Transactions, Buyer shall be entitled to either (i) terminate this Agreement and obtain a refund of its Refundable Deposit; or (ii) the remedy of specific performance in accordance with Section 12.04; as Buyer may elect, however, if such default of Seller or failure to consummate the Contemplated Transactions is the result of intentional fraud, or the willful misconduct of Seller, Buyer shall also be entitled to seek all remedies against Seller.  If Buyer elects to seek specific performance and at any time such remedy is not available as a result of Seller selling the Real Property to a bona fide purchaser, Buyer shall be entitled to seek the remedy under clause (i) of this Section 12.03(a), together with all other damages to which Buyer would otherwise be entitled at law, notwithstanding any waivers and limitations set forth in this Agreement.

(b)    If Buyer defaults on its obligation to close the Contemplated Transactions and Seller is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein, Seller shall be entitled to either (i) terminate this Agreement and retain the Refundable Deposit; or (ii) the remedy of specific performance in accordance with Section 12.04; as Seller may elect, however, if such default of Buyer or failure to consummate the Contemplated Transactions is the result of intentional fraud, or the willful misconduct of Buyer, Seller shall also be entitled to seek all remedies against Buyer.

**Section 12.04  Specific Performance**.  Each party specifically agrees that the other shall be entitled, in the event of a default by the other party to consummate the transaction contemplated by this Agreement, to enforcement of this Agreement by a decree of specific performance or injunctive relief requiring the other party to fulfill its obligations under this Agreement.

**Section 12.05  Obligations Upon Termination**.  Except as otherwise provided herein, if this Agreement is terminated, each of the parties shall bear its own costs incurred in connection with the Contemplated Transactions.

**Section 12.06  Sole and Exclusive Remedy**.  Except for the obligations of Seller and Buyer set forth in Article XI, and except in the event of fraud or willful misconduct, Seller and Buyer each acknowledge and agree that prior to the Closing, such party's sole and exclusive remedy with respect to any and all claims made prior to the Closing for any breach or liability under this Agreement or otherwise relating to the subject matter of this Agreement and the Contemplated Transactions shall be solely in accordance with, and limited to, Section 12.01, Section 12.02, Section 12.03, and Section 12.04. In addition, in no event shall the provisions of this Section 12.06, limit the non-prevailing party's obligation to pay the prevailing party's attorneys' fees and costs pursuant to Section 13.13 hereof.

## ARTICLE XIII.
## MISCELLANEOUS

**Section 13.01  Further Actions**.  From time to time before, at and after the Closing, each party will execute and deliver such other documents as reasonably requested by Buyer or Seller to consummate the Contemplated Transactions.

**Section 13.02** **Notices**.  All notices, demands or other communications given hereunder shall be in writing and shall be sufficiently given if delivered by facsimile (with written confirmation of receipt), by courier (including overnight delivery service), by email (as to communications that are not required notices or demands hereunder), or sent by registered or certified mail, first class, postage prepaid, addressed as follows:

If to Seller, to:

Fayette Memorial Hospital Association, Inc.
c/o Dan Parker, Board Chair
504 N. Central Avenue
Connersville, IN 47331-2046

*with copies to*:

Fultz Maddox Dickens PLC
101 South Fifth Street, 27th Floor
Louisville, KY 40202
Attn. Wendy Brewer & Laura Brymer
Facsimile: 502-588-2020
Email: wbrewer@fmdlegal.com and lbrymer@fmdlegal.com

If to Buyer, to:

Reid Health
1100 Reid Parkway
Richmond, IN  47374
Attention:  Craig C. Kinyon, Chief Executive Officer
Facsimile:  765-983-3219
E-mail:  Craig.Kinyon@reidhealth.org

*with copies to*:

Ice Miller LLP
One American Square Suite 2900
Indianapolis, IN 46282
Attention: Kevin Woodhouse
Facsimile: 317-592-4666
E-mail: kevin.woodhouse@icemiller.com

or such other address as a party may from time to time notify the other parties in writing (as provided above). Any such notice, demand or communication shall be deemed to have been given (i) if so sent by facsimile, upon receipt as evidenced by the sender's written confirmation of receipt, (ii) if so mailed, as of the date delivered, (iii) if emailed, when sent (provided that e-mail does not constitute delivery of any communication that is a required notice or demand hereunder), and (iv) if so delivered by courier, on the date received.

-60-

**Section 13.03  Entire Agreement**.   This Agreement, the Sale Order and the other Transaction Documents constitute the entire agreement and understanding between the parties with respect to the subject matter hereof and supersede any prior negotiations, agreements, understandings, or arrangements between the parties hereto with respect to the subject matter hereof, including without limitation to the Letter of Intent.

**Section 13.04  Binding Effect; Benefits**.   Except as otherwise provided herein, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors or permitted assigns. Except to the extent specified herein, nothing in this Agreement, express or implied, shall confer on any person other than the parties hereto and their respective successors or permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement.

**Section 13.05  Assignment**.   This Agreement may not be assigned by any party prior to Closing without the written consent of the other party, which consent may be given or withheld in each such party's sole and absolute discretion, except that Buyer may assign this Agreement and its rights and obligations hereunder without the consent of Seller (i) to an Affiliate of Buyer, (ii) to a partnership in which Buyer or any Affiliate of Buyer is a general partner, (iii) a limited liability company in which Buyer or any Affiliate of Buyer is a manager or managing member or (iv) any other lawful entity entitled to do business in the state in which the Property is located provided such entity is controlled by, controlling or under the common control with Buyer or any Affiliate of Buyer (each, a "Permitted Buyer-Assignee").

**Section 13.06  Amendments and Waivers; Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver**.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of Indiana applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Indiana applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Parties agree that the Bankruptcy Court shall have jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transactions and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding; *provided*, *however*, that, if the Bankruptcy Case is closed, all Actions and Proceedings arising out of or relating to this Agreement shall be heard and determined in an Indiana state court or a federal court sitting in Indianapolis, Indiana, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action or Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding. The Parties consent to service of process by mail (in accordance with Section 13.02) or any other manner permitted by law.

(c)     **EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR ANY OTHER AGREEMENT CONTEMPLATED HERETO AND THERETO OR THE CONTEMPLATED TRANSACTIONS OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

**Section 13.07  Amendments; Waivers**.  No term or provision of this Agreement may be amended, waived, discharged, or terminated orally, except by an instrument in writing signed by Buyer and Seller with respect to any provision contained herein. Any waiver shall be effective only in accordance with its express terms and conditions.

**Section 13.08  Severability**.  Any provision of this Agreement which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions hereof, and any such unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by Applicable Law, the parties hereto hereby waive any provision of Applicable Law now or hereafter in effect which renders any provision hereof unenforceable in any respect.

**Section 13.09  Counterparts**.  This Agreement may be executed and accepted in one or more counterparts for the convenience of the parties, each of which will be deemed an original and all of which, taken together, shall constitute one and the same instrument. Delivery of a counterpart hereof via facsimile transmission or by electronic mail transmission shall be as effective as delivery of a manually executed counterpart hereof.

**Section 13.10  References**.  All references in this Agreement to Articles and Sections are to Articles and Sections contained in this Agreement unless a different document is expressly specified.

**Section 13.11  Disclosure Schedules; Schedules; Exhibits**.  All Disclosure Schedules and Exhibits referred to herein form an integral part of this Agreement and shall be deemed to be part of this Agreement to the same extent as if set forth in the text of this Agreement. All statements contained in certificates and other instruments attached hereto or delivered or furnished on behalf of any party hereto shall be deemed representations and warranties of that party pursuant to this Agreement.

**Section 13.12  Closing Costs**.  Except as set forth in Section 13.12, Buyer and Seller shall each pay (a) their respective attorneys' fees and expenses and (b) any broker commissions due to any broker engaged by such party respectively.  The Parties acknowledge that fees for Seller's counsel and any broker shall be subject to approval of the Bankruptcy Court.  All of Buyer's due diligence and closing costs (except for the cost of the Title Commitment and Title Insurance Policy and any endorsements obtained by Seller to cure any of Buyer's objections to any matters related to the Title Commitment or Survey, which costs shall be the responsibility of Seller), including, without limitation, all costs and expenses associated with obtaining the Survey, shall be Buyer's responsibility.

**Section 13.13  Attorneys' Fees**.  In the event either party brings an action to enforce or interpret any of the provisions of this Agreement, the "*prevailing party*" in such action shall, in addition to any other recovery, be entitled to its reasonable attorneys' fees and expenses arising from such action and any appeal or any bankruptcy action related thereto, whether or not such matter proceeds to trial. For purposes of this Section 13.13, "*prevailing party*" shall mean, in the case of a person asserting a claim, such person is successful in obtaining substantially all of the relief sought, and in the case of a person defending against or responding to a claim, such person is successful in denying substantially all of the relief sought.

**Section 13.14  Survival of Defined Terms**.  Where this Agreement provides that a term or provision shall survive the Closing or the expiration or earlier termination of this Agreement, any defined terms contained in Article I that are used in such surviving term or provision shall also survive.

**Section 13.15  Time of Essence**.  Time shall be of the essence with respect to all matters contemplated by this Agreement. The time in which any act is to be done under this Agreement is computed by excluding the first day (such as the Execution Date), and including the last day, unless the last day is not a Business Day, in which case that day is also excluded and the event time shall be extended to the next Business Day.

**Section 13.16  No Third-Party Beneficiary**.  The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Buyer and Seller and their permitted assignees only and are not for the benefit of any third party; and, accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

**[SIGNATURE PAGE FOLLOWS]**

-63-

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed as of the Execution Date.

**SELLER:**

**Fayette Memorial Hospital Association, Inc. d/b/a Fayette Regional Health System**

By: _____

Name:  Dan Parker

Title: Chair, Board of Directors


**BUYER:**

**Reid Hospital & Health Care Services, Inc.**

By: _____

Name:  Craig C. Kinyon

Title:  President and Chief Executive Officer

## SPECIAL WARRANTY DEED

THIS INDENTURE WITNESSETH, that Fayette Memorial Hospital Association, Inc. d/b/a Fayette Regional Health System, an Indiana nonprofit corporation, as debtor and debtor-in-possession that that bankruptcy case pending in the United States Bankruptcy Court for the Southern District of Indiana (the "Bankruptcy Court") captioned In re Fayette Memorial Hospital Association, Inc. d/b/a Fayette Regional Health Systems, Case No.: 18-07762-JJG-11 (the "Bankruptcy Case") ("Grantor"), and pursuant to that Order of the Bankruptcy Court dated May __, 2019, CONVEYS AND SPECIALLY WARRANTS to Reid Hospital & Health Care Services, Inc., an Indiana nonprofit corporation (the "Grantee"), all of its right, title and interest in and to certain real property situated in Fayette County, in the State of Indiana, which real property is more particularly described in **Exhibit A** attached hereto and incorporated herein by reference (the "Real Estate"), for the sum of Ten Dollars ($10.00) and other valuable consideration, the receipt of which are hereby acknowledged.

SUBJECT TO (i) all current, non-delinquent real estate taxes and assessments; (ii) all applicable local, state and federal laws, ordinances and regulations, including but not limited to building and zoning laws; (iii) all matters that would be disclosed by an accurate survey of the Real Estate; and (iv) easements, commitments, covenants, agreements and encumbrances of record.

TO HAVE AND TO HOLD the Real Estate to Grantee and Grantee's successors and assigns forever; and Grantor, for itself and its successors and assigns, covenants with Grantee, and its successors and assigns, that the Real Estate hereby conveyed is free from all encumbrances made or suffered by Grantor, except as aforesaid, and that Grantor will, and that its successors and assigns shall, warrant and defend the same to said Grantee and its successors and assigns against the lawful claims and demands of all persons claiming by, through or under Grantor, but against none other.

The undersigned person executing this Special Warranty Deed on behalf of Grantor represents and certifies that the undersigned is duly authorized and has been fully empowered to execute and deliver this Special Warranty Deed; that Grantor has full power and authority to convey the Real Estate; and that all necessary action for the making of such conveyance has been taken and done.

**[Signature Page Follows]**

IN WITNESS WHEREOF, Grantor has executed this Special Warranty Deed this ___ day of _____, 2019.

Fayette Memorial Hospital Association, Inc. d/b/a
Fayette Regional Health System,
An Indiana nonprofit corporation

By:_____

Name: Dan Parker

Title: Chair, Board of Directors

STATE OF _____)
                                 ) SS:

COUNTY OF _____)

Before me, a Notary Public in and for said County and State, personally appeared Dan Parker, the Board Chair of Fayette Memorial Hospital Association, Inc. d/b/a Fayette Regional Health System, an Indiana nonprofit corporation, and acknowledged the execution of the foregoing instrument in such capacity acting for and on behalf of said corporation, and who, having been duly sworn, stated that any representations therein contained are true and correct.

Witness my hand and Notarial Seal this _____ day of _____, 2019.

_____
(signature)                                        Notary Public

_____
(printed name)

My Commission Expires:          County of Residence:

_____          _____

Send tax statements to and Grantee's mailing address is:

_____

_____

This instrument was prepared by Alex Beatty, Ice Miller LLP, One American Square, Suite 2900, Indianapolis, Indiana 46282.

I affirm, under the penalties for perjury, that I have taken reasonable care to redact each Social Security number in this document, unless required by law.  Alex Beatty

## **EXHIBIT A TO SPECIAL WARRANTY DEED**

**LEGAL DESCRIPTION**